FARELLA BRAUN + MARTEL LLP
Douglas R. Young (SBN 073248)
Christopher C. Wheeler (SBN 224872)
Daniel A. Contreras (SBN 329632)
235 Montgomery Street, 17th Fl.
San Francisco, CA 94104
Tel.:  (415) 954-4400
dyoung@fbm.com
cwheeler@fbm.com
dcontreras@fbm.com

CRAVATH, SWAINE & MOORE LLP
Antony L. Ryan (admitted *pro hac vice*)
J. Wesley Earnhardt (admitted *pro hac vice*)
David H. Korn (admitted *pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Tel.:  (212) 474-1000
aryan@cravath.com
wearnhardt@cravath.com
dkorn@cravath.com

*Counsel for Defendant The Walt Disney Company*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEATHER BIDDLE, JEFFREY KAPLAN, ZACHARY ROBERTS, and JOEL WILSON, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>  v.<br><br>THE WALT DISNEY COMPANY, a Delaware corporation,<br><br>      Defendant. | **Case No.: 5:22-cv-07317-EJD**<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS THE PLAINTIFFS' COMPLAINT**<br><br>Hearing Date:  July 13, 2023<br><br>Hearing Time:  9:00 AM |

**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS
THE PLAINTIFFS' COMPLAINT**

TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on July 13, 2023, at 9:00 AM, or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Edward J. Davila, 280 South 1st St., San Jose, CA 95113, Courtroom 4, 5th Floor, Defendant The Walt Disney Company will and does hereby move the Court for an order dismissing the Complaint in the above-captioned action.  This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6), and is based upon this Notice of Motion and the Memorandum of Points and Authorities in Support and such argument as may be heard.

1

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................1

STATEMENT OF ALLEGED FACTS ...........................................................................3

    I.       THE PARTIES. ...........................................................................................3

    II.      STREAMING COMPANIES BEGIN DISTRIBUTING LINEAR TV
            THROUGH THE INTERNET .....................................................................4

    III.    PLAINTIFFS ALLEGE THAT ESPN NEGOTIATES CARRIAGE
            AGREEMENTS WITH vMVPDS THAT INCLUDE THE BASE TERM AND
            AN MFN CLAUSE. .....................................................................................5

ARGUMENT ......................................................................................................................7

    I.       PLAINTIFFS FAIL TO ALLEGE A *PER SE* VIOLATION. .................................8

    II.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE RULE OF REASON.
            .................................................................................................................11

            A.      Plaintiffs have not pleaded a relevant antitrust market in which Disney has
                     market power. ...............................................................................12

            B.      Plaintiffs have not identified agreements that unreasonably restrain trade.
                     .........................................................................................14

                  1.      The Base Term does not unreasonably restrain trade...................14

                  2.      The MFN Clauses do not unreasonably restrain trade. .................16

    III.    PLAINTIFFS' CLAIMS FOR DAMAGES ARE BARRED BY *ILLINOIS
            BRICK*. .....................................................................................................19

CONCLUSION..................................................................................................................20

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                                                          **Page(s)**

3   *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051 (9th Cir. 1999)..............................................12

4   *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781 (9th Cir. 1996).......................................................7

5   *Am. Channel, LLC v. Time Warner Cable, Inc.*, No. 06-cv-2175, 2007 WL 142173
        (D. Minn. Jan. 17, 2007) ...........................................................................................13
6
    *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019) ....................................................................19
7
    *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..........................................................................7, 8
8
    *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102 (9th Cir. 2021)....................11
9
    *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)........................................................7, 11
10
    *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir.
11      1995), *as amended on denial of reh'g* (Oct. 13, 1995) ...............................................16

12  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) ............................................ passim

13  *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1 (1979)...........................11

14  *Brown v. S. Nev. Adult Mental Health Servs.*, 2:13-cv-1039, 2014 WL 2807688 (D.
        Nev. June 20, 2014)..................................................................................................18
15
    *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988)..........................................8, 9
16
    *Cascade Cabinet Co. v. Western Cabinet & Millwork Inc.*, 710 F.2d 1366 (9th Cir.
17      1983)...................................................................................................................15, 18

18  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) ...................................17

19  *Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986), *as modified*, 810 F.2d
        1517 (9th Cir. 1987) ..................................................................................................9
20
    *Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680 (9th Cir. 2022) ...............................8, 12, 14
21
    *Frame-Wilson v. Amazon.com*, 591 F. Supp. 3d 975 (W.D. Wash. 2022) .........................9, 10, 11
22
    *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020) .............................................................12, 13
23
    *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018) ......................................................8, 13, 14
24
    *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).....................................................................3, 19
25
    *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481, 2014 WL 4277510
26      (S.D.N.Y. Aug. 29, 2014) ..........................................................................................19

27  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015) ...............8, 11

28

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, No. 09-mdl-2074, 2013
    WL 12130034 (C.D. Cal. July 19, 2013) ............................................................... 18

*Intel Corp. v. Fortress Invs. Grp. LLC*, No. 19-cv-07651, 2020 WL 6390499 (N.D.
    Cal. July 15, 2020) ................................................................................................... 13

*Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999) ..................................... 13

*Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327 (11th Cir. 2010) ................................ 10

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) ................................ 17

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ................... 8, 15

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207 (11th Cir. 2002) .................. 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...................... 18

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592 (11th Cir. 1986) .................... 8

*No Spill LLC v. Scepter Canada, Inc.*, No. 2:18-cv-2681, 2022 WL 1078435 (D.
    Kan. Apr. 6, 2022) .................................................................................................... 16

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883
    F.2d 1101 (1st Cir. 1989) ......................................................................................... 16

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ................................................... passim

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002
    (N.D. Cal. 2013) ......................................................................................................... 8

*Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098 (N.D. Cal. 2022) ................................... 12, 13

*Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013) ........................................................ 19

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) ........................................................................ 8

*Universal Grading Serv. v. eBay, Inc.*, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012) .......... 18

*Valley Surgical Ctr. LLC v. Cnty. of Los Angeles*, No. 13-cv-2265, 2015 WL
    3825310 (C.D. Cal. June 18, 2015) .......................................................................... 18

*Westpoint Pepperell, Inc. v. Rea*, No. C 77-2093, 1980 WL 1842 (N.D. Cal. 1980) .................. 10

**Statutes & Rules**

15 U.S.C. § 1 .......................................................................................................... passim

**Court Documents**

Third Amended Complaint, *Brantley v. NBC Universal, Inc.*, No. 07-cv-6101, ECF
    No. 184 (C.D. Cal. May 4, 2009) ............................................................................. 14

