**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (*pro hac vice*)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78744
(213) 462-2772

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HEATHER BIDDLE, JEFFREY KAPLAN, ZACHARY ROBERTS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE WALT DISNEY COMPANY,<br><br>Defendant. | Case No. 5:22-cv-07317-EJD<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT THE WALT DISNEY COMPANY'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT**<br><br>Hon. Edward J. Davila<br><br>Hearing Date: July 13, 2023<br><br>Hearing Time: 9:00 a.m. |

PLAINTIFFS' OPPOSITION TO DISNEY'S MOTION TO DISMISS

1

2

# TABLE OF CONTENTS

3    PRELIMINARY STATEMENT ........................................................................................... 1

4    BACKGROUND ............................................................................................................... 2

5    ARGUMENT .................................................................................................................... 5

6    I.    DISNEY ENTERED INTO *PER SE* UNLAWFUL HORIZONTAL PRICE
         AGREEMENTS WITH ITS PRINCIPAL SLPTV COMPETITORS, INCLUDING
7        MARKET LEADER YOUTUBE ................................................................................. 6

8          A.    DISNEY'S SEPTEMBER 2019 AGREEMENT WITH DIRECTV
                AND DECEMBER 2021 AGREEMENT WITH YOUTUBE ARE
9               HORIZONTAL AGREEMENTS BETWEEN SLPTV COMPETITORS ............... 6

10         B.    DISNEY'S CHALLENGED AGREEMENTS WITH SLPTV
                PROVIDERS, INCLUDING WITH YOUTUBE TV AND DIRECTV
11              STREAM, ARE HORIZONTAL RESTRICTIONS ON PRICE ........................... 12

12   II.   DISNEY'S AGREEMENTS WITH SLPTV PROVIDERS, INCLUDING
         YOUTUBE AND DIRECTV, REGARDING SLPTV PRODUCTS AND
13       PRICES, FAIL THE RULE OF REASON ..................................................................... 14

14         A.    THE CAC ALLEGES A PLAUSIBLE PRODUCT AND GEOGRAPHIC
                MARKET ............................................................................................. 15
15
           B.    THE CAC ALLEGES HARM TO COMPETITION IN THE SLPTV
16              MARKET ............................................................................................. 19

17   III.  PLAINTIFFS ARE DIRECT PURCHASERS AND HAVE ANTITRUST
         STANDING TO SUE .......................................................................................... 25
18
19   IV.   REQUEST FOR LEAVE TO AMEND ........................................................................ 25

20   CONCLUSION ............................................................................................................... 25

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## Cases

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016)..................................................................................... 5

*Apple v. Pepper*,
   139 S. Ct. 1514 (2019) ...................................................................................... 13, 25

*Arandell Corp. v. Centerpoint Energy Servs., Inc.*,
   900 F.3d 623 (9th Cir. 2018)..................................................................................... 8

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
   9 F.4th 1102 (9th Cir. 2021)........................................................................... 6, 9, 11

*Bell Atl. Bus. Sys. Servs. v. Hitachi Data Sys. Corp.*,
   849 F. Supp. 702 (N.D. Cal. 1994) ........................................................................... 8

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
   182 F.3d 1096 (9th Cir. 1999)................................................................................. 15

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012)................................................................... 14, 22, 23

*Brown Shoe Co. v.  U.S.*,
   370 U.S. 294 (1962) .................................................................................... 16, 18, 19

*City of Long Beach v. Standard Oil Co.*,
   872 F.2d 1401 (9th Cir. 1989),
   opinion amended on denial of reh'g, 886 F.2d 246 (9th Cir. 1989).......................... 22

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ................................................................................................ 22

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984) .......................................................................................... *passim*

*Dimidowich v. Bell & Howell*,
   803 F.2d 1473 (9th Cir. 1986).......................................................................... *passim*

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ................................................................................................ 18

*Frame-Wilson v. Amazon.com*,
   591 F. Supp. 3d 975 (W.D. Wash. 2022) ...................................................... 11, 14, 25

*Freeman v. San Diego Ass'n of Realtors*,
   322 F.3d 1133 (9th Cir. 2003).................................................................................. 7

# TABLE OF AUTHORITIES

### Cases
(*continued*)

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018)......................................................................... 14

*High Tech. Careers v, San Jose Mercury News*,
   996 F.2d 987 (9th Cir. 1993)..................................................................... 15, 19

*Hightower v. Celestron Acquisition, LLC*,
   2021 WL 2224148 (N.D. Cal. June 2, 2021) ................................................... 8

*In re ATM Fee Antitrust Litig.*,
   686 F.3d 741 (9th Cir. 2012)........................................................................ 25

*In re eBay Seller Antitrust Litig.*,
   545 F. Supp. 2d 1027 (N.D. Cal. 2008) ...................................................... 14

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
   933 F.3d 1136 (9th Cir. 2019)........................................................ 21, 22, 25

*Jack Russell Terrier Network of N. Ca v. Am. Kennel Club, Inc.*,
   407 F.3d 1027 (9th Cir. 2005).......................................................................... 7

*Klein v. Facebook, Inc.*,
   580 F. Supp. 3d 743 (N.D. Cal. 2022) ................................................... 15, 16

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000)........................................................................ 13

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
   468 U.S. 85 (1984) ...................................................................................... 22

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
   435 U.S. 679 (1978) .................................................................................... 22

*Newcal Indus.*, Inc. *v. Ikon Off. Sol.*,
   513 F.3d 1038 (9th Cir. 2008)...................................................................... 15

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
   311 F. Supp. 2d 1048 (D. Colo. 2004) ......................................................... 18

*Schmitt v. Kaiser Found. Health Plan of Wash.*,
   965 F.3d 945 (9th Cir. 2020) ....................................................................... 25

*SmileDirectClub, LLC v. Tippins*,
   31 F.4th 1110 (9th Cir. 2022)....................................................................... 14

# TABLE OF AUTHORITIES

**Cases**
(*continued*)

*United States v. Apple*,
   791 F.3d 290 (2d Cir. 2015) ................................................................................................ 12, 13

*United States v. Patten*,
   226 U.S. 525 (1913) ................................................................................................................... 22

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940) ................................................................................................................... 13

**PRELIMINARY STATEMENT**

Defendant, The Walt Disney Corporation ("Disney") owns and controls the second largest streaming pay live television ("SLPTV") provider in the United States, Hulu, through which Disney offers an SLPTV product called Hulu + Live TV. Disney also owns and controls ESPN, the most significant cost input (by a large margin) into SLPTV products. The Class Action Complaint (the "CAC") alleges that Disney entered into a series of agreements with competing SLPTV providers, including DirecTV Stream and market leader YouTube TV, with the purpose and effect of increasing prices for SLPTV plans in the United States. Disney accomplished this by negotiating agreements with its horizontal competitors that required them to carry ESPN in the lowest-priced package they sold to their customers in the SLPTV market, while at the same time providing each counterparty with a most-favored-nation clause to assure it that any SLPTV price increases caused by ESPN rates would not be undercut by other SLPTV providers, including Disney's own Hulu + Live TV product. The net effect of these agreements, which Disney struck marketwide with all the major SLPTV providers, was the creation of unmitigated market power for Disney in the highly concentrated SLPTV market, as Disney could increase the price of its competitors' SLPTV products by simply increasing the price of their largest cost input, ESPN. Disney, however, would experience no such cost increase, as every dollar its Hulu + Live TV product spent on ESPN was recouped as revenue for Disney. The anticompetitive effects of these agreements were unmistakable. Between May 2019, when Disney took control of Hulu, and the end of 2021, prices nearly doubled across the entire market—and they have remained elevated in lockstep ever since. Prices charged up marketwide every time Disney entered into an agreement with one of its SLPTV competitors. Plaintiffs, who are YouTube TV subscribers,[1] paid these inflated prices.