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed. 2015)....................................................................10, 19

## PRELIMINARY STATEMENT

Plaintiffs in this case and in a related action, *Fendelander v. The Walt Disney Company*, No. 22-cv-07533 (N.D. Cal.), seek to represent putative classes of subscribers to YouTube TV and DirecTV Stream, which are two internet-based linear television streaming services, referred to by the Complaints as services that stream "live TV".[1]  Plaintiffs do not claim to buy anything from The Walt Disney Company ("Disney").  Instead, Plaintiffs complain that the subscription fees they pay to YouTube TV and DirecTV Stream are too high, which Plaintiffs blame on those companies' separate contracts with ESPN, Inc. ("ESPN") to carry its leading sports network, the ESPN network.  Although the Complaints contain a lengthy history of the TV distribution industry, as well as other allegations unrelated to ESPN's contracts—such as those concerning Disney's majority stake in Hulu LLC ("Hulu"), which itself offers a linear television streaming service—those allegations are irrelevant to Plaintiffs' claims.

Plaintiffs' Complaints challenge just two alleged terms in ESPN's contracts with YouTube TV and DirecTV Stream, asserting that those terms violate Section 1 of the Sherman Act:  (1) the "Base Term", which requires YouTube TV and DirecTV Stream to include the ESPN network in the "base" (or lowest-priced) package they offer; and (2) most favored nation ("MFN") clauses that require ESPN to offer YouTube TV and DirecTV Stream pricing terms at least as favorable as the terms ESPN offers to other linear television programming distributors.  Plaintiffs' Complaints on their face misconstrue basic antitrust and economic concepts and should be dismissed in their entirety with prejudice.

*First*, Plaintiffs assert a *per se* violation of the Sherman Act, but they do not (and cannot) plead a plausible *per se* claim.  *Per se* violations require that the challenged restraint be horizontal—that is, concerted activity between competitors at a single level of the distribution

---

[1] The allegations in this case are substantively identical to those in the related *Fendelander* case.  The only differences are non-substantive and relate to the fact that *Fendelander* has been brought on behalf of a putative class of DirecTV Stream subscribers, whereas this case is brought on behalf of a putative class of YouTube TV subscribers.  For the convenience of the Court, Disney addresses both Complaints in this memorandum of points and authorities, and has filed substantively identical motions and supporting memoranda in both actions.

1   chain.  Here, the alleged restraints are terms in agreements pursuant to which ESPN (as a

2   television network programmer) sells distribution rights to its ESPN network to YouTube TV

3   and DirecTV Stream (as television network program distributors), who then package and resell

4   rights to watch scheduled programming on ESPN's networks (and other programmers' networks)

5   to consumers downstream for a fee.  In those arrangements, ESPN is a supplier of television

6   programming to YouTube TV and DirecTV Stream, not a competitor.  As a result, the

7   agreements at issue are vertical (not horizontal), and as a matter of law the *per se* standard does

8   not apply.  That Disney—ESPN's majority owner—also owns a controlling stake in a linear TV

9   streaming service (Hulu + Live TV) is irrelevant for determining the nature of the restraints

10  challenged here.  (*See* Argument § I.)

11          *Second*, Plaintiffs do not (and cannot) plead a Sherman Act claim under the rule

12  of reason.  To state a rule of reason claim, Plaintiffs must plead both (i) a viable antitrust market

13  in which there has been harm to competition; and (ii) unreasonable restraints of trade in that

14  market plausibly causing harm to competition.  Plaintiffs plead neither.

15          <u>*Plaintiffs Fail to Plead a Relevant Antitrust Market.*</u>  Because the allegedly

16  anticompetitive conduct concerns contractual terms for programming rights, the relevant market

17  for any antitrust claim would be the market in which such negotiations occur—that is, the market

18  in which TV programmers sell linear network distribution rights to distributors.  But Plaintiffs

19  ignore that market entirely.  Plaintiffs reference only a different, downstream market—the

20  market in which distributors sell linear television streaming subscriptions to consumers.  Because

21  Plaintiffs have failed to plead the market in which the challenged restraint supposedly harmed

22  competition, Plaintiffs' rule of reason claim fails.  (*See* Argument § II.A.)

23          <u>*Plaintiffs Fail to Plead an Unreasonable Restraint of Trade.*</u>  Neither the Base

24  Term nor the MFN clauses plausibly can be unreasonable restraints of trade.  For the Base Term,

25  the Ninth Circuit already has rejected challenges to such terms as ***not*** plausibly anticompetitive.

26  *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012).  And for good reason:

27  "'[c]ompelling the purchase of unwanted products' is not itself an injury to competition", even if

28  it has "the effect of reducing consumers' choices or increasing prices to consumers".  *Id.* at 1202-

03.  Likewise, Plaintiffs' conclusory assertion that the MFN clauses create "upward price pressure" is directly contradicted by Plaintiffs' own allegations about what the MFN provisions actually do, *i.e.*, create price ***ceilings*** that benefit distributors, such as YouTube TV and DirecTV Stream, to the detriment of ESPN.  It is implausible that a term that creates a price ceiling— which is imposed on ESPN by distributors—functions to benefit ESPN by raising the price ESPN can charge distributors, let alone that it then also raises the price that distributors charge consumers, such as Plaintiffs.  (*See* Argument § II.B.)

*Third*, even if Plaintiffs had stated a claim, they lack standing to recover damages.  Under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), private antitrust plaintiffs must be direct purchasers from the alleged antitrust violator to recover damages.  Plaintiffs do not claim to have purchased anything from Disney.  Rather, Plaintiffs allege that distributors "have to bear and pass on the cost" of the ESPN network to subscribers like Plaintiffs, which is precisely the sort of alleged "pass-on" injury that the Supreme Court rejected in *Illinois Brick*.  (*See* Argument § III.)

## STATEMENT OF ALLEGED FACTS

The following facts are taken from the Complaints.  Disney assumes these facts to be true only for purposes of this motion.