As explained in this opposition, the agreements between Disney and its direct competitors in the SLPTV market are horizontal price restraints, *per se* unlawful under the Sherman Act. As set

---

[1] This case is related to No. 5:22-cv-07533 ("*Fendelander*"), which has a near-identical complaint but is brought by a putative class of DirecTV Stream subscribers. Disney has filed identical motions to dismiss in both cases, and this opposition is near-identical to the *Fendelander* opposition.

PLAINTIFFS' OPPOSITION TO DISNEY'S MOTION TO DISMISS

forth in detail in the Class Action Complaint ("CAC"), Disney, Hulu, and ESPN operate as a single economic unit with a unity of purpose, and are considered the same entity with respect to Section 1 conduct under the longstanding *Copperweld* doctrine. Both legally and factually, when Disney agreed, after taking complete control of Hulu, with SLPTV providers like YouTube TV and DirecTV Stream to restrict the prices and product bundles those providers could offer in the SLPTV market, Disney was entering into agreements on price with horizontal competitors of its own Hulu + Live TV product. Disney's motion to dismiss does not address the *Copperweld* doctrine, and ignores well-pleaded allegations that Disney's challenged agreements are price restraints. Moreover, even if judged under the Rule of Reason, the challenged agreements are alleged to have clear anticompetitive effect in a well-defined market, including by vesting Disney with market power, increasing prices, setting a market-wide price floor, and reducing output—all without any procompetitive justifications for the agreements. At bottom, the CAC plausibly alleges agreements that violate Section 1 of the Sherman Act. Disney's motion should be denied.

## BACKGROUND

This action pertains to the United States Streaming Live Pay TV ("SLPTV") market, a distinct submarket of the United States Live Pay TV ("LPTV") market, which includes cable and satellite television providers. CAC ¶ 223; *see id.* ¶¶ 223-77 (discussing product market and participants). Beginning in 2015, certain telecommunications and telecommunications-adjacent companies—first Dish, then Sony, then DirecTV—began offering subscription services in which conventional pay television content (*i.e.*, the bundled linear television channels, including live programming, generally associated with a cable or satellite television subscription) was streamed over an Internet connection without the need for dedicated hardware such as a cable set top box or satellite receiver. *Id.* ¶¶ 130-136. These new services, which resembled conventional cable or satellite pay television subscription services but were delivered through a generic Internet connection and devices, represented a nascent alternative to cable for consumers who wanted to stream television content over the Internet, but still enjoy the multi-channel, live television experience that most Americans have consumed since the 1990s. *Id.* ¶¶ 130-37.

1       In 2017, two major new entrants brought the SLPTV market to maturity: YouTube TV and

2 Hulu + Live TV. CAC ¶¶ 139-40. YouTube TV offered approximately 50 live channels, including

3 the major networks, for $35 per month; Hulu + Live TV offered approximately 50 live channels for

4 $39.99 per month. *Id.* By 2019, the SLPTV market was rapidly growing, and three SLPTV services

5 were dominant: Hulu + Live TV was the market leader, with approximately 2 million subscribers,

6 YouTube TV was number two with approximately 1 million, and DirecTV Stream—which had been

7 around longer than both of its newer rivals—retained a significant subscriber foothold. *Id.* ¶¶ 179,

8 273-74. Each provider's SLPTV bundle was priced at about $40 to $45 per month in early 2019,

9 substantially cheaper than the $65 to $70 per month charged for basic cable or satellite television

10 subscriptions. *Id.* ¶¶ 139-40, 142, 154-56, 59.

11       In May 2019, Disney assumed full operational control of Hulu. CAC ¶¶ 150-51. Disney had

12 obtained majority ownership of Hulu a year earlier, after acquiring Fox (Hulu had previously

13 operated as a joint venture between Disney, Fox, and Comcast), *id.* ¶¶ 145-47, but Comcast had still

14 retained some corporate control despite Disney's majority ownership, *id.* ¶¶ 150-51. This ended in

15 May 2019, as "Disney and Comcast jointly announced that Disney will seize full operational control

16 of Hulu, effective immediately." *Id.* ¶ 150. In the May 2019 deal, Comcast gave up its three seats

17 on the Hulu board—giving complete operational control of Hulu to Disney—and agreed to sell its

18 remaining stake in Hulu to Disney by 2024 if Disney or Comcast demanded it. *Id.* ¶¶ 150-51.

19       Having gained full control over Hulu, Disney quickly moved to integrate it. In January 2020,

20 Disney removed Hulu's CEO, Randy Freer, moved Hulu into Disney's direct-to-consumer business

21 operations—the same Disney division that oversees Disney+ and ESPN+—and restructured the

22 company so that Hulu operations that had reported to Freer now reported to their counterparts at

23 Disney. CAC ¶ 152. Like another directly-controlled Disney subsidiary, ESPN, Hulu began to be

24 reported as part of Disney's consolidated balance sheet, and Disney's SEC filings state that it has

25 "full operational control" over Hulu. *Id.* ¶¶ 16-18. Disney now operates both Hulu and ESPN with

26 unfettered control and a unity of interest and purpose, reporting profits and losses for both lines of

27 business as part of its consolidated balance sheet, exercising direct control over Hulu and ESPN

28 operations and strategy, and negotiating agreements on behalf of the combined entity. *Id.* ¶¶ 16-19.

1      After taking control of Hulu, Disney moved quickly to monetize its new asset. In September

2  2019, Disney began hard-nosed—and public—negotiations with DirecTV regarding the products

3  and prices DirecTV could offer on its SLPTV service, DirecTV Now. CAC ¶¶ 167-76. On

4  September 22, 2019, Disney and DirecTV reached an agreement. *Id.* ¶¶ 171. On October 19, 2019,

5  DirecTV Stream raised prices by 30%, increasing the price of its basic "Plus" package from $50 per

6  month to $65. *Id.* ¶ 172.

7      Disney's agreements with other SLPTV providers allow it to increase the prices of its

8  competitors' products. CAC ¶¶ 154-66; 216-22; 304-27. It is able to do so because of two terms in

9  each agreement. First, each agreement requires that Disney's ESPN be included in the lowest-priced

10  bundle offered by the agreeing SLPTV provider (the "Base Term"). *Id.* ¶¶ 307-11. This provides

11  Disney the ability to increase its competitors' prices by increasing the costs of their largest product

12  input, ESPN. *Id.* ¶ 319. Second, the agreements include a most-favored-nation clause preventing

13  Disney from providing more favorable terms to other parties without also providing those terms to

14  the agreeing SLPTV provider (the "MFN"). *Id.* ¶¶ 312-14. This term not only creates upward price

15  pressure, it provides SLPTV providers that conspire with Disney assurances that Disney will not

16  allow an SLPTV competitor, including Disney's own Hulu + Live TV product, to undercut them

17  with a lower price—a price that the agreeing party could not match if Disney increased the cost of

18  ESPN, the largest cost input into SLPTV subscriptions. *Id.* ¶ 315. Indeed, Disney would not

19  experience a cost increase if fees for ESPN increased for its Hulu + Live TV product, as it recoups

20  such increases as revenue. *Id.* ¶ 322, 323-24.

21      In November 2019, Disney raised the base price of Hulu + Live TV—by then the SLPTV

22  market leader, with nearly half of all SLPTV subscribers—by $10, from $45 per month to $55. CAC

23  ¶ 154. In June 2020, YouTube TV raised the price of its base plan by $15 per month, from $50 to

24  $65. *Id.* ¶ 159. In November 2020, Disney against raised the price of Hulu + Live TV, increasing

25  the base plan price from $55 to $65. *Id.* ¶ 160.