## I.    THE PARTIES.

Plaintiffs are nine individuals who currently subscribe to either YouTube TV or DirecTV Stream.  (*Biddle* ¶¶ 9-12; *Fendelander* ¶¶ 9-13.[2])  YouTube TV and DirecTV Stream are virtual multichannel video programming distributors ("vMVPDs"), services that transmit linear television networks on a subscription basis via the internet rather than by cable or satellite.  Linear television networks stream scheduled programming 24 hours a day—what the Complaints refer to as "live TV"—which is in contrast to "on demand" services (such as Netflix) that allow consumers to choose particular programs to watch when they want to watch them.  (*Biddle* ¶¶ 16, 231; *Fendelander* ¶¶ 17, 234.)  Plaintiffs allege that they pay "an anticompetitive overcharge"

---

[2] Citations to *"Biddle"* refer to the Complaint in *Biddle v. The Walt Disney Company*, No. 22-cv-07317 (N.D. Cal.), while citations to "*Fendelander*" refer to the Complaint in *Fendelander v. The Walt Disney Company*, No. 22-cv-07533 (N.D. Cal.).

for their subscriptions "by reason of Disney's anticompetitive agreements" with vMVPDs. (*Biddle* ¶ 372; *Fendelander* ¶ 375.)  Plaintiffs do not claim to be party to those agreements.

The sole Defendant in this case is Disney.  (*Biddle* ¶ 14; *Fendelander* ¶ 15.) Disney operates a range of businesses, including "theme parks, movie studios, cruise ships, consumer products and the ABC TV network".  (*Biddle* ¶ 43; *Fendelander* ¶ 46.)  Disney also is the majority owner of ESPN and, separately, the majority owner of Hulu.  (*Biddle* ¶ 16; *Fendelander* ¶ 17.)  ESPN is a television programmer, with several networks, that "provides sports coverage as part of cable packages throughout the United States".  (*Biddle* ¶ 27; *Fendelander* ¶ 30.)  Hulu is a video streaming company that offers, among other products, a linear television streaming service called Hulu + Live TV.  (*Biddle* ¶ 16; *Fendelander* ¶ 17.) Plaintiffs allege that Disney owns controlling interests in ESPN and Hulu and has operational control over the two companies, but Plaintiffs acknowledge that those two companies are each joint ventures:  Disney owns 80% of ESPN (the remainder is owned by Hearst Corporation) and 67% of Hulu (the remainder is owned by NBCUniversal Media, LLC).  (*Id.*)

## II.   STREAMING COMPANIES BEGIN DISTRIBUTING LINEAR TV THROUGH THE INTERNET.

As alleged at length in the Complaints, until recently, linear television distribution was dominated by cable and satellite providers—so-called multichannel video programming distributors or "MVPDs".  (*Biddle* ¶¶ 63, 132; *Fendelander* ¶ 66, 135.)  MVPDs negotiate "carriage agreements" with TV programmers (like ESPN), which give MVPDs the right to distribute a programmer's linear television networks.  (*Id.*)  MVPDs then aggregate networks from numerous programmers, and sell those networks in a package to consumers.  (*Biddle* ¶¶ 299-300; *Fendelander* ¶¶ 302-303.)  Those packages are the traditional cable and satellite TV packages with which most people are familiar.  (*Biddle* ¶ 133; *Fendelander* ¶ 136.)

As the internet became "a viable distribution channel" for TV networks, a new form of distribution emerged.  (*Biddle* ¶¶ 74, 85; *Fendelander* ¶¶ 77, 88.)  Distributors that stream linear television networks over the internet—such as YouTube TV and DirecTV Stream—came to be known as *virtual* multichannel video programming distributors or

"vMVPDs".  (*Biddle* ¶ 132; *Fendelander* ¶ 135.)  "To consumers, the new vMVPDs served the same role as traditional cable and satellite TV providers, and quickly [be]came potential alternatives to legacy/traditional cable/satellite pay TV."  (*Biddle* ¶ 133; *Fendelander* ¶ 136.)  Plaintiffs assert that vMVPDs are distinct from services that stream movies or TV shows on demand over the internet, such as Netflix and the Hulu video-on-demand service (as opposed to Hulu + Live TV).  As Plaintiffs put it, vMVPDs are not to be confused with "streaming on-demand providers, like Netflix, as vMVPDs package[] live pay TV channels from various sources into a single bundle, much like traditional MVPDs (*i.e.*, legacy cable and satellite TV providers)".  (*Id.*)  In this way, "vMVPD services resemble the familiar layout of cable packages where users can browse a guide or flip through channels that stream programming 24 hours a day".  (*Id.*)

## III.   PLAINTIFFS ALLEGE THAT ESPN NEGOTIATES CARRIAGE AGREEMENTS WITH vMVPDS THAT INCLUDE THE BASE TERM AND AN MFN CLAUSE.

As with traditional MVPDs that have existed for decades, vMVPDs negotiated carriage agreements with ESPN so that they could distribute ESPN's linear television network to their subscribers.  (*Biddle* ¶¶ 167, 183, 210-211; *Fendelander* ¶¶ 170, 186, 213-214.)  Those carriage agreements govern the terms pursuant to which ESPN grants the vMVPDs the rights to distribute the ESPN network and other networks in the ESPN family.  (*Biddle* ¶ 163; *Fendelander* ¶ 166.)

Like many television programmers, ESPN generates a portion of its revenue through "affiliate fees", which are fees paid by TV distributors to ESPN each month based on the number of households that subscribe to the channel.  (*Biddle* ¶¶ 45, 47; *Fendelander* ¶¶ 48, 50.)  ESPN also generates revenue through advertising, the amount of which is largely a function of a network's reach and popularity.  (*Biddle* ¶ 283; *Fendelander* ¶ 286.)  For both those reasons, it always has been important for ESPN to maximize the total number of subscribers to its linear television network.

ESPN, therefore, negotiates for provisions in its carriage agreements with vMVPDs that obligate those distributors to include the ESPN network in their base product (*i.e.*,

1    their basic package of channels sold to subscribers).  (*Biddle* ¶ 4; *Fendelander* ¶ 4.)  The result,

2    Plaintiffs claim, is that all subscribers to that TV distributor—no matter the package they

3    purchase—will receive the ESPN network.  Plaintiffs call this ESPN's "Base Term".  (*Biddle*

4    ¶¶ 54, 307; *Fendelander* ¶¶ 57, 310.)

5            But obtaining the Base Term in a carriage agreement ordinarily requires

6    compromise on ESPN's part.  Plaintiffs allege that most TV distributors demand, among other

7    things, that ESPN's carriage agreements also include a "most favored nation" provision

8    regarding the ESPN affiliate fee (the "MFN Clause").  (*Biddle* ¶ 312; *Fendelander* ¶ 315.)