26      In late 2021, YouTube began negotiating a new carriage agreement with Disney for

27  YouTube TV. By this point, YouTube TV and Disney's Hulu + Live TV were neck-and-neck as the

28  top two services in the U.S. SLPTV market, combining for a near-70% market share. *Id.* ¶¶ 178-81.

YouTube had an existing carriage agreement with Disney that, through a combination of terms, effectively created a price floor controlled by Disney, and in the companies' renewed carriage negotiations, YouTube played hardball: it publicly announced that if a Disney carriage agreement was not reached, YouTube would drop the price of everyone's YouTube TV subscription by $15, bringing its base plan back down to $50 from $65. *Id.* ¶¶ 180-95.

On December 19, 2021, Disney—the operator of Hulu + Live TV, the number two service in the U.S. SLPTV market—and YouTube, the operator of the number one service in the U.S. SLPTV market, reached an agreement regarding the products that YouTube TV could offer to SLPTV subscribers, and at what prices. CAC ¶¶ 194-96 (agreement); 304-39 (terms). After reaching an agreement with Disney, YouTube TV did not drop its prices. *Id.* ¶¶ 196, 216-22. No one else did, either: as of the filing of the CAC, prices across the SLPTV market were holding at approximately $65-70 per month, having increased about 40% marketwide since Disney took direct control of Hulu in May 2019. *Id.* ¶¶ 216-22, 316-22.

On November 18, 2022, Plaintiffs—YouTube TV subscribers who have been anticompetitively overcharged due to Disney's illegal agreements—filed this action.

## ARGUMENT

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. "To establish liability under § 1, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016). As explained below, Disney's agreements with its principal SLPTV rivals, including co-conspirator YouTube and co-conspirator DirecTV, meet both elements, as they are horizontal agreements with Disney's direct competitors in the SLPTV market, which directly restrained prices in that market, ultimately doubling prices marketwide. Moreover, even if evaluated under the Rule of Reason, Disney's agreements violate Section 1 of the Sherman Act. Regardless of how the challenged agreements are analyzed, Plaintiffs were directly injured by them, in a way that the antitrust laws were designed to prevent.

**I.    DISNEY ENTERED INTO *PER SE* UNLAWFUL HORIZONTAL PRICE AGREEMENTS WITH ITS PRINCIPAL SLPTV COMPETITORS, INCLUDING MARKET LEADER YOUTUBE**

This case challenges a series of anticompetitive agreements between Disney, which provides the second-largest service in the United States SLPTV market, and its principal competitors in that market, including market leader YouTube, about the products and prices that can be offered by those competitors' SLPTV services. These agreements are horizontal—they are between direct competitors in the SLPTV market—and they restrict price and output in that market. As a result of these characteristics, which flow uncontroversially from allegations in the CAC that Disney's motion ignores, the challenged agreements between Disney and its SLPTV competitors, including YouTube, are *per se* illegal under longstanding precedent. Plaintiffs and the Proposed Class, all of whom are or were YouTube TV subscribers, directly bore the burden of the price and output restraints contained in the anticompetitive agreements between Disney and its SLPTV rivals, including YouTube itself.

**A.    Disney's September 2019 Agreement with DirecTV and December 2021 Agreement with YouTube are Horizontal Agreements Between SLPTV Competitors**

In September 2019, Disney reached an agreement with DirecTV—one of the five principal SLPTV providers in the United States—restricting the consumer-facing products DirecTV could offer in the SLPTV market through its DirecTV Stream service, and the prices at which it could offer them. *See* CAC ¶¶ 167-76 (DirecTV Stream agreement); *infra* at § I.B (discussion of terms). In December 2021, Disney reached an agreement with YouTube—the largest SLPTV provider in the United States—dictating prices and consumer-facing product choices for YouTube's SLPTV market-leading YouTube TV service. *See* CAC 177-96 (YouTube TV agreement); *infra* at I.B (discussion of terms). These were horizontal agreements, made between three direct competitors (at the time, the three leading providers) in the U.S. SLPTV market.

"A horizontal restraint is an agreement among competitors on the way in which they will compete with one another." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021) (cleaned up). By contrast, "[v]ertical restraints are restraints imposed by agreement between firms at different levels of distribution." *Id.* (cleaned up). Here, there is no

serious dispute that the challenged agreements were "among competitors" at the same level of distribution—to wit, three of the leading service providers in the consumer-facing SLPTV market. In particular, both the DirecTV Stream agreement and the YouTube TV agreement were negotiated and executed by Disney, which operates the second-largest subscription service in the U.S. SLPTV market: Hulu + Live TV. CAC ¶¶ 273-74.

As alleged in the CAC, Disney operates Hulu with unfettered control and unity of purpose: it owns a 67% ownership stake in Hulu; it has a put/call agreement to purchase the remaining 33% beginning January 2024; it has maintained full operational control of Hulu since May 2019; and it reports Hulu's profits and losses as part of its consolidated balance sheet. *See* CAC ¶¶ 16, 17, 19, 146-53. This isn't just Plaintiffs' position—it's Disney's. As the CAC explains, in May 2019 "Disney and Comcast jointly announced that Disney will seize operational control of Hulu, effective immediately." *Id.* ¶ 150; *see also id.* at ¶ 151. In January 2020, Disney restructured Hulu to place it within Disney's internal direct-to-consumer division, removing Hulu's CEO and reassigning his reports to Disney counterparts under Disney's chairman of direct-to-consumer operations, who also oversees Disney+ and ESPN+. *Id.* ¶ 152. Disney negotiates contracts on behalf of its combined operations, including Hulu. *Id.* ¶ 19. Disney also owns and fully controls ESPN: like Hulu, Disney operates ESPN directly, exercising complete operational and financial control over its ESPN lines of business. CAC ¶¶ 18-19; *see also id.* ¶¶ 39-43, 114-15.

Given the above facts—none of which Disney has (or could) refute—the CAC plausibly alleges that Disney, Hulu, and ESPN operate as a single economic unit for purposes of Section 1 of the Sherman Act. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) ("[T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act."); *see also Jack Russell Terrier Network of N. Ca v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005) (*Copperweld* doctrine includes affiliated entities, where the entities share a "common goal," "are best understood as extensions" of the single economic unit, and uphold the same "goals, purposes, and policies"); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147-48 (9th Cir. 2003) ("Where there is substantial common ownership, . . . individual firms function as an economic unit and are generally treated as

a single entity."); *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 630-31 (9th Cir. 2018) ("[I]t is legally impossible for firms within a single 'economic unit' to act together in furtherance of the same price-fixing scheme for independent and distinct purposes."); *Hightower v. Celestron Acquisition, LLC*, 2021 WL 2224148, at *10-11 (N.D. Cal. June 2, 2021) (Davila, J) (applying *Arandell* and holding that corporate entities within the same family were a single entity under *Copperweld*); *Bell Atl. Bus. Sys. Servs. v. Hitachi Data Sys. Corp.*, 849 F. Supp. 702, 705-07 (N.D. Cal. 1994) (80%-owned subsidiary was "same entity" as parent corporation, rejecting argument that *Copperweld* only extends to wholly-owned entities or those owned a *de minimis* amount less than 100%).

Disney's motion does nothing to dispute this. It entirely ignores the CAC's lengthy, well-pleaded allegations of operational control and unity of purpose between Disney, Hulu, and ESPN, *see* CAC ¶¶ 16, 17, 19, 146-53—including the specific allegation that "Disney negotiates contracts on behalf of the combined [ESPN, Hulu, and Disney] operations," *id.* ¶ 19—and brushes off what it calls "Disney's majority stake in Hulu LLC" as "irrelevant to Plaintiffs' claims," Mot. at 1. But both the facts and the law are otherwise.