9    Plaintiffs allege that MFN Clause requires ESPN "to provide the counterparty with the lowest

10   price for ESPN and other channels offered to any other market participant".  (*Id.*)  So if, for

11   example, ESPN discounts the ESPN network affiliate fee for one distributor, it must offer

12   comparable terms to all distributors with an applicable MFN Clause, whether ESPN wants to or

13   not.  (*Biddle* ¶ 62; *Fendelander* ¶ 65.)  As the *Hollywood Reporter* explained (in an article

14   incorporated by reference into the Complaints), such MFN clauses "equal the playing field"

15   among TV distributors, preventing ESPN from charging a higher affiliate fee for the ESPN

16   network to a distributor who negotiated for an applicable MFN Clause.  (*Biddle* ¶ 65;

17   *Fendelander* ¶ 68.)

18           Negotiations between ESPN and vMVPDs over the Base Term and MFN Clause

19   have been extremely hard fought.  For instance, in 2021, ESPN negotiated a carriage agreement

20   with Google's YouTube TV.  (*Biddle* ¶ 184; *Fendelander* ¶ 187.)  At first, "Google publicly

21   threatened to offer a baseline YouTube TV package without ESPN if it could not reach a carriage

22   agreement with Disney".  (*Biddle* ¶ 185; *Fendelander* ¶ 188.)  As described in the Complaints,

23   the "sticking point" for Google was its desire to have "an MFN agreement that would ensure

24   price and term parity" with other distributors.  (*Biddle* ¶ 186; *Fendelander* ¶ 189.)  "The press

25   continued to report that negotiations had stalled . . . over MFN terms", as Google was "seeking

26   to ensure that a lower price for Disney-owned content (principally, ESPN) offered to another

27   streaming live TV provider would be offered to Google as well".  (*Biddle* ¶¶ 188-189;

28   *Fendelander* ¶¶ 191-192.)

1  True to its word, on December 18, 2021, Google chose to let its existing carriage

2  agreement lapse, at which point YouTube TV subscribers lost access to the ESPN family of

3  networks.  (*Biddle* ¶ 190; *Fendelander* ¶ 193.)  Ultimately, according to Plaintiffs, the parties

4  entered into a carriage agreement containing both the Base Term and an MFN Clause.  (*Biddle*

5  ¶¶ 194-195; *Fendelander* ¶¶ 197-198.)

6  Similarly, in October 2022, ESPN's carriage agreement with Sling TV, another

7  vMPVD, expired.  (*Biddle* ¶ 204; *Fendelander* ¶ 207.)  After its subscribers lost access to

8  ESPN's networks for two days, Sling TV agreed to a "handshake deal" on a new carriage

9  agreement, which Plaintiffs allege included both the Base Term and an MFN Clause.  (*Biddle*

10  ¶¶ 210, 212; *Fendelander* ¶¶ 213, 215.)  Distribution of the ESPN network on Sling TV was

11  quickly restored.  (*Biddle* ¶ 211; *Fendelander* ¶ 214.)

12  <u>**ARGUMENT**</u>

13  "In order to prevail on a cause of action for violation of 15 U.S.C. § 1, a plaintiff

14  must show (1) there was an agreement, conspiracy, or combination between two or more entities;

15  (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason

16  analysis; and (3) the restraint affected interstate commerce."  *Am. Ad Mgmt., Inc. v. GTE Corp.*,

17  92 F.3d 781, 784 (9th Cir. 1996).  Private plaintiffs must also demonstrate that "they were

18  harmed by the defendant's anti-competitive contract, combination or conspiracy, and that this

19  harm flowed from an 'anti-competitive aspect of the practice under scrutiny'".  *Brantley*, 675

20  F.3d at 1197.

21  "To survive a motion to dismiss, a complaint must contain sufficient factual

22  matter, accepted as true, to 'state a claim to relief that is plausible on its face'."  *Hicks v. PGA*

23  *Tour, Inc.*, 897 F.3d 1109, 1117 (9th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

24  (2009)).  Facial plausibility, in turn, requires a plaintiff to allege "more than labels and

25  conclusions, and a formulaic recitation of the elements of a cause of action will not do".  *Bell*

26  *Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The Court need not assume the truth of

27  legal conclusions merely because they are cast in the form of factual allegations.  *Id.*  "Applying

28

this standard is a 'context-specific task' that requires [the Court to] draw[] on 'judicial experience and common sense'." *Hicks*, 897 F.3d at 1117 (quoting *Iqbal*, 556 U.S. at 679).

## I.      PLAINTIFFS FAIL TO ALLEGE A *PER SE* VIOLATION.

A challenged restraint is unreasonable under the Sherman Act only if it is *per se* unlawful or because it fails the rule of reason analysis. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018); *Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 688 (9th Cir. 2022). Only agreements that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality" are subject to *per se* treatment. *Flaa*, 55 F.4th at 688. Courts start from the general assumption that the rule of reason applies. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

Plaintiffs' *per se* claims should be dismissed because Plaintiffs do not (and cannot) allege the type of extraordinary facts necessary to deviate from the default rule of reason standard. *See Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002, 1007-10 (N.D. Cal. 2013) (disposing of *per se* claims on a motion to dismiss); *see also Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 596 (11th Cir. 1986) ("Whether to apply a per se or rule of reason analysis is a question of law . . . .").

*First*, the challenged restraints are vertical. Antitrust conspiracies are generally classified as either "vertical" or "horizontal", a categorization that describes the way in which the alleged conspirators relate to one another in the product distribution chain in connection with the challenged restraint. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015). Restraints "imposed by agreement between firms at different levels of distribution"—*e.g.*, between a supplier and distributor—are vertical. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988). "Vertical agreements . . . are analyzed under the rule of reason." *Musical Instruments & Equip.*, 798 F.3d at 1191-92; *see also Am. Express*, 138 S. Ct. at 2283-84 ("Typically only 'horizontal restraints' . . . qualify as unreasonable *per se*."); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007) (holding that vertical restraints "are to be judged according to the rule of reason").

Here, the challenged restraints are terms in carriage agreements that certain vMVPDs allegedly executed with ESPN. Those contracts are between firms acting at different levels of distribution: ESPN (acting as a TV programmer that supplies linear television networks to distributors) and vMVPDs (acting as the distributors who package the ESPN network together with other linear television networks for resale to consumers). As shown in Figure 1 below, that relationship is vertical. *See Bus. Elecs.*, 483 U.S. at 730.