When Disney sat down at a table to negotiate an agreement regarding DirecTV Stream products and pricing in September 2019, it did so as the entity that fully and directly controlled—not just owned—DirecTV Stream's competitor Hulu + Live TV. The CAC specifically and plausibly alleges as much, including through Disney's own public statements about how it controls and operates Hulu. CAC ¶¶ 16, 17, 19, 146-53. In December 2021, when Disney again hunkered down to negotiate an SLPTV agreement, this one implicating the product offerings and prices that would be permitted by the SLPTV market leader, YouTube TV, Disney did so as the entity that owned, operated, and fully, directly controlled the number two competitor in that very market. This is precisely the situation—two market-leading competitors sitting down in a room to agree on prices—that the United States antitrust laws were written to prevent. And the relevant legal doctrines recognize this reality (whether Disney decides to acknowledge as much or not).

That is, the *Copperweld* doctrine recognizes the reality that when one company—here, Disney—fully, directly, and with unity of purpose controls a subsidiary like Hulu, it can't "take off

its Hulu hat" for purposes of a price negotiation with Hulu's most vicious competitor. And similarly, when that same company tries to put on its ESPN hat, it's still Disney. The actual facts of Disney's direct and complete control of its subsidiaries Hulu and ESPN, *see* CAC ¶¶ 16, 17, 19, 146-53, are specific and damning, and it's perhaps no surprise that Disney's motion simply ignores them—and *Copperweld*. But taking an ostrich approach to *Copperweld*—and the specific allegations in the CAC showing that it applies to the challenged agreements—doesn't exempt Disney from that portion of the United States antitrust laws. When direct competitors make an agreement regarding the ways they will compete with one another, that is a horizontal restraint. *Aya Healthcare Servs.*, 9 F.4th at 1108. And the challenged DirecTV Stream and YouTube TV agreements were between direct competitors, regarding the ways that they would compete with one another.

Disney argues that "[w]hether a restraint is horizontal or vertical is determined by reference to the parties' relationship *with respect to the agreement at issue*," Mot. at 9 (emphasis in original), and cites *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1481 (9th Cir. 1986), *as modified*, 810 F.2d 1517 (9th Cir. 1987), in support. As an initial matter, that is not what *Dimidowich* actually says:

> We determine the economic impact of the alleged conspiracy largely by examining the economic relationship between the parties. If the relationship between [the two agreeing parties] could be characterized as purely "horizontal" (between competitors at the same level of distribution), the alleged agreement would fit squarely within the per se pattern. On the other hand, if the relationship is purely "vertical" (between entities at different levels of the same distribution chain), we would apply the rule of reason.

803 F.2d at 1480. Contrary to the proposition—stated as a rule—put forth by Disney that "[w]hether a restraint is horizontal or vertical is determined by reference to the parties' relationship *with respect to the agreement at issue*," Mot. at 9, *Dimidowich* actually recites the familiar rule that whether a restraint is horizontal or vertical is determined by reference to the parties' relationship *with respect to each other*, 803 F.2d at 1480—with due attention paid to what the parties are actually agreeing on. (This is precisely the rule of *Aya Healthcare*, incidentally—when direct competitors make an agreement *regarding the ways they compete with one another*, that is a horizontal restraint. 9 F.4th at 1108.)

To be clear, *Dimidowich* does recognize that where there is "complex[ity]" to two parties' relationship, a court must look at the context of the restriction between them, 803 F.2d at 1480-81, but the case and the principle actually set forth within it do not support Disney's argument that its challenged agreements with SLPTV providers should be deemed vertical. In *Dimidowich*, the defendant was a microfilm equipment manufacturer that directly distributed replacement parts for its machines in most of the country, but contracted with a third-party exclusive distributor to do so in the Southwest. *Id.* at 1475-76. When the third-party distributor refused to sell the Plaintiff—a rival servicer—replacement parts,  he sued, asserting that the contract between the manufacturer and the distributor violated the Cartwright Act. *Id.* The Ninth Circuit, after noting that the court "determines the economic impact of [an] alleged conspiracy largely by examining the economic relationship between the parties," *id.* at 1480, acknowledged the "complex" relationship between the manufacturer and its distributor, and relying on so-called "dual distributorship" cases—where "a manufacturer operates at two distinct levels of the distribution chain in the same market by acting as both a supplier and a distributor of its own products"—concluded that under the Sherman Act, the challenged agreement would be challenged under the rule of reason, *id.* at 1480-81. The *Dimidowich* case stands for the unremarkable proposition that the agreement between the manufacturer and distributor, as to how the manufacturers' replacement parts were distributed and sold, was vertical. *See id.* Indeed, the court stated that the affiliated distributor did not compete with the manufacturer as to servicing in the region for which it was exclusively responsible. *Id.* at 1475 ("In that region, B&H sells replacement parts to a single authorized dealer-service representative, Comgraphix. B&H does not service microfilm equipment within this region, and Comgraphix does not service B&H equipment outside of this region.").

More importantly, the *Dimidowich* court explained that it would be a horizontal restraint if the manufacturer and distributor had agreed on prices for a competitive product:

> The fact that Conglomerate A supplies Conglomerate B with bread to sell in B's retail stores almost certainly has nothing to do with A and B's ability to agree to sell steel at the same price. The latter is still horizontal price fixing and illegal per se.

*See id.* at 1481 n.6. The Ninth Circuit was thus clear that whether an agreement is horizontal depends on whether the parties compete to sell the same product they are agreeing about. *See id.* Nothing in *Dimidowich* stands for anything to the contrary. In this case, Disney—which is a single unit comprising Disney, Hulu, and ESPN under *Copperweld*—agreed with its direct competitors in the SLPTV market ***about the SLPTV product those competitors would offer their subscribers***, including the terms at which those competitors could offer their lowest-price subscriptions. This falls squarely within what *Dimidowich* (and *Aya Healthcare Sys.*, and the Supreme Court on numerous occasions) have said is a horizontal agreement: an agreement between direct competitors, about the terms of a product they compete on. *See* 803 F.2d at 1481 n.6.[2]

Disney also cites *Frame-Wilson v. Amazon.com*, 591 F. Supp. 3d 975, 987-88 (W.D. Wash. 2022) to support its argument that the agreements challenged here are akin to a "typical supplier/distributor relationship" and is thus vertical. Mot. at 10. *Frame-Wilson*, however, bears no resemblance to the agreements alleged here. There, Amazon was alleged to have horizontally conspired with third-party sellers on Amazon because both competed with each other for online sales. *Id.* at 986. The court held that the challenged agreement was "vertical . . . between third-party sellers and their *host platform*, Amazon.com." *Id.* (emphasis in original). But there, unlike here, "Plaintiffs [we]re not challenging Amazon's conduct as a competitor to its third-party sellers." *Id.* "Indeed," unlike in this case, "Plaintiffs provide[d] no factual allegations to support how Amazon and its third-party sellers agree on how they compete with one another in online sales . . . ." *Id.* All

---

[2] The other dual distribution cases Disney cites are distinguishable for the same reason: Disney is not vertically aligned with ESPN or Hulu, but is in fact a single economic entity, Disney-Hulu-ESPN, under *Copperweld*. *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1331-32, 1340-43 & n.15 (11th Cir. 2010) (defendant that distributed mattresses both directly and through an unaffiliated distributor did not horizontally conspire with the distributor by setting minimum prices); *Westpoint Pepperell, Inc. v. Rea*, 1980 WL 1842, at *3 (N.D. Cal. Apr. 8, 1980) (challenging alleged anticompetitive agreement between carpet wholesaler and unaffiliated distributor).

this is in sharp distinction to this case: Disney and ESPN are not suppliers and distributors that happen to also compete with SLPTV providers through Hulu—as explained at length in the CAC, Disney-Hulu-ESPN is a single economic entity under *Copperweld*, and it is this combined entity that negotiated with Disney's principal SLPTV competitors between 2019 and 2022, agreed with these direct competitors on prices and product offerings in the SLPTV market, and caused a marketwide price inflation of approximately 40% in a three-year period.