**Figure 1: Industry Structure**



Because Plaintiffs have not alleged a horizontal restraint—that is, an agreement between competitors at the same level of the distribution chain—the *per se* rule cannot apply, and any *per se* claims must be dismissed. *See, e.g.*, *Frame-Wilson v. Amazon.com*, 591 F. Supp. 3d 975, 987-88 (W.D. Wash. 2022) ("Absent plausible allegations of a horizontal arrangement— or any legal authority supporting *per se* analysis in the absence of a horizontal agreement or inference thereof—the Court concludes that Plaintiffs' allegations of a *per se* violation fail as conclusory and unsupported.").

That Disney, ESPN's majority owner, also owns a majority stake in Hulu, which operates Hulu + Live TV, a vMVPD, does not convert this challenged vertical arrangement into a horizontal one. Whether a restraint is horizontal or vertical is determined by reference to the parties' relationship *with respect to the agreement at issue*. *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1481 (9th Cir. 1986), *as modified*, 810 F.2d 1517 (9th Cir. 1987) ("We have

categorized restrictions imposed in the context of dual distributorships as vertical and analyzed them under the rule of reason."); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1331-32, 1340-43 & n.15 (11th Cir. 2010) (holding that a manufacturer's imposition of a minimum sale price on third-party distributors did not constitute a horizontal restraint, even though the manufacturer also directly distributed some of its own products); *Westpoint Pepperell, Inc. v. Rea*, No. C 77-2093, 1980 WL 1842, at *6 (N.D. Cal. 1980) (concluding that a dual distributor's market allocation requirements for third-party distributors were vertical restraints because "there is no evidence in this record which would permit the drawing of any inference that . . . [defendant] was acting in its role as a competitor to its distributors"); *see also Brantley*, 675 F.3d at 1195 nn.1-2, 1198-99 (concluding that the challenged restraints between TV programmers and TV distributors were "vertical agreements" even though a programmer defendant (Turner Broadcasting System, Inc.) and a distributor defendant (Time Warner Cable Inc.) were both part of the Time Warner corporate family); 8 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1605 & n.8 (4th ed. 2017) ("Most recent decisions have unsurprisingly concluded that dual distribution restraints are vertical and therefore subject to the rule of reason." (collecting cases)).

Here, the challenged agreement is made as part of a typical supplier/distributor relationship, which is vertical. *Frame-Wilson v. Amazon.com* is instructive on this point. The defendant in that case was Amazon, a vertically integrated company that acts as both an online marketplace and "an online retailer, selling its own products directly" on its website. 591 F. Supp. 3d at 980-81. The challenged restraint was an agreement between Amazon and third-party sellers about the terms on which those sellers could use Amazon's marketplace. *Id.* at 981, 986. The plaintiffs said the agreement was horizontal because Amazon competes with those third-party sellers when it sells products on its website. *Id.* at 980-81, 986. The court rejected that argument because the plaintiffs were "not challenging Amazon's conduct as a competitor to its third-party sellers" but rather "the vertical agreement between third-party sellers and their *host platform*". *Id.* at 986-88. Thus, the court concluded the alleged restraint was vertical and subject to the rule of reason.

So too here.  Even if Hulu + Live TV competes with vMVPDs, Plaintiffs "are not challenging [Disney's] conduct *as a competitor* to" vMVPDs.  *Id.* at 986 (emphasis added). Plaintiffs do not allege that Hulu (or Disney through Hulu) entered into any horizontal agreements with YouTube TV or DirecTV Stream.  Put differently, the Complaints do not even attempt to identify "who . . . conspired with whom, what exactly they agreed to, and how the alleged conspiracy was organized and carried out" between competitors (such as Hulu + live TV and YouTube TV) at the vMVPD level; that is not the theory of Plaintiffs' Complaints.  *Musical Instruments*, 798 F.3d at 1193 nn.5-6; *see also Twombly*, 550 U.S. at 565 n.10.  In fact, Plaintiffs do not challenge any conduct by or agreement with Hulu at all.  Rather, Plaintiffs are challenging purely vertical agreements pursuant to which ESPN supplies its network to YouTube TV and DirecTV Stream, services to which Plaintiffs then subscribed.

*Second*, even if the challenged agreements were considered horizontal—and it is hard to see how they could be—Plaintiffs still have not stated a *per se* claim.  *Per se* condemnation is reserved for a "small group" of specified restraints with which courts have sufficient experience to know that they nearly always create unreasonable restraints on trade, such as agreements to fix prices, rig bids, or allocate markets.  *Am. Express*, 138 S. Ct. at 2283; *see also Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 9-10 (1979) ("[I]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations[.]"); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021) (identifying the prototypical examples of *per se* unlawful restraints). Plaintiffs allege nothing of the sort here.  The Court should dismiss Plaintiffs' *per se* claims.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE RULE OF REASON.

Plaintiffs alternatively assert a Sherman Act violation under the rule of reason. That claim must be dismissed for two independent reasons:  (i) Plaintiffs have not pleaded a relevant antitrust market in which competition was harmed, much less that Disney has market power in that relevant market; and (ii) Plaintiffs have not plausibly alleged any unreasonable restraint of trade.

**A.**      **Plaintiffs have not pleaded a relevant antitrust market in which Disney has market power.**

"A threshold step in any antitrust case is to accurately define the relevant market." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Am. Express*, 138 S. Ct. at 2285); *see also Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1109 (N.D. Cal. 2022).  That is because "[w]ithout a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition".  *Am. Express*, 138 S. Ct. at 2285.

Defining a relevant market is particularly important in cases—like this one—that concern a vertical restraint.  Vertical restraints "often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market".  *Id.* at 2285 n.7.  Absent a properly pleaded relevant market, Plaintiffs' rule of reason claims must be dismissed.  *See Flaa*, 55 F.4th at 693; *Reilly*, 578 F. Supp. 3d at 1109.

Plaintiffs' claim fails at this threshold step.  The relevant market is the one "where competition is allegedly being restrained".  *Qualcomm*, 969 F.3d at 992 (brackets omitted) (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1057 (9th Cir. 1999)); *see also Am. Express*, 138 S. Ct. at 2285 & n.7; *Flaa*, 55 F.4th at 693; *Reilly*, 578 F. Supp. 3d at 1109.  Here, Plaintiffs' challenge is limited to the Base Term and MFN Clauses, two provisions in contracts between ESPN and vMVPDs that, according to Plaintiffs, increase vMVPDs' costs and limit their freedom to develop certain products.  (*Biddle* ¶¶ 309, 323, 361-366; *Fendelander* ¶¶ 312, 326, 364-369.)  Thus, the relevant market is the one in which those programmer-distributor negotiations occur.