   **B.     Disney's Challenged Agreements with SLPTV Providers, including with YouTube TV and DirecTV Stream, Are Horizontal Restrictions on Price**

   Disney next argues that even if its challenged agreements with SLPTV providers (*e.g.,* the September 2019 DirecTV Stream agreement and the December 2021 YouTube TV Agreement) are horizontal, they should not receive *per se* condemnation. Mot. at 11. Specifically, Disney argues that the challenged SPLTV agreements do not impose the sort of "restraints with which courts have sufficient experience to know that they nearly always create unreasonable restraints on trade, such as agreements to fix prices, rig bids, or allocate markets." *Id.* The CAC, however, is clear that the purpose and effect of the alleged agreements was to fix prices of the SLPTV products sold by YouTube TV and DirecTV Stream to those services' subscribers—including Plaintiffs and the Proposed Class. CAC ¶¶ 304-39. This is an agreement on price or output, which is *per se* unlawful under the Sherman Act.

   In particular, the CAC alleges that Disney negotiated ESPN carriage agreements with YouTube TV, DirecTV Stream, and other SLPTV providers that require ESPN to be included in the lowest priced SLPTV product offered by these SLPTV providers. CAC ¶¶ 304, 306-15; *see also id.* ¶¶ 167-76 (DirecTV Stream), 177-96 (YouTube TV), 216-22 (marketwide). The agreements also include a most-favored-nation clause, which prevent Disney from offering more favorable terms to any SLPTV provider—including price terms or less onerous constraints on the lowest-priced product an SLPTV provider can offer—without offering those same terms to every SLPTV provider that agrees with Disney. *Id.* ¶¶ 306-27. Because Disney has struck mirroring agreements with all of the leading SLPTV providers—all of Disney's direct competitors in the SLPTV market—these terms, taken together, not only create a price floor for SLPTV products, but provide Disney with a

means of increasing the prices offered by its competitors marketwide. CAC ¶¶ 216-22, 304-27. Put simply, the agreements enabled Disney to increase the prices for all of its SLPTV competitors by increasing ESPN fees, all without imposing an additional cost on its own SLPTV product because Disney recoups those increases as revenue from ESPN. *Id.* The net effect is an agreement by Disney, with its direct competitors in the SLPTV market, on prices at which those competitors' lowest-price SLPTV subscription product is sold. *Id.* ¶¶ 154-66, 216-22, 304-27, 356-64. The CAC is clear that these agreements with SLPTV providers nearly doubled the price—marketwide—for SLPTV products in the three years after Disney took over operational control of Hulu and started negotiating carriage agreements with its horizontal competitors in the SLPTV market. *Id.* ¶¶ 154-66, 167-96, 216-22, 304-27.

It does not matter that the means by which Disney has agreed with its competitors on price involves increasing the price of ESPN. An agreement to manipulate a product's input to fix the price of a product is still a price-fixing agreement. *See, e.g.*, *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989–91 (9th Cir. 2000) (allegations that defendant fixed the price of milk by rigging the price of a product input, bulk cheese, was sufficient for price-fixing conspiracy under the California Cartwright Act (as interpreted in accordance with federal antitrust law) because bulk cheese price manipulation "was a tool used by the conspirators to manipulate the California milk price"). Indeed, the law has long been clear that "[t]he machinery employed by a combination for price-fixing is immaterial." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940).

*United States v. Apple*, 791 F.3d 290 (2d Cir. 2015), illustrates this point. There, Defendants argued that their agreement, coordinated by Apple, to transition to an "agency model" of distribution that allowed them to increase prices for physical and electronic books, was not "not actually a 'price fixing' conspiracy that deserves per se treatment in the first place." *Id.* at 327. The Second Circuit rejected the argument, holding:

> But it is well established that per se condemnation is not limited to agreements that literally set or restrict prices. Instead, any conspiracy "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity . . . is illegal per se," and the precise "machinery employed . . . is immaterial." The

1

> conspiracy among Apple and the Publisher Defendants comfortably
> qualifies as a horizontal price-fixing conspiracy.

2

3    *Id.* (cleaned up). The Court explained that the Defendants' "primary objective in expressly colluding

4    to shift the entire ebook industry to an agency model (with Apple's help)" was to eliminate

5    Amazon's lower pricing for books. *Id.* Moreover, the Court held, "the conspiracy to raise prices had

6    its intended effect," resulting in price increases directly as a result of the agreements. *Id.* Here, as in

7    *Apple*, the CAC alleges that the challenged agreements between Disney and its principal SLPTV

8    competitors were intended to increase the price of SLPTV products; directly governed what SLPTV

9    products could be offered as the cheapest subscription options for SLPTV providers; and resulted

10   in a near 100% price increase for the SLPTV products purchased by Plaintiffs. *Id.* ¶¶ 154-66, 167-

11   96, 216-22, 304-27, 356-64. This is conduct falling within the core of what is *per se* unlawful.

12   **II.   DISNEY'S AGREEMENTS WITH SLPTV PROVIDERS, INCLUDING YOUTUBE
13          AND DIRECTV, REGARDING SLPTV PRODUCTS AND PRICES, FAIL THE
            RULE OF REASON**

14              Even if evaluated under the Rule of Reason, the agreements between Disney and SLPTV

15   providers, including YouTube and DirecTV, regarding the products and prices that can be offered

16   by those providers in the SLPTV market, are plainly anticompetitive. To state a claim under the

17   Rule of Reason, "[P]laintiffs must plead facts which, if true, will prove: (1) a contract, combination

18   or conspiracy among two or more persons or distinct business entities; (2) by which the persons or

19   entities intended to harm or restrain trade or commerce among the several States, or with foreign

20   nations; (3) which actually injures competition." *Brantley v. NBC Universal, Inc*., 675 F.3d 1192,

21   1197 (9th Cir. 2012) (cleaned up). Plaintiffs must also have antitrust standing to sue. *See id.*

22   Plaintiffs are required only to establish a *prima facie* case to survive a motion to dismiss.

23   *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1121 (9th Cir. 2022); *Frame-Wilson*, 591 F. Supp.

24   3d 975, 992 (W.D. Wash. 2022), *reconsideration denied*, 2022 WL 4240826 (W.D. Wash. Aug. 2,

25   2022) (citing *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1033 (N.D. Cal. 2008)). At

26   later stages, after a Plaintiff establishes a *prima facie* case, a court considers whether the "alleged

27   restraint's harm to competition outweighs its procompetitive effects." *SmileDirectClub*, 31 F.4th at

28   1120 (9th Cir. 2022). Disney does not dispute that it has entered into agreements with SLPTV

providers, including YouTube and DirecTV, regarding SLPTV products (YouTube TV and DirecTV stream) nor does Disney's Motion dispute that these agreements meet the interstate commerce element. Moreover, as explained below (at Section III, *infra*), Plaintiffs have antitrust standing to sue for the price overcharge they suffered.

In connection with the Rule of Reason, Disney argues that the CAC (a) fails to plead harm to competition, including by failing to define a relevant market, and (b) does not plausibly allege any unreasonable restraint of trade. Mot. at 11. Disney is incorrect on both points. The CAC pleads, with factual detail, the existence of the Streaming Live Pay Television Market ("SLPTV Market") as a distinct submarket of the Live Pay Television Market. CAC ¶¶ 223-77. Moreover, the CAC is clear that the challenged agreements directly restrained trade and harmed competition in that market, resulting in a nearly doubling of SLPTV prices; a marketwide price floor; an increase in Disney's market power in the SLPTV market, including the ability to increase prices; and immediate price increases after each alleged agreement struck between Disney and SLPTV providers. *Id.* ¶¶ CAC ¶¶ 154-66, 216-22, 304-27.