Plaintiffs do not even attempt to plead the contours of that market.  The only market identified in Plaintiffs' Complaints is a supposed "Streaming Live Pay TV Market" (or "SLPTV Market"), in which ***consumers*** purchase packages of linear programming networks ***from vMVPDs***.  (*Biddle* ¶¶ 223-303; *Fendelander* ¶¶ 226-306.)  That SLPTV Market is downstream—*i.e.*, further along in the distribution chain—from the market in which the challenged restraints allegedly occurred. (*See* Figure 1.)

1    Because the only market Plaintiffs attempt to define is not the market in which the

2 challenged restraints actually are alleged to have occurred, Plaintiffs have failed to plead the

3 market necessary to their Section 1 claims. *See Qualcomm*, 969 F.3d at 992; *see also Maris*

4 *Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1214 (11th Cir. 2002); *Intergraph Corp. v.*

5 *Intel Corp.*, 195 F.3d 1346, 1354 (Fed. Cir. 1999).[3]

6    This is not a mere technicality or triviality.

7    For one thing, without an adequately pleaded market, the Court cannot assess the

8 "area of effective competition" in which the challenged restraints are taking place, which is the

9 *sine qua non* of any rule of reason case. *See Am. Express*, 138 S. Ct. at 2285; *see also*

10 *Qualcomm*, 969 F.3d at 992; *Reilly*, 578 F. Supp. 3d at 1109; *Intel Corp. v. Fortress Invs. Grp.*

11 *LLC*, No. 19-cv-07651, 2020 WL 6390499, at *7, *9 (N.D. Cal. July 15, 2020) (noting that a

12 Section 1 claim cannot survive on "*no* market analysis").

13    Similarly, because Plaintiffs have failed to plead the relevant market, they

14 necessarily also have failed to plead that ESPN plausibly has market power ***in that market***. *See,*

15 *e.g.*, *Am. Express*, 138 S. Ct. at 2285 & n.7. Plaintiffs' allegations concerning Hulu's market

16 share—as well as the market share of other vMVPDs—in the downstream SLPTV Market have

17 no bearing on whether ESPN has market power in the relevant market in which television

18 programmers sell networks to television distributors. *See Maris Distrib.*, 302 F.3d at 1214-15

19 (refusing to credit power in one market to a separate market); *Intergraph*, 195 F.3d at 1354.

20 Absent plausible allegations that ESPN has power in that relevant market—a market overrun by

21 ─────────────

22    [3] Even if the market in which consumers purchase linear television programming services
were the relevant market, Plaintiffs' market allegations would still be facially defective.

23 Plaintiffs have defined that market as limited to services sold by vMVPDs, alleging that
traditional MVPDs are not substitutes for vMVPDs because of technological differences between

24 the two. (*Biddle* ¶¶ 231, 233, 262-263; *Fendelander* ¶¶ 234, 236, 265-266.) But Plaintiffs' own
allegations demonstrate that consumers frequently switch from MVPDs to vMVPDs (*Biddle*

25 ¶¶ 112, 133, 231, 233, 262-263; *Fendelander* ¶¶ 115, 136, 234, 236, 265-266), which is the
hallmark of economic substitutes found within the same market, *Hicks*, 897 F.3d at 1121. That

26 MVPDs and vMVPDs distribute networks through different technological means is therefore
irrelevant—a fact that courts have recognized in the context of satellite and cable providers. *See,*

27 *e.g.*, *Am. Channel, LLC v. Time Warner Cable, Inc.*, No. 06-cv-2175, 2007 WL 142173, at *9

28 (D. Minn. Jan. 17, 2007).

other major programmers, such as NBC, CBS, Discovery, Fox Sports, *etc.*—Plaintiffs cannot state a rule of reason claim. *See Am. Express*, 138 S. Ct. at 2285 n.7; *Flaa*, 55 F.4th at 693 ("Under the rule of reason . . . the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market.").

**B.    Plaintiffs have not identified agreements that unreasonably restrain trade.**

Plaintiffs also fail to state a rule of reason claim for the independent reason that the Complaints do not plausibly allege an unreasonable restraint of trade. *See Hicks*, 897 F.3d at 1117 (complaint must "state a claim to relief that is plausible on its face"). Under the rule of reason, an unreasonable restraint is one that "actually injures competition" in the relevant market. *Brantley*, 675 F.3d at 1197. Plaintiffs' claim rests on two contractual terms, neither of which plausibly cause such injury.

**1.    The Base Term does not unreasonably restrain trade.**

Plaintiffs contend that the Base Term unreasonably restrains trade by preventing vMVPDs from offering cheaper "skinny bundles" of TV networks without the ESPN network. (*Biddle* ¶¶ 309, 366; *Fendelander* ¶¶ 312, 369.) That argument is foreclosed by the Ninth Circuit's decision in *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012).

In *Brantley*, a putative class of linear television network subscribers sued various linear television programmers and distributors, challenging two provisions in the programmer-distributor contracts. *Id.* at 1195-96, 1200. The plaintiffs challenged a provision in agreements between linear television programmers (such as ESPN) and linear television distributors (such as cable and satellite companies) that required the distributors to include the programmers' low- and high-demand networks in the distributors' cable and satellite packages, rather than allowing the distributors to make only select networks available to their subscribers. *Id.* at 1201. In addition, the *Brantley* plaintiffs alleged (just as Plaintiffs do in this case) that the programmers contractually required the distributors to include certain of the programmers' networks in the distributors' basic tier of packages, which forced consumers to take from the distributors networks they did not want. (Third Am. Compl. ¶ 44, *Brantley v. NBC Universal, Inc.*, No. 07-cv-6101, ECF No. 184 (C.D. Cal. May 4, 2009).) The *Brantley* plaintiffs claimed that those

contractual provisions, together and independently, "limit[ed] the manner in which Distributors compete with one another in that Distributors are unable to offer a la carte programming [to consumers], which . . . reduc[es] consumer choice, and . . . increas[es] prices". *Brantley*, 675 F.3d at 1201.

The Ninth Circuit held on appeal from the grant of a motion to dismiss for failure to state a claim that those restraints, either individually or in the aggregate, did not cause "a cognizable injury to competition", and, therefore, could not plausibly support a Section 1 claim. *Id.* at 1202. Specifically, the court explained that the challenged conduct—forcing consumers to pay for unwanted networks in order to purchase the networks they did in fact want—constituted a form of tying arrangement. *Id.* at 1199-1200. But "tying arrangements, without more, do not necessarily threaten an injury to competition", since "[c]ompelling the purchase of unwanted products is not itself an injury to competition". *Id.* at 1201, 1203. That remains so even where a distribution contract requires the distributor to sell products in a package, as "Section 1 does not proscribe all contracts that limit the freedom of the contracting parties". *Id.* at 1201-02. Indeed, because the challenged restraints were imposed by the programmers and not the distributors, the court noted that "any competitive threat" the alleged packaging requirements might pose was even further "diminished". *Id.* at 1203 n.12 ("If . . . a manufacturer adopted the policy independent of retailer pressure, the restraint is less likely to promote anticompetitive conduct." (quoting *Leegin*, 551 U.S. at 898)).