## A.    The CAC Alleges a Plausible Product and Geographic Market

The Complaint factually pleads the SLPTV market with particularity. An alleged market can survive a motion to dismiss "unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Newcal Indus.,* Inc*. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008); *see also High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) (holding that "[t]he process of defining the relevant market is a factual inquiry for the jury").

A plausible relevant market includes both a geographic and product market. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018). A product market must encompass the product at issue as well as the economic substitutes for the product. *Id*. Economic substitutes have a "reasonable interchangeability of use" or sufficient "cross-elasticity of demand" with the relevant product. *Id.* (quoting *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999)).  To plead a product market based on "reasonable interchangeability," a plaintiff must allege details about a product's "price, use and qualities" and explain why products without those characteristics are not reasonably interchangeable. *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743,

766 (N.D. Cal. 2022). A broad market may also contain relevant submarkets which themselves "constitute product markets for antitrust purposes." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

The CAC pleads each of the *Brown Shoe* factors with factual particularity:

**Industry or public recognition of the submarket as a separate economic entity.** CAC ¶¶ 229-32, 246-50. The Complaint alleges that "live television providers over the Internet are widely recognized as providing services to a separate and distinct submarket." *Id.* ¶ 229. CAC ¶¶ 230-32 and 246-50 offer specific support for this statement, including industry analyst reports, FCC regulatory differences, and industry news sources. Disney does not rebut these allegations in its Motion, nor could it.

**The product's peculiar characteristics and use.** CAC ¶¶ 230, 233-45, 250. As the CAC describes, SLPTV products are peculiar in that, unlike traditional LPTV products, they are much more flexible in their use—they do not require separate transmission infrastructure, and instead rely on existing broadband Internet connections and Internet-connected home devices (*e.g.*, smartphones and smart TVs) to provide services. *Id.* ¶ 230. The CAC goes on to explain in detail why these characteristics differentiate products in the SLPTV market from those in the broader LPTV market, including the lack of hardware, dependency on an Internet connection, and distinct devices that can provide SLTPV services (*e.g.*, smartphones, smart TVs, and laptops). *Id.* ¶¶ 233-45, 250. Disney declines to address these product differences in its Motion.

**Unique production facilities.** CAC ¶¶ 251-57. The CAC alleges that vMVPDs provide SLPTV services using data centers, which host live streams of data sent over broadband connections to subscribers, as opposed to the hardware used by traditional MVPDs. *Id.* ¶¶ 251, 257. To provide live television in this way, vMVPDs must contend with latency, or delays caused by slow streams. *Id.* ¶¶ 253-54. This requires sufficient bandwidth, distributor infrastructure, and testing. *Id.* ¶¶ 254-55. The bandwidth and infrastructure are often provided by third parties, and vMVPDs have little

1  control over outages. *Id.* ¶ 256. In comparison, MVPDs control their transmission infrastructure. *Id.*

2  ¶ 257. Disney does not provide any analysis of SLPTV production facilities in its Motion.

3       **Distinct customers.** CAC ¶¶ 258-63. The CAC alleges that consumers of SLPTV products

4  are distinct from those in the LPTV market. *Id.* ¶ 258. It alleges that they tend to be younger,

5  consume less video using a television, and are frequently cord cutters. *Id.* ¶¶ 259-63. The CAC

6  supports this with research from think tanks and industry analysts. *Id.* ¶¶ 260, 262-63. Disney's

7  paltry response to these allegations is discussed further below.

8       **Distinct prices and sensitivity to price changes.** CAC ¶¶ 264-71. The CAC alleges that

9  "[p]rices in the SLPTV Market are, and have historically been, distinct from prices in the LPTV

10  market." *Id.* ¶ 264. There are a number of reasons for this difference including, that SLPTV products

11  typically include less channels, do not have costs associated with hardware, have a uniform price

12  throughout the United States, and are not sold as part of long-term contracts. *Id.* ¶¶ 264-68, 269-71.

13  SLPTV price changes are also not sensitive to price changes for traditional cable or satellite TV

14  plans, nor do they vary with bundle discounts, introductory rates, increased fees and taxes, and other

15  charges imposed by traditional cable TV and satellite TV providers. *Id.* ¶ 268. These allegations are

16  not considered by Disney in its Motion.

17       **Specialized vendors.** CAC ¶ 272. Finally, the CAC alleges that vendors for SLPTV products

18  are specialized, as vMVPDs do not require consumers to purchase specialized hardware to consume

19  products and thus must rely on cloud-based products from major cloud computing vendors, such as

20  Google Cloud or Amazon Web Services. *Id.* ¶ 272. Disney also declines to address this factor.

21                                                   *       *       *

22       The CAC also pleads the relevant geographic market—the United States. CAC ¶¶ 278-86.

23  As the CAC explains, SLPTV products are offered throughout the United States because they are

24  not constrained by regional cable or satellite television infrastructure, *id.* ¶ 279, and the products

25  can be consumed over any internet connection, including mobile networks, such as 5G data

26  networks, *id.* ¶ 280; the content distributed as part of SLPTV products is allegedly predominantly

27  in English, tailored for a United States audience, including through U.S. targeted commercials, *id.*

28

¶ 281; and SLPTV providers enforce territorial licensing restrictions that deny access to content outside of the United States, *id.* ¶ 285-86.

In addition, the CAC alleges the barrier to entry surrounding the SLPTV market, called the Carriage and Streaming Infrastructure Barrier to Entry ("CSIBE"), which arises from (i) the server and streaming infrastructure required to enter the market, particularly given latency requirements for serving streaming content, *id.* ¶¶ 288-95; (ii) the requirement that entry be at scale, particularly as to cloud-based streaming infrastructure already owned by companies such as Disney and Google (which owns YouTube TV), *id.* ¶¶ 296-98; and the amount of content that must be licensed to provide a viable subscription offering upon entry, including content that a new entrant must license from Disney, *id.* ¶¶ 209-303. Disney does not address any of the CSIBE allegations, which plausibly allege preconditions to entry of the distinct SLPTV Market.

Indeed, Disney ignores all of the well-pleaded market allegations that define the SLPTV market as a distinct *Brown Shoe* submarket of the broader pay television market. Disney instead asserts that the market definition fails because the correct market is supposedly one "in which [ ] programmer-distributor negotiations occur," Mot. at 12, and curiously not the market in which SLPTV products were sold, at an inflated price, directly to consumers including Plaintiffs. Disney's argument that this "negotiation" market is where "competition is allegedly being restrained" finds no support in the allegations of the CAC, nor is there any legal basis for Disney's assertion that this Court should ignore, as a relevant market for antitrust purposes, the actual market in which the product purchased by the Plaintiffs—SLPTV subscription services—was sold. To the contrary, the law is clear that "[t]he relevant market for antitrust purposes is determined by the choices available" to *plaintiffs*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481-82 (1992). Here, it is the market in which Plaintiffs purchased the price-inflated product—the SLPTV market—because the relevant consumer for market definition purposes is the SLPTV subscriber, not Disney's SLPTV competitors that entered into unlawful agreements with it. *See Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1076 (D. Colo. 2004) ("[T]he identity of the relevant consumer for the purposes of determining market definition is not necessarily the end-

1   user of the product but, rather, is also determined based on the level of commerce effected by

2   defendant's behavior.").

3          Finally, in a footnote, Disney makes the conclusory argument that the relevant market should

4   be the general market for pay television, because non-streaming pay television products are

5   supposedly "economic substitutes" for live streaming pay television products. Mot. at 13 n.3. The

6   CAC, however, includes detailed factual allegations on the *Brown Shoe* factors precisely to show

7   that these products are *not* economic substitutes. CAC ¶¶ 223-77. Disney fails to address on its own

8   any of the relevant *Brown Shoe* factors, and provides only bald factual disagreement with the *Brown*

9   *Shoe* allegations in the CAC, specifically discussing only one factor, Mot. at 13 n.3.But Disney's

10  disagreement with the facts alleged about SLPTV market (to the extent it addresses them at all) is

11  not a proper basis for dismissal at the pleading stage. *See High Tech. Careers*, 996 F.2d at 990.