The Ninth Circuit went on to conclude that the harms the *Brantley* plaintiffs said they experienced as a result of the challenged restraints—higher prices and reduced choice as linear television network subscribers—were insufficient to allege an injury to competition. *Id.* at 1202. "Both effects are fully consistent with a free, competitive market." *Id.* Thus, while the allegations showed that "plaintiffs ha[d] [themselves] been harmed as a result of the practices at issue", the allegations did not demonstrate that "those practices [we]re anticompetitive". *Id.* at 1202-03. And since the antitrust laws exist to protect competition, not individuals, the complaint failed to state a claim. *Id.* at 1203-04; *see also Cascade Cabinet Co. v. W. Cabinet & Millwork Inc.*, 710 F.2d 1366, 1374 (9th Cir. 1983) ("The Sherman Act was enacted to protect

competition in the marketplace.  It was not designed, and has never been interpreted, to reach all business practices, unfair or otherwise, damaging to individual companies.").

Plaintiffs' challenge to the Base Term in ESPN's contracts with YouTube TV and DirecTV Stream is squarely foreclosed by *Brantley*.  Just like the plaintiffs in *Brantley*, Plaintiffs here allege that the Base Term forces distributors of linear television networks to include the ESPN network in the basic or entry package sold to consumers, which they allege raises prices and reduces choice.  (*Biddle* ¶¶ 361, 366; *Fendelander* ¶¶ 364, 369.)  In *Brantley*, the Ninth Circuit held that virtually identical allegations failed to state a claim under the Sherman Act.  *See Brantley*, 675 F.3d at 1202-04.  Thus, for the same reasons, Plaintiffs have not plausibly alleged that the Base Term unreasonably restrains trade under governing Ninth Circuit law.  *Id.*

### 2.      The MFN Clauses do not unreasonably restrain trade.

Plaintiffs' challenge to the MFN Clauses fails because Plaintiffs' theory of how the MFN Clauses operate to supposedly harm competition is contradicted both by Plaintiffs' own allegations and basic economic logic.

MFN, or "most favored nation", provisions are contract terms that typically exist in certain situations when a seller contracts with multiple, similarly situated buyers.  If the buyers want assurance that the terms they receive are at least as favorable as those of their peers, the buyers may ask for MFN provisions.  Typically, MFN clauses are not initiated or preferred by the seller; they instead are "standard devices by which buyers try to bargain for low prices".  *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995), *as amended on denial of reh'g* (Oct. 13, 1995).  In the language of the Sherman Act, MFN provisions are "the sort of conduct that the antitrust laws seek to encourage", not prohibit.  *Id.*; *see also Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1110 (1st Cir. 1989) ("[A] policy of insisting on a supplier's lowest price . . . tends to further competition on the merits . . . ."); *No Spill LLC v. Scepter Can., Inc.*, No. 2:18-cv-2681, 2022 WL 1078435, at *7 (D. Kan. Apr. 6, 2022) ("A most-favored-nation clause does not harm competition absent additional factual allegations.").

Despite this common-sense economic understanding of the protections MFN clauses afford purchasers of products, Plaintiffs' theory is that the challenged MFN Clauses somehow harm competition by creating a price floor for the ESPN network, thereby raising the cost to subscribers to vMVPDs' packages.  (*Biddle* ¶¶ 197, 209, 319; *Fendelander* ¶¶ 200, 212, 322.)  That theory, frankly, makes no sense.  As the Complaints themselves explain, the MFN Clauses at issue here operate to give vMVPDs the ***option*** to pay the ***lowest*** price available for the ESPN network; they do not ***require*** vMVPDs to take the ***highest***.  (*Biddle* ¶ 312; *Fendelander* ¶ 315.)  The challenged MFN Clauses do not create a price floor; they create a price ceiling.

Indeed, according to the Complaints, it was ***the vMVPDs***, the buyers, that sought to include the MFN Clauses in the carriage agreements.  (*Biddle* ¶¶ 186, 188, 189, 191, 195; *Fendelander* ¶¶ 189, 191, 192, 194, 198.)  The Complaints repeatedly allege that Disney fervently resisted those provisions—to the point that, according to Plaintiffs, they played a role in the breakdown of negotiations with certain vMVPDs.  (*Biddle* ¶¶ 190-191, 204-205; *Fendelander* ¶¶ 193-194, 207-208.)[4]  It is simply implausible that provisions sought by the

---

[4] *See also* Steve Dent, *YouTube TV may lose ESPN, ABC, FX and other Disney channels this week*, Engadget (Dec. 14, 2021), https://www.engadget.com/you-tube-tv-may-lose-espn-abc-fx-and-other-disney-channels-this-week-090746003.html (last visited Jan. 27, 2023) (quoting Google's statement that their "ask of Disney . . . is to treat YouTube TV like any other TV provider—by offering us the same rates"); Jon Brodkin, *YouTube TV warns it may lose all Disney-owned channels amid contract dispute*, Ars Technica (Dec. 14, 2021), https://arstechnica.com/information-technology/2021/12/youtube-tv-warns-it-may-lose-all-disney-owned-channels-amid-contract-dispute/ (last visited Jan. 27, 2023) ("YouTube's statement . . . indicates that it is seeking a most-favored-nation clause from Disney."); Rakesh Sharma, *YouTube TV Reaches Agreement to Keep Disney (DIS) Channels*, Investopedia (Dec. 20, 2021), https://www.investopedia.com/youtube-tv-reaches-agreement-with-disney-5213780 (last visited Jan. 27, 2023) ("The contractual clause is known as the Most Favored Nation clause and requires Disney to match its carriage rates . . . . Disney resisted the change.").  The Complaints include quotes from each of those articles, and rely on those articles' descriptions of carriage agreement negotiations between ESPN and various vMVPDs to support Plaintiffs' claims that the Base Term and MFN clauses are anticompetitive.  (*See Biddle* ¶¶ 185-188, 194-195; *Fendelander* ¶¶ 188-190, ¶¶ 197-198.)  Because Plaintiffs "refer[] extensively" to these articles and also because Plaintiffs use the content of the articles to "form[] the basis of [their] claims", they are incorporated by reference into the Complaints.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002-05 (9th Cir. 2018); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) ("Plaintiffs directly quoted the material posted on these web pages, thereby incorporating them into the Complaint.").

vMVPDs and resisted by ESPN—provisions that, by their very terms, give the MVPDs the option to force ESPN to charge them less to distribute the ESPN network—could somehow operate to ESPN's advantage, allowing ESPN to raise prices above a competitive level.