12      **B.     The CAC Alleges Harm to Competition in the SLPTV Market**

13         The CAC alleges, with factual detail, harm to competition in the SLPTV market as a result

14  of the anticompetitive agreements between Disney and its major SLPTV competitors, including

15  YouTube TV and DirecTV Stream. CAC ¶¶ 304-339. Specifically, the CAC alleges that the

16  challenged agreements allow Disney to increase prices offered by its direct competitors by

17  increasing the price of the largest cost input for their products—ESPN. *Id.* ¶ 319. Disney is able to

18  do so because of two terms it includes in its agreements, as well as by ensuring that all competitors

19  in the SLPTV market enter into agreements with those terms. *Id.* ¶¶ 325-27. First, the agreements

20  contain a term requiring that Disney's ESPN be included in the lowest priced subscription product

21  offered by each SLPTV counterparty (the "Base Term"). CAC ¶¶ 307-11. This is a direct agreement

22  on what product can be offered at the lowest price point offered by YouTube TV, DirecTV Stream,

23  and other SLPTV providers. *Id.* ¶ 319. Because of this term, Disney has a direct input into the costs

24  of every one of its competitors. *Id.* ¶ 327. Second, to ensure that prices move only in one direction,

25  Disney provides its SLPTV co-conspirators with assurances that it will not provide more favorable

26  terms, including price terms, to any SLPTV competitor (the "MFN Term"). *Id.* ¶¶ 312-14. Without

27  this term, SLPTV competitors could be undercut by a direct competitor, including Disney's own

28  Hulu + Live TV product. *Id.* ¶¶ 313, 317. When mirrored across agreements with every competitor

in the SLPTV market, including the largest SLPTV provider, YouTube TV, these agreements taken together have instituted a price floor for all available SLPTV products in the market, and Disney can use ESPN prices as a one-way price ratchet. *Id.* ¶ 315. The CAC alleges that these agreements, taken as a whole, have had the following anticompetitive effects on the SLPTV market:

**Price Increases and Market Power.** The CAC alleges that the agreements have directly resulted in price increases for YouTube TV and DirecTV Stream products. CAC ¶ 365. The CAC also alleges that the agreements allowed Disney to unilaterally raise the prices of all of its competitors' SLPTV products by increasing their costs and without increasing its own costs—that is, the agreements give Disney market power. *Id.* ¶ 222. Moreover, the CAC alleges that the agreements augmented Disney's market power in an already highly concentrated market, *id.* ¶¶ 273-77, with a Herfindahl-Hirschman Index (HHI) of 2794, a highly concentrated market under the Department of Justice Horizontal Merger Guidelines, *id.* ¶¶ 276-77.

**Imposition of Costs on Competitors.** The CAC alleges that the agreements allow Disney to impose costs on its direct competitors in the SLPTV Market. CAC ¶¶ 323-27. The CAC alleges that ESPN is the largest cost input to SLPTV products, *id.* ¶ 323, and that if Disney increases the price of ESPN, its competitors would have to increase prices to recoup the increased costs, *id.* ¶ 324. Disney, on the other hand, would not experience a cost increase because it recoups any additional price paid by Hulu for ESPN as ESPN revenues to Disney. *Id.* ¶¶ 324-25.

**Marketwide Price Floor and Elimination of Price Competition.** The CAC alleges that Disney's agreements with SLPTV providers, all of which govern the lowest-priced product SLPTV providers can offer, have allowed Disney to set a price floor for SLPTV subscriptions across the entire market. *Id.* ¶¶ 316-22. Indeed, the CAC alleges that comparable prices for SLPTV plans have nearly doubled across the entire market since Disney entered into anticompetitive agreements with each major SLPTV provider, including YouTube TV and DirecTV Stream. *Id.* ¶ 322. Moreover, after Disney's agreements with the other leading SLPTV providers, price competition has essentially been eliminated—every SLPTV provider has charged approximately the same price ($70/month, up from about $40-45 in 2019), without any of them offering a discount. *Id.* ¶¶ 220-22.

***The Strengthening of the CSIBE (barriers to entry).*** The CAC alleges that the alleged agreements strengthen the CSIBE. CAC ¶¶ 328-33. Specifically, the CAC alleges that because of the importance of ESPN to subscribers, a new entrant must carry ESPN channels controlled by Disney, and must accordingly negotiate with Disney for rights to carry the channels. *Id.* ¶¶ 329-32. Because Disney owns the second largest SLPTV provider, a new entrant would be forced to negotiate with one of the largest SLPTV competitors for rights, and because Disney conditions carriage on including ESPN as part of the lowest-cost subscription available, Disney would have a direct cost input into the new entrant's price. *Id.* ¶¶ 331-33. In other words, because of Disney's anticompetitive agreements, *de novo* entry, even if successful, would not operate as an effective check on prices in the SLPTV market.

***Output Restriction.*** The CAC alleges that the ESPN Term requiring ESPN to be included in the lowest price SLPTV package reduces the output of bundles offered by SLPTV providers. *See* CAC ¶¶ 330, 339, 366. This output restriction in products offered in the SLPTV plainly harms competition in the SLPTV Market. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1155 (9th Cir. 2019) ("We conclude that for purposes of determining whether plaintiffs have stated an injury to competition, the plaintiffs have plausibly alleged that the output in this case is the number of telecasts of games, and that the defendants' interlocking agreements reduce output.").

Finally, the CAC is unequivocal that the alleged agreements serve no procompetitive purpose, *id.* ¶ 337-38, 368, and that the challenged are not required for the existence of the SLPTV product, *id.* ¶ 369. In total, all of this pleads a *prima facie* violation of the Rule of Reason.

                    *        *        *

Disney does not dispute that the CAC factually alleges these concrete harms to competition in the SLPTV market. Instead, Disney dismembers the agreements, and then attacks the Base Term and MFN one by one, in isolation. Disney does not consider the effect of the challenged agreements' terms as a whole, nor does it consider the effect of all of the mirroring agreements with each SLPTV market competitor, taken together. The Supreme Court and the Ninth Circuit are clear that this is an

impermissible way of analyzing an allegedly anticompetitive restraint on trade. As the Ninth Circuit

explained in *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*:

> Contrary to the defendants' argument, we are required to take a holistic look at how the interlocking agreements actually impact competition. *See Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978). Indeed, "the essential inquiry" is "whether or not the challenged restraint enhances competition," which is assessed by considering the totality of "the nature or character of the contracts." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 103-04 (1984) ("NCAA") (quoting *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 690). Thus, the law requires that the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962) (quoting *United States v. Patten*, 226 U.S. 525, 544 (1913)). Accordingly, we must give plaintiffs "the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *City of Long Beach v. Standard Oil Co.*, 872 F.2d 1401, 1404–05 (9th Cir. 1989), opinion amended on denial of reh'g, 886 F.2d 246 (9th Cir. 1989) (quoting *Continental Ore Co.*, 370 U.S. at 699).