Put simply, Plaintiffs' own allegations suggest that the MFN Clauses benefit vMVPDs—and benefit competition—by allowing for an "equal . . . playing field" in their dealings with ESPN.  (*Biddle* ¶ 65; *Fendelander* ¶ 68.)  According to Plaintiffs' own allegations, vMVPDs with such clauses in their carriage agreement can force ESPN to give them the ***best*** price.[5]  (*Biddle* ¶ 312; *Fendelander* ¶ 315.)  The only plausible effect such MFN Clauses could have downstream on the price that consumers pay for linear television networks is to lower it.  It is axiomatic that Plaintiffs cannot recover on the basis of an alleged restraint from which they in fact benefit.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986) (no antitrust recovery where the plaintiff benefits); *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, No. 09-mdl-2074, 2013 WL 12130034, at *9 (C.D. Cal. July 19, 2013) (same).

Plaintiffs' conclusory assertions to the contrary—that Disney forced the MFN Clauses onto unwilling vMVPDs in order to create a price floor—should not be accepted because those assertions "defy common sense", *Brown v. S. Nev. Adult Mental Health Servs.*, 2:13-cv-1039, 2014 WL 2807688, at *4, *6 (D. Nev. June 20, 2014), violate basic economic logic, *Universal Grading Serv. v. eBay, Inc.*, No. 09-cv-2755, 2012 WL 70644, at *5 (N.D. Cal. Jan. 9, 2012), and are "internally inconsistent" with more particularized factual allegations in the Complaints, *Valley Surgical Ctr. LLC v. County of Los Angeles*, No. 13-cv-2265, 2015 WL 3825310, at *6 (C.D. Cal. June 18, 2015).

Neither of the terms that Plaintiffs challenge plausibly constitutes an unreasonable restraint of trade.  Plaintiffs' rule of reason claim should be dismissed.

---

[5] Of course, the fact that larger vMVPDs may be unable to leverage their market power to secure lower prices for the ESPN network than their competitors is not a cognizable claim under the Sherman Act, which serves to protect competition, not to facilitate the exercise of market power or protect any particular market participant.  *See Cascade Cabinet*, 710 F.2d at 1374.

III.   **PLAINTIFFS' CLAIMS FOR DAMAGES ARE BARRED BY *ILLINOIS BRICK*.**

In addition to the substantive defects in Plaintiffs' antitrust claims, Plaintiffs are categorically barred from seeking damages because they are "indirect purchasers".

In *Illinois Brick*, the Supreme Court held that indirect purchasers lack standing to pursue damages under the Sherman Act.  431 U.S. at 728-35, 746-47; *see also Somers v. Apple, Inc.*, 729 F.3d 953, 961 (9th Cir. 2013).  Direct purchasers are "those who are the immediate buyers from the alleged antitrust violators", whereas indirect purchasers are those "who are two or more steps removed from the antitrust violator in a distribution chain".  *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019) (internal quotation marks omitted).

A purchaser is considered indirect if she purchased the allegedly overpriced product through an intermediary, rather than the entity alleged to be in violation of the antitrust laws.  *Id.* at 1521; *Ill. Brick*, 431 U.S. at 728-35; *see also* 3F Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶¶ 346c, 356e (4th ed. 2015) ("[T]he decisive question [is] whether the purchaser . . . contracted directly with the defendant" or "paid the money to the violator.").  For instance, "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A."  *Apple*, 139 S. Ct. at 1521.

That is the precise factual scenario alleged here.  ESPN (manufacturer A) sells its ESPN television network to YouTube TV and DirecTV Stream (retailers B), and YouTube TV and DirecTV Stream (retailers B) sell their vMVPD services (which include the ESPN network) to Plaintiffs (consumers C).  Thus, Plaintiffs (consumers C) cannot sue ESPN (manufacturer A). (*Biddle* ¶ 2; *Fendelander* ¶ 2; *see* Figure 1.)  *See Apple*, 139 S. Ct. at 1521.

Plaintiffs' express theory of harm is that vMVPDs "bear and pass on [added] cost" from ESPN to subscribers like themselves (*Biddle* ¶ 324; *Fendelander* ¶ 327), which is precisely the "pass-on" theory of damages that *Illinois Brick* forbids.  *See* 431 U.S. at 743-47; *Somers*, 729 F.3d at 961-62.  Because, by their own admission, Plaintiffs purchased the ESPN network indirectly from YouTube TV or DirecTV Stream, not directly from ESPN (or Disney), Plaintiffs are indirect purchasers and, thus, lack standing to pursue damages.  *See In re Aluminum*

*Warehousing Antitrust Litig.*, No. 13-md-2481, 2014 WL 4277510, at *23 (S.D.N.Y. Aug. 29, 2014) ("Given their own allegations regarding their positions in the supply/distribution chain, they cannot plead around this issue.").

## CONCLUSION

For the foregoing reasons, Disney respectfully submits that Plaintiffs' Complaint should be dismissed with prejudice for failure to state a claim.

Dated:      January 31, 2023       FARELLA BRAUN + MARTEL LLP

*/s/ Christopher C. Wheeler*
Douglas R. Young (SBN 073248)
Christopher C. Wheeler (SBN 224872)
Daniel A. Contreras (SBN 329632)
235 Montgomery Street, 17th Fl.
San Francisco, CA 94104
Tel.: (415) 954-4400
dyoung@fbm.com
cwheeler@fbm.com
dcontreras@fbm.com

CRAVATH, SWAINE & MOORE LLP

*/s/ J. Wesley Earnhardt*

Antony L. Ryan (admitted *pro hac vice*)
J. Wesley Earnhardt (admitted *pro hac vice*)
David H. Korn (admitted *pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Tel.:  (212) 474-1000
aryan@cravath.com
wearnhardt@cravath.com
dkorn@cravath.com

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 31, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.


Dated:  January 31, 2023                    */s/ Christopher C. Wheeler*

                                         Christopher C. Wheeler

                                         (CA Bar No. 224872)