933 F.3d at 1152 (internal citations cleaned up).

Disney's first argument in this vein is to isolate the ESPN term. Specifically, Disney looks at the ESPN term in isolation and argues that it is analogous to *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012). That case, however, is plainly distinguishable. There, the plaintiffs, who were cable and satellite television subscribers, alleged that the defendants, who were programmers and distributors of television content, had engaged in unlawful tying by bundling high-demand channels with low-demand channels as part of cable packages. *Id.* at 1195-96, 1199. The Court held that Plaintiffs had failed to show harm to competition as a result of the alleged tie. *Id.* at 1200-04. This case is vastly different. To begin with, the challenged agreements here are not alleged to be anticompetitive ties, but rather are agreements to increase SLPTV prices. The Base Term is alleged to provide Disney—the number two SLPTV provider—a direct cost input into its SLPTV competitors' prices, allowing Disney to increase prices marketwide, CAC ¶ 327—which indeed happened, with marketwide price increase of nearly 80% in a three year period after Disney took over control of Hulu, *id.* ¶¶ 154-66, 216-22, 304-27. And this term in the challenged agreements

restrains prices in conjunction with the MFNs in those same agreements, along with Disney's systemic capture of the entire market with mirroring agreements. *Id.* ¶¶ 325-27. Put simply, this is not a tying case. *Id.* ¶¶ 154, 159, 160.

Moreover, plaintiffs in *Brantley* did not include any of the allegations here showing harm to competition in the market. As the Ninth Circuit noted, plaintiffs there had *not* alleged that the asserted tying agreement "raises barriers to entry," *Brantley*, 675 F.3d at 1201; "foreclosed" or impeded entry, *id.*; "facilitated horizontal collusion" (as the challenged Disney agreements did here), *id.*; harmed the market rather than merely plaintiffs (in contrast to allegations of marketwide price increase and floor here), *id.* at 1202, 1203 ("But the plaintiffs have not alleged in their complaint how competition (rather than consumers) is injured by the widespread practice of packaging low- and high-demand channels."); increased "costs or quality of service," *id.* at 1204; or prevented any market participant from "offering their channels individually if the practice was competitively advantageous," *id.* Disney's assertion that the allegations in Brantley were "virtually identical" to the allegations here is demonstrably false, Mot. at 16: The tying allegations in *Brantley* bear no resemblance to the facts alleged here, especially when the agreements with SLPTV providers are (correctly) considered as a whole, along with their marketwide effects.

Disney offers the same legal error with respect to the MFNs in the challenged agreements, again analyzing that single term in isolation rather than in connection with the agreement—and Disney's web of agreements—as a whole. Disney simply refuses to consider the MFN as part of the overall agreement and refuses to consider the agreement as part of a marketwide series of agreements. Disney instead again erects a strawman, arguing in the abstract about the procompetitive effects of MFNs. Specifically, Disney argues that the CAC's allegations regarding a price floor "make[] no sense," Mot. at 16, because the MFNs require Disney to lower its prices for the SLPTV counterparties if it lowers prices for others in the market. In making this argument Disney ignores the actual allegations of the CAC—and the actual context of the MFN's in Disney's challenged agreements. The CAC includes detailed factual allegations as to how the MFNs work in conjunction with the base term to create a one-way price ratchet. CAC ¶¶ 304-327. Indeed, the CAC alleges that the MFNs facilitated the price-inflationary aspects of the challenged agreements—and

necessary enticements for execution of the agreements themselves—because they provided the agreeing SLPTV providers, including YouTube and DirecTV, with assurances that Disney would not offer a better lowest-price bundle term to anyone else in the market, including ***Disney's own Hulu + Live TV product***. *Id.* ¶¶ 316-27. This was important because while every competing SLPTV provider experiences cost increases when ESPN prices increase, Disney recoups every dollar Hulu spends on ESPN as revenue. *Id.* ¶¶ 320, 323-25. As such, without the MFN, Disney could undercut the competition by lowering Hulu + Live TV prices. *Id.* ¶¶ 316-327. The MFN is an agreement by Disney that it will not do so, maintaining the price floor.[3] *Id.* Moreover, contrary to Disney's factually untethered argument that MFNs can result in price discounts, the MFNs here served no such purpose—Disney increased prices across the entire market through mirroring agreements including MFN and Base Terms in agreements with virtually every SLPTV provider. *Id.* ¶ 327; *see id.* ¶¶ 154-66, 216-22, 304-27 (price increases). Indeed, Disney was able to repeatedly increase prices marketwide throughout the three years after it took control of Hulu, as it completed agreement after agreement with its SLPTV rivals. *Id.* ¶¶ 156, 159, 160, 216-22, 304-27.

---

[3] Disney argues that CAC's allegations are implausible because SLPTV providers, such as YouTube TV and DirecTV Stream, reportedly demanded MFN clauses in their agreements with Disney, and Disney supposedly resisted those demands before capitulating. Mot. at 17. None of this, even if true, renders the anticompetitive effects of the challenged agreements implausible. To the contrary, it makes the anticompetitive effects ***more*** plausible in context. That is, the CAC alleges a conspiracy between Disney and its SLPTV competitors. It is entirely unsurprising that each co-conspirator would demand assurance, in the form of an MFN, that Disney would not offer any other SLPTV provider terms that could be used to offer a competing product at a lower price, particularly given that Disney could have used its ***own competing SLPTV product***, Hulu + Live TV, to lower its prices while at the same time raising that of its rivals, capturing market share. *See* CAC ¶¶ 323-24.

PLAINTIFFS' OPPOSITION TO DISNEY'S MOTION TO DISMISS

1

2

### III.   PLAINTIFFS ARE DIRECT PURCHASERS AND HAVE ANTITRUST STANDING TO SUE

Ignoring allegations that Plaintiffs were injured by inflated SLPTV prices, Disney argues that Plaintiffs' claims are barred by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), because the Plaintiffs—direct purchasers of YouTube TV subscriptions—are supposedly indirect purchasers of ESPN. This argument is meritless and relies on a mischaracterization of the claims asserted in the CAC. Plaintiffs are direct purchasers of ***SLPTV subscriptions*** from YouTube TV, which is alleged to have conspired with its fiercest competitor in the SLPTV Market, Disney, to inflate prices of the subscriptions Plaintiffs purchased. CAC ¶¶ 154-66, 177-96, 216-22, 304-27, 356-64. Plaintiffs are alleged to have paid prices for their SLPTV subscriptions that were inflated by this conspiracy, and may sue any of the co-conspirators as direct purchasers. *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 750 (9th Cir. 2012). As the Ninth Circuit recently explained, "[w]hen co-conspirators have jointly committed the antitrust violation, a plaintiff who is the immediate purchaser from any of the conspirators is directly injured by the violation." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d at 1157 (citing *Apple v. Pepper*, 139 S. Ct. 1514, 1522 (2019)); *see also In re ATM Fee Antitrust Litig.*, 686 F.3d at 750 (holding that Illinois Brick does not apply where a Plaintiff purchases from one of the co-conspirators in a price fixing scheme); *Frame-Wilson*, 591 F. Supp. 3d at 984 ("Here, Plaintiffs allege they are direct purchasers of antitrust conspirators. . . . Plaintiffs allege that they overpaid as a result of the alleged price-fixing conspiracy when they purchased class products from Amazon's co-conspirators on platforms other than Amazon.com. The Court agrees that Plaintiffs have established standing on this basis.").

### IV.   REQUEST FOR LEAVE TO AMEND

Should the Court dismiss any portion of the CAC, Plaintiffs respectfully request leave to amend their complaint, as any deficiencies can be cured, including based on facts gleaned from discovery. *See Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 960 (9th Cir. 2020).

### CONCLUSION

For these reasons, the Court should deny Disney's motion to dismiss in its entirety.

DATED:  April 7, 2023

Respectfully submitted,

**BATHAEE DUNNE LLP**

By:  */s/ Brian J. Dunne*
Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

By:  */s/ Yavar Bathaee*
Yavar Bathaee (CA 282388)
   yavar@bathaeedunne.com
Andrew C. Wolinsky (*pro hac vice*)
   awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 322-8835

*Attorneys for Plaintiffs and the
Proposed Class*

PLAINTIFFS' OPPOSITION TO DISNEY'S MOTION TO DISMISS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of April 2023, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing the document to be electronically served on all attorneys of record.

By    */s/ Brian J. Dunne*
        Brian J. Dunne