FARELLA BRAUN + MARTEL LLP
Douglas R. Young (SBN 073248)
Christopher C. Wheeler (SBN 224872)
Daniel A. Contreras (SBN 329632)
One Bush Street, 9th Fl.
San Francisco, CA 94104
Tel.:  (415) 954-4400
dyoung@fbm.com
cwheeler@fbm.com
dcontreras@fbm.com

CRAVATH, SWAINE & MOORE LLP
Antony L. Ryan (*pro hac vice*)
J. Wesley Earnhardt (*pro hac vice*)
David H. Korn (*pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Tel.:  (212) 474-1000
aryan@cravath.com
wearnhardt@cravath.com
dkorn@cravath.com

*Counsel for Defendant The Walt Disney Company*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| HEATHER BIDDLE, et al.,<br><br>               Plaintiffs,<br><br>    v.<br><br>THE WALT DISNEY COMPANY,<br><br>               Defendant. | **Case No.: 5:22-cv-07317-EJD**<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>Hearing Date:    February 15, 2024<br><br>Hearing Time:    9:00 AM |

**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS**
**PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on February 15, 2024, at 9:00 AM, or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Edward J. Davila, 280 South 1st St., San Jose, CA 95113, Courtroom 4, 5th Floor, Defendant The Walt Disney Company will and does hereby move the Court for an order dismissing Plaintiffs' Consolidated Amended Class Action Complaint in the above-captioned action. This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6), and is based upon this Notice of Motion and the Memorandum of Points and Authorities in Support and such argument as may be heard.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF ALLEGED FACTS ................................................................................... 4

      I.      THE PARTIES................................................................................................. 4

      II.     STREAMING COMPANIES BEGIN DISTRIBUTING LINEAR TV
           THROUGH THE INTERNET................................................................... 5

      III.    PLAINTIFFS ALLEGE THAT ESPN NEGOTIATES CARRIAGE
           AGREEMENTS WITH SLPTV PROVIDERS THAT INCLUDE THE BASE
           TERM AND AN MFN CLAUSE. ........................................................... 6

PROCEDURAL HISTORY...................................................................................................... 8

LEGAL STANDARD............................................................................................................... 9

ARGUMENT .......................................................................................................................... 10

      I.      THE COURT RIGHTLY CONCLUDED THAT PLAINTIFFS FAIL TO
           ALLEGE A *PER SE* VIOLATION. ........................................................ 10

      II.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE RULE
           OF REASON. ............................................................................................ 13

           A.     Plaintiffs Fail To Plead the Relevant Antitrust Product Market. .............. 14

           B.     Plaintiffs Have Not Identified Agreements that Unreasonably Restrain
                 Trade. ...................................................................................................... 19

      III.    PLAINTIFFS HAVE NO CLAIM FOR DAMAGES FOR FEDERAL LAW
           CLAIMS. .................................................................................................. 24

      IV.    PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED.................. 25

           A.     Plaintiffs Have Not Plausibly Alleged Agreements Violating
                 the Antitrust Law of Nine of the Eleven States. ....................................... 25

           B.     Plaintiffs Fail To State a Claim Under Massachusetts and Florida Law. . 27

           C.     Plaintiffs' Claim Under Illinois Law Should Be Dismissed Because
                 Illinois Does Not Permit Indirect Purchasers To Bring Class Actions..... 29

           D.     Plaintiffs' Claim Under Tennessee Law Should Be Dismissed
                 Because the Tennessee Trade Practice Act Does Not Apply
                 to "Services". .......................................................................................... 29

CONCLUSION........................................................................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051 (9th Cir. 1999) ............................14

*Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781 (9th Cir. 1996) .................................10

*Am. Channel, LLC v. Time Warner Cable, Inc.*, No. 06-cv-2175, 2007 WL 142173
(D. Minn. Jan. 17, 2007) ....................................................................................18

*Anheuser-Busch, Inc. v. Abrams*, 520 N.E.2d 535 (N.Y. 1988) ...............................26

*Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019) .......................................................24, 25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................10

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990).................................10

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102 (9th Cir. 2021) ...................13

*Baptist Hosp., Inc. v. Baker*, 84 So. 3d 1200 (Fla. Dist. Ct. App. 2012) .......................28

*Beaudreau v. Larry Hill Pontiac/Oldsmobile/GMC, Inc.*, 160 S.W.3d 874 (Tenn. Ct. App.
2004) ..................................................................................................................30

*Bei Jing Han Tong San Kun Ke Ji You Xian Gong Si v. Atl. Med. Prods., LLC*, No. 8:20-
CV-2972-CEH-TGW, 2022 WL 88167 (M.D. Fla. Jan. 7, 2022) ..........................28

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................24

*Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747 (Tenn. Ct. App. 2006) ......................29, 30

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir.
1995) ..................................................................................................................20

*Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350 (M.D. Fla.
2007) ..................................................................................................................28

*Boulware v. Nev., Dep't of Hum. Res.*, 960 F.2d 793 (9th Cir. 1992) .........................26

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) .......................... passim

*Brantley v. NBC Universal, Inc.*, Case No. CV 07-6101 CAS, 2008 WL 11338585
(C.D. Cal. Mar. 10, 2008) ..................................................................................17

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979)..........................13

*Bryan v. Del Monte Foods, Inc.*, Case No. 23-cv-00865-MMC, 2023 WL 6959128
(N.D. Cal. Oct. 19, 2023) ....................................................................................13

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988)................................................11, 12

*City of Knoxville v. Netflix, Inc.*, 656 S.W.3d 106 (Tenn. 2022) ...........................................31

*City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882 (9th Cir. 2001) .........................13

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148 (9th Cir. 2001)................................25

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).....................................................12

*Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986), *as modified*, 810 F.2d 1517
    (9th Cir. 1987)...........................................................................................................................11

*Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019 (N.D. Cal. 2015)............................................16, 17

*Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680 (9th Cir. 2022)........................................10

*Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975 (W.D. Wash. 2022) ............................12

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020)...........................................................passim

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485 (2d Cir. 2004)............................18

*GenTech Constr., LLC v. Natare Corp.*, No. 1:07-cv-192, 2011 WL 1257943 (E.D. Tenn.
    Mar. 31, 2011)..........................................................................................................................30

*Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758 (N.D. Ill. 2015)....................................25

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018).............................................10, 18, 19

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*,
    535 F. Supp. 3d 638 (E.D. Mich. 2021)...................................................................................26

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ........................................................................24

*In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151 (2d Cir. 2016)................................17

*In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015)...................11

*In re Nat'l Ass'n of Music Merch., Musical Instruments & Equip. Antitrust Litig.*, No. 09-
    cv-2002, 2011 WL 3702453 (S.D. Cal. Aug. 22, 2011) .........................................................27

*In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*,
    758 F. Supp. 2d 1077 (S.D. Cal. 2010)....................................................................................13

*In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670 (E.D. Pa. 2010) ..................................29

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 555 F. Supp. 3d 829 (N.D. Cal. 2021) ..............29

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) ........................................................21

*JES Props. Inc. v. USA Equestrian, Inc.*, No. 8:02-CV-1585-T24MAP, 2005 WL 1126665 (M.D. Fla. May 9, 2005) .........................................................................28

*Jo Ann Forman, Inc. v. Nat'l Council on Comp. Ins., Inc.*, 13 S.W.3d 365 (Tenn. Ct. App. 1999) .............................................................................................................30

*Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897 (N.D. Cal. 2019)...............................29

*Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012)................................................13

*Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422 (9th Cir. 1993) ......................23

*Mahaska Bottling Co. v. PepsiCo Inc.*, 271 F. Supp. 3d 1054 (S.D. Iowa 2017)..........26

*McAdoo Contractors, Inc. v. Harris*, 439 S.W.2d 594 (Tenn. 1969) ............................30

*McGlinchy v. Shell Chem. Co.*, 845 F.2d 802 (9th Cir. 1988)........................................25

*Moss v. U.S. Secret Serv.*, 572 F.3d 962 (9th Cir. 2009) ..............................................10

*Mothershed v. Justs. of Supr. Ct.*, 410 F.3d 602 (9th Cir. 2005) ..................................25

*No Spill LLC v. Scepter Can., Inc.*, No. 2:18-cv-2681, 2022 WL 1078435 (D. Kan. Apr. 6, 2022) .........................................................................................20

*Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300 (LGS), 2017 WL 1133446 (S.D.N.Y. Mar. 24, 2017) ...............................................................................17

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101 (1st Cir. 1989)...........................................................................20

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) .........................................11, 14, 18

*Parziale v. HP, Inc.*, 445 F. Supp. 3d 435 (N.D. Cal. 2020) ........................................28

*Pearson v. Dennison*, 353 F.2d 24 (9th Cir. 1965) ......................................................13

*Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190 (N.D. Cal. 2014).................................7

*Rafferty v. Merck & Co., Inc.*, 92 N.E.3d 1205 (Mass. 2018) ......................................27

*Rearden LLC v. Rearden Commerce, Inc.*, 597 F. Supp. 2d 1006 (N.D. Cal. 2009).......7

*Rose v. Vulcan Materials Co.*, 194 S.E.2d 521 (N.C. 1973)..........................................26

*Sidebotham v. Robison*, 216 F.2d 816 (9th Cir. 1954)..................................................13

*Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013) ............................................24, 25

*Spahr v. Leegin Creative Leather Prods., Inc.*, No. 2:07-CV-187, 2008 WL 3914461 (E.D. Tenn. Aug. 20, 2008) ............................................................................26

*Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578 (N.D. Cal. 2020) ...............................29

*State v. Beach Blvd. Auto. Inc.*, 139 So. 3d 380 (Fla. Dist. Ct. App. 2014) ...................28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...............................7

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) ...........................................................10

*U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) ..........................................31

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health and Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052 (N.D. Cal. 2014) ...........................29

*United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972) ...........................................11

*Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244 (11th Cir. 2016) ...............................31

**Statutes & Rules**

740 Ill. Comp. Stat. Ann. 10/11 .......................................................................26

740 Ill. Comp. Stat. Ann. 10/7 ........................................................................29

Ariz. Rev. Stat. § 44-1412 ..............................................................................25

Fed. R. Evid. 201(b) .......................................................................................7

Iowa Code Ann. § 553.2 .................................................................................26

Mass. G.L. c. 93A, § 2 ...................................................................................27

Mich. Comp. Laws § 445.784 ..........................................................................26

Nev. Rev. Stat. Ann. § 598a.050.......................................................................26

Tenn. Code Ann. § 47-2-105 ...........................................................................30

## PRELIMINARY STATEMENT

Disney hereby moves to dismiss Plaintiffs' Consolidated Amended Class Action Complaint (the "Amended Complaint") in its entirety.

***Sherman Act Per Se and Damages Claims.***  The Court previously dismissed Plaintiffs' claim for *per se* liability, holding that the challenged restraints are vertical.  The Court also previously dismissed Plaintiffs' claim for damages under the Sherman Act, holding that Plaintiffs are indirect purchasers under *Illinois Brick*.  Those holdings are both correct.  The Amended Complaint contains no additional or different allegations that could affect the Court's analysis of those issues.  As a result, Plaintiffs' *per se* and Sherman Act damages claims must be dismissed again, for the same reasons previously held.  (*Infra* §§ I, III.)

***Sherman Act Rule of Reason Claim.***  Plaintiffs' Sherman Act rule of reason claim for injunctive relief also should be dismissed.  The Court previously denied Disney's motion to dismiss that claim.  Disney respectfully submits that the Court's prior Order made three missteps under controlling Ninth Circuit law; each provides an independent basis to dismiss Plaintiffs' rule of reason claim in its entirety.  (*Infra* § II.)

*First*, Plaintiffs' rule of reason claim fails because Plaintiffs have not alleged the relevant antitrust product market.  As the Court correctly recognized, under recent and controlling Ninth Circuit precedent, the relevant product market is the one "where competition is [allegedly] being restrained".  (Order at 18 (alteration in original) (quoting *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020)).)  The product market ***where competition is allegedly being restrained*** can be different from the product market ***where consumers allegedly suffered harm*** from the alleged restraint on competition.  Indeed, that fundamental distinction, between where competition allegedly is restrained and where pass-through harm might occur, underpins the *Illinois Brick* jurisprudence pursuant to which the Court dismissed Plaintiffs' Sherman Act damages claim.

Here, as the Court correctly recognized, "the only agreements at issue"—and, thus, the only alleged restraints on competition—"are carriage agreements between ESPN and SLPTV [streaming live pay television] providers in which ESPN provides the ESPN network to

SLPTV streaming platforms". (Order at 12.) The product in those agreements is the ESPN network; the only alleged restraints concern the terms pursuant to which that product (the ESPN network) is sold to SLPTV providers. Thus, the product market "where competition is allegedly being restrained" is the market where network programmers (such as ESPN) sell their products (linear networks such as the ESPN network) to distributors (such as YouTube TV and DirecTV Stream). Plaintiffs do not even attempt to plead that market for linear TV networks, let alone that Disney has market power in that market. That is a dispositive failing.

The Court's prior Order focused on Plaintiffs' assertion that consumers allegedly suffered pass-through harm in a different, downstream market—the one in which SLPTV providers sell SLPTV subscriptions to consumers. That is the market Plaintiffs attempt to define in the Amended Complaint. But alleging that consumers suffered pass-through harm in that downstream market does not convert that downstream market into the relevant product market for Plaintiffs' rule of reason claim. Were it otherwise, most cases dismissing damages claims under *Illinois Brick* would be decided differently, because the plaintiff simply could allege that the market in which it purchased the product at inflated prices is the relevant product market, converting an indirect purchaser claim into a direct purchaser claim. That is not the law. As the Court previously has ruled, ESPN does not compete in the downstream SLPTV market, and Plaintiffs do not allege the existence of **any** agreement between competitors in that downstream market, let alone agreements that allegedly restrain competition. (Order at 12.) Because the relevant antitrust market must be the one in which the allegedly unlawful restraint occurred, the SLPTV market cannot be the relevant antitrust market.

*Second*, even if one were to assume that the market for SLPTV subscriptions could be the relevant product market here—and, as explained above, Disney believes Ninth Circuit law forecloses that assumption—Plaintiffs' rule of reason claim still would fail. Alleging an unreasonable restraint of trade in the relevant product market is a bedrock element of any Sherman Act Section 1 claim. Here, however, Plaintiffs allege **no agreement whatsoever** between Disney and YouTube TV / DirecTV Stream about the YouTube TV / DirecTV Stream products, *i.e.*, about SLPTV subscriptions. The only agreements concern how ESPN sells its

product (the ESPN network) to SLPTV providers.  Thus, even if Plaintiffs are permitted to define the relevant product market as the market for SLPTV subscriptions, their claim still fails because they have identified no agreement restraining ***competition in that market***.

*Third*, even if one were to permit Plaintiffs to plead the downstream SLPTV market as the relevant product market, while also permitting Plaintiffs to plead the upstream ESPN network carriage agreements as the allegedly unlawful restraint—a mismatch that Disney believes is foreclosed by controlling Ninth Circuit law—Plaintiffs' rule of reason claim ***still*** fails because Plaintiffs have not plausibly alleged that the restraint "actually injures competition" in that downstream market.  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012). In evaluating that element of a rule of reason claim, the Court previously held—correctly—that *Brantley* controls.  The Court also held—correctly—that, under *Brantley*, the claim can survive a motion to dismiss only if Plaintiffs plausibly allege that the challenged practices "raise[ ] barriers to entry".  (Order at 22 (citing *Brantley*, 675 F.3d at 1201).)

Plaintiffs have not, however, pleaded that causal element.  While the Court found that Plaintiffs allege the ***existence of*** barriers to entry in the SLPTV market, Plaintiffs do not allege (as they must) that the challenged restraints ***raised or created*** those barriers to entry. Plaintiffs point to purported infrastructure barriers to entry—arguing that SLPTV providers require costly servers with significant computing power (Am. Compl. ¶ 318)—but Plaintiffs do not allege that the Base Term or the MFN Clauses create or contribute to any such infrastructure requirements.  Plaintiffs also cite the alleged difficulty of securing a "critical mass of live television channels" necessary "to become a viable pay television platform" (*id.* ¶ 329), but the average U.S. household receives nearly 200 linear networks (*id.* ¶ 137)—Plaintiffs allege that the Base Term and MFN Clauses restrict only ESPN (*id.* ¶¶ 337, 342, 345).  Therefore, those alleged agreements cannot create or contribute to an SLPTV provider's supposed difficulty in securing sufficient channels other than ESPN from programmers across the industry to offer an SLPTV package.

Plaintiffs say that a "potential entrant must negotiate with Disney to remain competitive" because "ESPN is important to a large number of live television subscribers" (*id.*

¶ 359), but that assertion is (i) rendered implausible by the Amended Complaint's overarching theory—that subscribers and SLPTV providers would prefer packages *without* ESPN; (ii) has nothing to do with any alleged *restraint* in the agreement by which SLPTV providers buy ESPN (as opposed to ESPN's desirability as a channel); and (iii) is insufficient as a matter of law because Plaintiffs do not (and cannot) allege facts establishing that each SLPTV provider always has carried ESPN.  Finally, any assertion that the ESPN agreements somehow foreclose new entrants from competing in the SLPTV market is rendered implausible by Plaintiffs' own more specific factual allegations that, since 2015, numerous competitors have entered the market, including Sling TV, DirecTV Now, PlayStation Vue, Pluto TV, Xumo, fuboTV, YouTube TV and Hulu + Live TV.  (*Id.* ¶ 261.)  Because Plaintiffs have not pleaded facts plausibly suggesting that the Base Term or MFN Clauses "raised" barriers to entry in the SLPTV market and, instead, have pleaded facts rendering that conclusion *implausible*, *Brantley* requires that Plaintiffs' Section 1 claim be dismissed in its entirety.

    ***State Law Claims.***  In the Amended Complaint, Plaintiffs add antitrust or unfair competition claims under the laws of eleven states, in an apparent effort to claim damages under those statutes notwithstanding the *Illinois Brick* bar to indirect purchaser damages under the Sherman Act.  For nine of the eleven states, the claims fail for the same reason as the federal Sherman Act claims.  (*Infra* § IV(A) (Arizona, California, Illinois, Iowa, Michigan, Nevada, New York, North Carolina and Tennessee).)  For the remaining two states, Plaintiffs' only alleged unfair trade practice is the purported antitrust violation, which, therefore, fails for the same reasons.  (*Infra* § IV(B) (Massachusetts and Florida).)  The Illinois and Tennessee claims fail for additional reasons specific to those states' statutes.  (*Infra* § IV(C, D).)

<u>**STATEMENT OF ALLEGED FACTS**</u>

    The following facts are taken from the Amended Complaint.  Disney assumes these facts to be true only for purposes of this motion.

**I.  THE PARTIES.**

    Plaintiffs are 25 individuals who currently subscribe or previously subscribed to either YouTube TV or DirecTV Stream.  (Am. Compl. ¶¶ 11-25, 29-38.)  YouTube TV and

DirecTV Stream are virtual multichannel video programming distributors ("vMVPDs"), services that transmit linear television networks on a subscription basis via the internet rather than by cable or satellite.  Linear television networks stream scheduled programming 24 hours a day—what the Amended Complaint refers to as "live TV"—which is in contrast to "on demand" services (such as Netflix), which allow consumers to choose particular programs to watch when they want to watch them.  (*Id.* ¶¶ 44, 261.)

The sole Defendant is The Walt Disney Company ("Disney").  (*Id.* ¶ 42.)  Disney is the majority owner of ESPN and, separately, the majority owner of Hulu.  (*Id.* ¶ 44.)  ESPN is a television programmer that "provides sports coverage as part of cable packages throughout the United States".  (*Id.* ¶ 56.)  Hulu is a video streaming company that offers, among other products, a linear television streaming service called Hulu + Live TV.  (*Id.* ¶ 44.)  Plaintiffs allege that Disney owns controlling interests in ESPN and Hulu and has operational control over the two companies, but Plaintiffs acknowledge that those two companies are each joint ventures:  Disney owns 80% of ESPN (the remainder is owned by Hearst Corporation) and 67% of Hulu (the remainder is owned by NBCUniversal Media, LLC).  (*Id.*)

## II.  STREAMING COMPANIES BEGIN DISTRIBUTING LINEAR TV THROUGH THE INTERNET.

As alleged at length in the Amended Complaint, until recently, linear television distribution was dominated by cable and satellite providers—so-called multichannel video programming distributors, or "MVPDs".  (Am. Compl. ¶ 92.)  MVPDs negotiate "carriage agreements" with TV programmers (like ESPN), which give MVPDs the right to distribute a programmer's linear television networks.  (*Id.*)  MVPDs then aggregate networks from numerous programmers and sell those networks in a package to consumers.  (*Id.* ¶¶ 329-30.)  Those packages are the traditional cable and satellite TV packages with which most people are familiar.  (*Id.* ¶ 162.)

As the internet became "a viable distribution channel" for TV networks, a new form of distribution emerged.  (*Id.* ¶¶ 103, 114.)  Distributors that stream linear television networks over the internet—such as YouTube TV and DirecTV Stream—came to be known as

*virtual* multichannel video programming distributors, or "vMVPDs".  (*Id.* ¶ 161.)  "To consumers, the new vMVPDs served the same role as traditional cable and satellite TV providers, and quickly became potential alternatives to legacy/traditional cable/satellite pay TV." (*Id.* ¶ 162.)  Plaintiffs assert that vMVPDs are distinct from services that stream movies or TV shows on demand over the internet, such as Netflix and the Hulu video-on-demand service (as opposed to Hulu + Live TV).  As Plaintiffs put it, vMVPDs are not to be confused with "streaming on-demand services", like Netflix, as vMVPDs "package live pay TV channels from various sources into a single bundle, much like traditional live pay television products (*i.e.*, legacy cable and satellite TV products)."  (*Id.*)  In this way, "vMVPD services resemble the familiar layout of cable packages where users can browse a guide or flip through channels that stream programming 24 hours a day."  (*Id.*)  In recent years, at least the following SLPTV platforms are alleged to have entered the market:  Sling TV, DirecTV Stream, PlayStation Vue, Pluto TV, Xumo, fuboTV, YouTube TV and Hulu + Live TV.  (*Id.* ¶¶ 161, 164, 167-69, 261, 303.)  According to Plaintiffs, DirecTV Stream, YouTube TV, Hulu + Live TV and Sling TV carry ESPN (*id.* ¶¶ 182-245), yet they do not allege which—if any—of the other SLPTV providers have carried ESPN (or when).

## III.   PLAINTIFFS ALLEGE THAT ESPN NEGOTIATES CARRIAGE AGREEMENTS WITH SLPTV PROVIDERS THAT INCLUDE THE BASE TERM AND AN MFN CLAUSE.

Plaintiffs do not allege that there is any rule or any agreement that requires any SLPTV provider to carry the ESPN network.  Rather, as with traditional MVPDs that have existed for decades, Plaintiffs allege that certain SLPTV providers chose to negotiate carriage agreements with ESPN so that they could distribute ESPN's linear television network to their subscribers.  (Am. Compl. ¶¶ 197, 213, 240-41.)  Those carriage agreements govern the terms pursuant to which ESPN grants the SLPTV providers the rights to distribute the ESPN network. (*Id.* ¶ 193.)  Plaintiffs do not allege that there is any agreement that would prevent a new SLPTV provider from entering the market ***without*** carrying ESPN.

Like many television programmers, ESPN generates a portion of its revenue through "affiliate fees", which are fees paid by TV distributors to ESPN each month based on

subscription levels.  (*Id.* ¶¶ 74, 76.)  ESPN also generates revenue through advertising, the amount of which is largely a function of a network's reach and popularity.  (*Id.* ¶ 313.)  For both those reasons, it always has been important for ESPN to maximize the total number of subscribers to its linear television network.

ESPN, therefore, offers a simple bargain to SLPTV providers:  if you would like to offer the ESPN network to your subscribers, you must offer it in your base product (*i.e.*, the basic package of channels sold to subscribers).  (*Id.* ¶ 4.)  SLPTV providers are, of course, free not to offer ESPN at all; Plaintiffs do not allege that there is any agreement requiring new SLPTV providers to carry the ESPN network in the first place.  In fact, fuboTV, one of the SLPTV providers Plaintiffs reference (*id.* ¶¶ 261, 303-04), did not carry the ESPN network from its inception in 2015 until 2020, and Philo TV, another SLPTV provider, has never carried the ESPN network at all.[1]

Obtaining the Base Term in a carriage agreement from SLPTV providers that choose to offer ESPN ordinarily requires compromise on ESPN's part.  Plaintiffs allege that most TV distributors demand, among other things, that ESPN's carriage agreements also include a "most favored nation" provision regarding the ESPN affiliate fee (the "MFN Clause").  (*Id.* ¶ 342.)  Plaintiffs allege that the MFN Clause requires ESPN "to provide the counterparty with the lowest price for ESPN and other channels offered to any other market participant".  (*Id.*)  So if, for example, ESPN discounts the ESPN network affiliate fee for one distributor, it must offer

---

[1] *See* Todd Spangler, *ESPN Is Finally Coming to FuboTV Lineup*, Variety (June 24, 2020), https://variety.com/2020/digital/news/espn-available-fubotv-lineup-1234648449/ (last visited Dec. 1, 2023); *Channel Lineup & TV Guide*, Philo, https://www.philo.com/go/channels (last visited Dec. 1, 2023).

The Court may take judicial notice of these facts regarding network lineups because they are "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned".  Fed. R. Evid. 201(b); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (noting that courts ruling on 12(b)(6) motions to dismiss may consider "matters of which a court may take judicial notice"); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1205 (N.D. Cal. 2014) (taking judicial notice of pages from a company's website); *Rearden LLC v. Rearden Commerce, Inc.*, 597 F. Supp. 2d 1006, 1013 n.3 (N.D. Cal. 2009), *vacated on other grounds*, 683 F.3d 1190 (9th Cir. 2012) (taking judicial notice of contents of a webpage listing a company's office locations).

this lower price to all distributors with an applicable MFN Clause, whether ESPN wants to or not.  (*Id.*)  As the *Hollywood Reporter* explained in an article incorporated by reference into the Amended Complaint, such MFN clauses "equal the playing field" among TV distributors, preventing ESPN from charging a higher affiliate fee for the ESPN network to a distributor who negotiated for an applicable MFN Clause.  (*Id.* ¶ 94.)

Negotiations between ESPN and SLPTV providers over the Base Term and MFN Clauses have been hard fought.  For instance, in 2021, ESPN negotiated a carriage agreement with Google's YouTube TV.  (*Id.* ¶ 214.)  At first, "Google publicly threatened to offer a baseline YouTube TV package without ESPN if it could not reach a carriage agreement with Disney."  (*Id.* ¶ 215.)  The "sticking point" for Google was its desire to have "an MFN agreement that would ensure price and term parity" with other distributors.  (*Id.* ¶ 216.)  "The press continued to report that negotiations had stalled . . . over MFN terms", as Google was "seeking to ensure that a lower price for Disney-owned content (principally, ESPN) offered to another streaming live TV provider would be offered to Google as well".  (*Id.* ¶¶ 218-19.)

True to its word, on December 18, 2021, Google chose to let its existing carriage agreement lapse, at which point YouTube TV subscribers lost access to ESPN.  (*Id.* ¶ 220.)  Ultimately, according to Plaintiffs, the parties entered into a carriage agreement containing both the Base Term and an MFN Clause.  (*Id.* ¶¶ 224-25.)  Similarly, in October 2022, ESPN's carriage agreement with Sling TV, another vMVPD, expired.  (*Id.* ¶ 234.)  After its subscribers lost access to ESPN for two days, Sling TV agreed to a "handshake deal" on a new carriage agreement, which Plaintiffs allege included an MFN Clause.  (*Id.* ¶¶ 240, 242.)

## PROCEDURAL HISTORY

On November 18, 2022, subscribers to YouTube TV filed a putative class action against Disney, captioned *Biddle v. The Walt Disney Company*, No. 5:22-cv-07317-EJD (the "*Biddle* Action").  Separately, on November 30, 2022, subscribers to DirecTV Stream (represented by the same counsel) filed a substantially similar action, captioned *Fendelander v. The Walt Disney Company*, No. 5:22-cv-07533-EJD (the "*Fendelander* Action").

On January 31, 2023, Disney filed substantially similar motions to dismiss the *Biddle* and *Fendelander* complaints for failure to state a claim.  (Def.'s Notice of Mot. and Mot. to Dismiss Pls.' Compl., ECF No. 19.)  On September 30, 2023, the Court issued substantially similar orders (i) granting Disney's motions to dismiss *Biddle* and *Fendelander* Plaintiffs' claims that Disney *per se* violated the Sherman Act Section 1 and to dismiss Plaintiffs' claims for damages; and (ii) denying Disney's motions to dismiss Plaintiffs' claim that Disney violated the Sherman Act Section 1 under the rule of reason.  (Order Granting in Part and Denying in Part Mot. to Dismiss, ECF No. 51 ("Order").)

On October 13, 2023, pursuant to stipulation, the Court consolidated the *Biddle* and *Fendelander* Actions under Case No. 5:22-cv-07317-EJD for all pre-trial purposes (the "Consolidated Action").  (Order re Consolidation of Actions, ECF No. 53.)  On October 18, 2023, Plaintiffs in the Consolidated Action filed the Amended Complaint.  (Consolidated Am. Class Action Compl., ECF No. 59 ("Am. Compl.").)  The Amended Complaint adds additional plaintiffs to the purported YouTube TV and DirecTV Stream Subscriber Classes (*id.* ¶¶ 15-25, 34-38), corresponding state-specific subscriber classes (*id.* ¶¶ 376-405), and corresponding state law claims (*id.* ¶¶ 462-599).

In the Amended Complaint, Plaintiffs allege that Disney violated Section 1 of the Sherman Act based on two alternative theories:  that the challenged agreements are a *per se* violation; and that the challenged agreements are unlawful under the rule of reason.  (*See id.* ¶¶ 418-39 (Count I, YouTube TV Subscriber Class); ¶¶ 440-61 (Count II, DirecTV Stream Subscriber Class).)  The Amended Complaint also adds for the first time claims based on statutes in eleven states:  California, Florida, New York and North Carolina for both the YouTube TV and DirecTV Stream Subscriber Classes; Arizona, Michigan and Tennessee for only the YouTube TV Subscriber Class; and Illinois, Iowa, Massachusetts and Nevada for only the DirecTV Stream Subscriber Class.

## **LEGAL STANDARD**

"In order to prevail on a cause of action for violation of 15 U.S.C. § 1, a plaintiff must show (1) there was an agreement, conspiracy, or combination between two or more entities;

(2) the agreement was an unreasonable restraint of trade under either a *per se* or rule of reason analysis; and (3) the restraint affected interstate commerce." *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996).  Private plaintiffs must also demonstrate that "they were harmed by the defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from an 'anti-competitive aspect of the practice under scrutiny'". *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1117 (9th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  It is not enough to allege a claim is *possible*; plaintiffs must allege sufficient facts to support a *plausible* claim.  *See, e.g.*, *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.") (quoting *Iqbal*, 556 U.S. at 678). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Iqbal*, 556 U.S. at 678).  The Court need not assume the truth of legal conclusions merely because they are cast in the form of factual allegations.  *Id.*

<u>**ARGUMENT**</u>

**I.    THE COURT RIGHTLY CONCLUDED THAT PLAINTIFFS FAIL TO ALLEGE A *PER SE* VIOLATION.**

Only agreements that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish [their] illegality" are subject to *per se* treatment.  *Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 688 (9th Cir. 2022) (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)).  The Court previously found that Plaintiffs' allegations here could not meet that high bar and dismissed Plaintiffs' *per se* claim.  (Order at 9-15.)  Although the Court granted Plaintiffs leave to amend their complaint, Plaintiffs failed to add any substantive allegations in support of their *per se* theory.  Because Plaintiffs made no attempt to amend or

expand their prior allegations, Plaintiffs' *per se* claim must be dismissed for the same reasons described in the Court's prior Order.

Antitrust conspiracies generally are classified as either "vertical" or "horizontal", a categorization that describes the way in which the alleged conspirators relate to one another in the product distribution chain in connection with the challenged restraint.  *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015).  Restraints "imposed by agreement between firms at different levels of distribution"—*e.g.*, between a supplier and distributor—are vertical.  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).  As the Court correctly observed in its Order, "[i]n general, only agreements between competitors to restrain trade, *i.e.*, horizontal agreements, qualify as unreasonable *per se*".  (Order at 10 (citing *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018))); *see also Musical Instruments & Equip.*, 798 F.3d at 1191-92 ("Vertical agreements . . . are analyzed under the rule of reason."); *see also Am. Express*, 138 S. Ct. at 2283-84 ("Typically only 'horizontal restraints' . . . qualify as unreasonable *per se*.").

The Court properly concluded that the challenged restraints here are vertical. Whether a restraint is horizontal or vertical is determined by reference to the parties' relationship **with respect to the agreement at issue**.  *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1481 (9th Cir. 1986), *as modified*, 810 F.2d 1517 (9th Cir. 1987) ("We have categorized restrictions imposed in the context of dual distributorships as vertical and analyzed them under the rule of reason."); *see also Brantley*, 675 F.3d at 1195 nn.1 & 2, 1198-99 (concluding that the challenged restraints between TV programmers and TV distributors were "vertical agreements" even though many programmer defendants (such as Turner Broadcasting System, Inc.) also operated distribution services (such as Time Warner Cable Inc.)).  Here, as the Court held, "the only agreements at issue are carriage agreements between ESPN and SLPTV providers in which ESPN provides the ESPN network to SLPTV streaming platforms within the same distribution chain—a relationship that is categorically vertical".  (Order at 12 (citing *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (defining a vertical restraint as a "combination[ ] of persons at different levels of the market structure, *e.g.*, manufacturers and distributors"))).)  Those

contracts are between firms acting at different levels of distribution:  ESPN (acting as a TV programmer that supplies linear television networks to distributors) and SLPTV providers (acting as the distributors who package the ESPN network together with other linear television networks to create a different product for resale to consumers).  That relationship is vertical.  *See Bus. Elecs.*, 485 U.S. at 730.

As the Court further held, contrary to Plaintiffs' prior arguments, *Copperweld* does not change the analysis.  (Order at 12-14.)  In *Copperweld*, the Supreme Court considered antitrust liability of parents and subsidiaries, holding that a parent and its wholly owned subsidiary cannot conspire with each other for purposes of Section 1 because they have a unity of purpose.  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 777 (1984).  That unity of purpose does not mean, however, that because Disney owns most (but not all) of ESPN and also owns most (but not all) of Hulu, ESPN's agreements with SLPTV providers are converted from straightforward vertical distribution agreements into horizontal agreements with competitors; the question remains "what is the relationship of the parties with respect to the agreements at issue?".  As the Court set forth in its Order, "Plaintiffs do not allege that ESPN competes with the SLPTV providers, nor do Plaintiffs allege that Hulu—or even Disney through Hulu—entered into a horizontal agreement with a competitor."  (Order at 12.)  Rather, the only agreements at issue are between ESPN (as a linear network producer) and SLPTV providers (as distributors of packages of linear networks to consumers), "a relationship that is categorically vertical".  (*Id.*)

Because Plaintiffs have not alleged a horizontal restraint—that is, an agreement between competitors at the same level of the distribution chain—the *per se* rule cannot apply, and any *per se* claims must be dismissed.  *See, e.g.*, *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 987-88 (W.D. Wash. 2022) ("Absent plausible allegations of a horizontal arrangement—or any legal authority supporting *per se* analysis in the absence of a horizontal agreement or inference thereof—the Court concludes that Plaintiffs' allegations of a *per se* violation fail as conclusory and unsupported.").  The agreements at issue here are not among the small group of restraints that may be condemned as *per se* unlawful.  (*See* Order at 14 ("[W]hile some vertical agreements may constitute a *per se* violation, Plaintiff has failed to

allege a *per se* anticompetitive restraint."*)); *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9-10 (1979) ("[I]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations"); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021) (identifying the prototypical examples of *per se* unlawful restraints).  Thus, the Court should again dismiss Plaintiffs' claim based on any alleged *per se* violation of Section 1 of the Sherman Act.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE RULE OF REASON.

As an alternative to their *per se* claim, Plaintiffs assert a Sherman Act Section 1 claim based on the rule of reason.  That claim must be dismissed because Plaintiffs have alleged neither an appropriate relevant product market nor that Disney has market power in any such market.  (*See infra* § A.)  Even if the "SLPTV market" Plaintiffs trumpet were a relevant product market in which Disney has market power, Plaintiffs have failed to plausibly allege that the agreements at issue unreasonably restrain trade in that market because Plaintiffs have not pleaded facts suggesting that those agreements raise barriers to entry for SLPTV competitors beyond the barriers to entry that would exist anyway, in the absence of the agreements at issue. (*See infra* § B.)[2]

---

[2] Although the Court previously denied Disney's motion to dismiss the rule of reason claims for injunctive relief in the prior *Biddle* and *Fendelander* complaints, Disney moves to dismiss the consolidated Amended Complaint in its entirety.  It has long been the law in the Ninth Circuit that "an amended complaint super[s]edes the original complaint and renders it without legal effect", *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 927 (9th Cir. 2012), leaving a defendant "free to challenge the entire new complaint" on a renewed motion to dismiss, *Sidebotham v. Robison*, 216 F.2d 816, 823 (9th Cir. 1954), even on issues identical between the two complaints.  *See In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1098 (S.D. Cal. 2010) (granting second motion to dismiss a claim for breach of express warranty after the same claim survived an earlier motion to dismiss and plaintiffs' allegations with respect to the claim were the same in both complaints); *see also Bryan v. Del Monte Foods, Inc.*, Case No. 23-cv-00865-MMC, 2023 WL 6959128, at *1 n.5, *2 n.7 (N.D. Cal. Oct. 19, 2023).  Moreover, the previous denial of a motion to dismiss is "interlocutory, and [can] be renewed and reconsidered at any time before final judgment". *Pearson v. Dennison*, 353 F.2d 24, 28 (9th Cir. 1965); *see, e.g.*, *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001) (same).

---

**A.      Plaintiffs Fail To Plead the Relevant Antitrust Product Market.**

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'"  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Am. Express*, 138 S. Ct. at 2285).  Without defining the relevant product market, "there is no way to measure [the defendant's] ability to lessen or destroy competition".  *Am. Express*, 138 S. Ct. at 2285.  As the Ninth Circuit has held, the relevant product market is the one "***where competition is [allegedly] being restrained***".  *Qualcomm*, 969 F.3d at 992 (emphasis added) (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1057 (9th Cir. 1999)).

Here, Plaintiffs allege that "competition is allegedly being restrained" ***only*** by the Base Term and MFN provisions, which are terms in contracts pursuant to which ESPN sells the ESPN network to SLPTV providers.  In those transactions, ESPN is the seller; SLPTV providers are the buyers; and the ESPN network is the product.  "Plaintiffs do not allege that ESPN competes with the SLPTV providers, nor do Plaintiffs allege that Hulu—or even Disney through Hulu—entered into a horizontal agreement with [SLPTV providers]."  (Order at 12.)  As a result, the only agreements alleged to restrain competition are agreements in which the ESPN network is the product.  There are no agreements alleged in which SLPTV subscriptions are the product.  Thus, the relevant product market for Plaintiffs' claims is the market in which linear network programmers compete to sell linear networks (such as the ESPN network) to SLPTV providers.

Plaintiffs do not even attempt to plead that market.  Nor do Plaintiffs allege, as they must, that Disney has market power in that market.  *See, e.g.*, *Am. Express*, 138 S. Ct. at 2285 & n.7.  Instead, the Amended Complaint reflects that the linear network market contains well over one hundred linear networks, including the ESPN network, CBS, USA, CNN, Fox Sports, Nickelodeon, Home and Garden TV, and many more.  (*See* Am. Compl. ¶ 137 (reporting that the average U.S. household receives nearly 200 linear networks).)

Plaintiffs allege only an SLPTV product market—the ***downstream*** market in which YouTube TV, DirecTV Stream and other SLPTV providers bundle together many linear networks to sell a different product (subscriptions to streaming services) directly to consumers.

(*Id.* ¶¶ 253-57.)  Plaintiffs' proposed product market fails under controlling Ninth Circuit law.  *Qualcomm*, 969 F.3d at 992.

In *Qualcomm*, original equipment manufacturers ("OEMs"), such as Apple and Samsung, purchased modem chips from Qualcomm.  The OEMs also licensed a portfolio of cellular standard essential patents from Qualcomm.  The OEMs then combined those modem chips, and the right to practice those patents, together with other inputs (such as touchscreens and antennas) to manufacture cell phones, which the OEMs then sold downstream to consumers.  The FTC alleged that Qualcomm had monopoly power in the market for certain modem chips but challenged a variety of restrictions that Qualcomm imposed on the OEMs, including both "*licensing* practices" (which occurred outside the defined market) as well as "practices relating to *modem chip sales* (the relevant antitrust market)".  *Qualcomm*, 969 F.3d at 992-93.  The district court found in favor of the FTC, defining the relevant product market as the market for certain modem chips, but finding harm in the broader market of "cellular services generally".  *Id.* at 992.

The Ninth Circuit reversed.  The Ninth Circuit first ruled that "the district court correctly defined the relevant markets" as the market for Qualcomm's modem chips—because that is where "competition [was] allegedly being restrained".  *Id.*  The Ninth Circuit found the District Court erred, however, by "consider[ing] alleged economic harms to OEMs—who are Qualcomm's *customers*, not its competitors—resulting in higher prices to consumers", explaining that "even if Qualcomm's practices [were] interrelated, actual or alleged harms to customers and consumers outside the relevant markets"—*i.e.*, outside the market for modem chips—"are beyond the scope of antitrust law".  *Id.* at 993.  The appropriate question was whether **competition** had been harmed—*i.e.*, whether Qualcomm's practices allegedly disadvantaged the business of Qualcomm's modem chip **competitors**.  *Id.*  Thus, the district court in *Qualcomm* correctly determined that the relevant product market was the market where the allegedly anticompetitive restraints took place—the modem chip market—but erred by finding anticompetitive harm outside that market, rather than to competitors in that market.  *Id.*

1    Plaintiffs here compound the error made by the FTC and the district court in

2    *Qualcomm*.  As in *Qualcomm*, Plaintiffs allege harm in a different market (the downstream

3    market for SLPTV subscriptions) from the market with the alleged restrictions (the upstream

4    market for linear TV networks).  That error—alleging harm in a different market from the one

5    containing the allegedly anticompetitive restraints—was the basis for the Ninth Circuit's reversal

6    in *Qualcomm*.  But the error here is even more fundamental than the one made by the FTC and

7    the district court in *Qualcomm*.  Here, Plaintiffs do not even accurately define the product market

8    to be the one in which the alleged restraints occurred.  Put differently, in *Qualcomm*, the Ninth

9    Circuit made clear that a rule of reason claim requires the plaintiff both (i) to define as the

10   relevant product market the market in which the allegedly anticompetitive restraint took place

11   and then (ii) to identify harm to competition ***in that market***.  In *Qualcomm*, the FTC did (i) but

12   not (ii).  Here, Plaintiffs do neither (i) nor (ii).

13   In its Order, the Court noted Plaintiffs' assertion that "competition is allegedly

14   being unreasonably restrained in the SLPTV market" because the challenged agreements

15   purportedly increased SLPTV subscription prices and limited consumer choice as to SLPTV

16   products.  (Order at 18.)  But, even if true, the fact that some alleged ***effects*** of an alleged

17   anticompetitive restraint might be "passed through" to consumers downstream does not mean

18   that the downstream market becomes the relevant product market for antitrust analysis.  Just the

19   opposite—as the Ninth Circuit held in *Qualcomm*, a plaintiff must plausibly allege

20   anticompetitive effects on competition in the product market where the alleged restraint

21   occurred, which requires first pleading the product market in which the alleged restraint

22   occurred, even if some effects of that alleged anticompetitive restraint are "passed through"

23   downstream.  *Qualcomm*, 969 F.3d at 992.

24   Numerous decisions make clear that the relevant product market is the one in

25   which the alleged restraint occurred, even if harm from that alleged restraint allegedly passes

26   through to consumers in a different downstream market.  *See, e.g.*, *Feitelson v. Google Inc.*, 80

27   F. Supp. 3d 1019, 1022-23, 1027-28 (N.D. Cal. 2015) (granting motion to dismiss claims that

28   Google allegedly restrained trade in the relevant markets for Internet search because "Plaintiffs

---

DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT; CASE NO. 5:22-CV-07317

1  allege that they suffered antitrust injury in the form of supracompetitive pricing in Android

2  phones, which [wa]s not the market in which the alleged anticompetitive conduct occurred"); *In*

3  *re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 155, 162 (2d Cir. 2016) (identifying

4  the warehouse storage market as a relevant product market because "[a]ll of th[e] conduct took

5  place (if at all) in [that] market" and affirming dismissal when plaintiffs alleged harm from

6  inflated costs "they eventually paid downstream"); *Nypl v. JPMorgan Chase & Co.*, No. 15 Civ.

7  9300 (LGS), 2017 WL 1133446, at *1, *5 (S.D.N.Y. Mar. 24, 2017) (granting motion to dismiss

8  for failure to plead antitrust injury when plaintiffs "purchased foreign currency in the end-user

9  market" because "any injury Plaintiffs suffered was in a market separate from the [FX spot

10  market] that Defendants allegedly manipulated").

11          In fact, that is the underlying premise of the Court's correct holding, based on

12  *Illinois Brick*, that Plaintiffs here lack antitrust standing because they are not direct purchasers of

13  a product that is subject to an antitrust conspiracy.  Indirect purchasers, *i.e.*, "individuals

14  purchasing a product from at a point in the supply chain *removed from the antitrust violation*",

15  cannot sue for damages based on unlawful overcharges passed onto them by others in the

16  distribution chain.  (Order at 24 (emphasis added) (quoting *Brantley v. NBC Universal, Inc.*,

17  No. CV 07-6101 CAS, 2008 WL 11338585, at *5 (C.D. Cal. Mar. 10, 2008)).)  Plaintiffs are

18  indirect purchasers precisely because they did not purchase the ESPN network (the product

19  subject to the supposed conspiracy) directly from ESPN; instead, they purchased a different

20  product (an SLPTV subscription package) "removed from the antitrust violation".  The Court's

21  *Illinois Brick* holding is correct.  And its logic compels the conclusion that the relevant product

22  market is the one in which the ESPN network is sold, not the one in which SLPTV subscriptions

23  are sold.

24          This is not a technicality or triviality; defining the relevant product market

25  correctly is fundamental to any antitrust case.  It determines who the relevant actual and potential

26  competitors are (here, that should be ESPN's linear network competitors, not YouTube TV's and

27  DirecTV Stream's SLPTV competitors), determines the outcome of any market power analysis,

28  and determines what market must be analyzed for barriers to entry.  As in *Qualcomm*, the correct

1    product market is the one in which competition allegedly is being restrained by the allegedly

2    anticompetitive agreements.[3]

3            Finally, even if Plaintiffs are permitted to allege a viable downstream SLPTV

4    product market, they have not plausibly alleged that Disney has market power *in that market*.

5    After "the Court first defines the relevant market", it must evaluate whether the defendant has

6    market power in that market.  *Am. Express*, 138 S. Ct. at 2285 & n.7.  Without market power,

7    vertical restraints "often pose no risk to competition".  *Id.*  Plaintiffs do not plausibly allege that

8    Disney has market power in their purported (and defective) downstream SLPTV market.

9    Plaintiffs' market power allegations focus on Disney's purported control over both Hulu and

10   ESPN, and the supposed dominance *of ESPN*.  (Am. Compl. ¶¶ 3-4, 56-81.)  But "Plaintiffs do

11   not allege that ESPN competes with SLPTV providers" in the SLPTV product market.  (Order

12   at 12.)  Therefore, Disney cannot have market power in the SLPTV market through ESPN—

13   because ESPN does not compete in that market at all.  And the only allegation Plaintiffs make

14   regarding Hulu is that Hulu + Live TV is the second-largest SLPTV service, with a 31% market

15   share.  (Am. Compl. ¶ 304.)  Nowhere do Plaintiffs allege that Hulu by itself gives Disney

16   market power in the SLPTV market.  As a result, even if Plaintiffs are permitted to plead the

17   downstream SLPTV product market, they do not plausibly allege that Disney has market power

18   in it.

19

20       [3] If the market in which consumers purchase linear television programming services via
     SLPTV subscriptions were the relevant product market, Plaintiffs' alleged market definition
21   would still be facially implausible.  As Plaintiffs concede, linear television distributors include
     both vMVPD distributors and traditional cable and satellite distributors.  (Am. Compl. ¶¶ 74, 82-
22   88.)   Plaintiffs even allege that "most people with a vMVPD service switched directly from"
     MVPDs (*id.* ¶ 292), which is the hallmark of economic substitutes found within the same market,
23   *Hicks*, 897 F.3d at 1121.  Plaintiffs focus on *Brown Shoe* factors they claim suggest a viable
     submarket exists, but this submarket "analysis simply clarifies whether two products are in fact
24   'reasonable' substitutes and are therefore part of the same market".  *Geneva Pharms. Tech. Corp.
     v. Barr Labs., Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).  Plaintiffs' own claims of switching here
25   establish substitutability and that they have implausibly excluded MVPDs from their proposed
     market definition.  That MVPDs and vMVPDs distribute networks through different
26   technological means is therefore irrelevant—a fact that courts have recognized in the context of
     satellite and cable providers.  *See, e.g.*, *Am. Channel, LLC v. Time Warner Cable, Inc.*, No. 06-
27   cv-2175, 2007 WL 142173, at *9 (D. Minn. Jan. 17, 2007).

28

**B.      Plaintiffs Have Not Identified Agreements that Unreasonably Restrain Trade.**

Plaintiffs also fail to state a rule of reason claim for the independent reason that the Amended Complaint does not plausibly allege an unreasonable restraint of trade under any formulation of the relevant product market.  *See Hicks*, 897 F.3d at 1117 (complaint must "state a claim to relief that is plausible on its face").  Here, *Brantley* is the controlling case.  Under the rule of reason, an unreasonable restraint is one that "actually injures **competition**", not one that causes harm to customers or consumers.  *Brantley*, 675 F.3d at 1197 (emphasis added).

The conduct Plaintiffs challenge is limited to two contractual terms.  The first is the Base Term.  Plaintiffs allege that, if distributors of linear television networks want to distribute the ESPN network, the Base Term requires that it be distributed in the basic or entry package sold to consumers, which Plaintiffs say raises prices and reduces choice.  (*See* Am. Compl. ¶¶ 424, 429.)  Such allegations are insufficient to survive a motion to dismiss.  While consumers might be harmed by higher subscription prices and the inability to purchase skinny bundles, that harm "is not sufficient to allege an injury to **competition**".  *Brantley*, 675 F.3d at 1202 (emphasis added); *see also Qualcomm*, 969 F.3d at 992 (allegations that conduct resulted in higher prices to consumers "even if real, are not 'anticompetitive' in the antitrust sense . . . because they do not involve restraints on trade or exclusionary conduct in 'the area of effective competition'").

Plaintiffs also challenge the MFN Clauses.  Plaintiffs contend the MFN Clauses "exacerbate" the Base Term by establishing a price floor (Mot. to Dismiss Hearing Tr., ECF No. 49, at 41:6), but Plaintiffs' theory of how the MFN Clauses operate to supposedly harm competition is contradicted both by Plaintiffs' own allegations and basic economic logic.  MFN provisions operate to give buyers assurance that the terms they receive are at least as favorable as those of their peers.  As Plaintiffs here explain, the MFN Clause in this case "requires Disney to provide the counterparty with the lowest price for ESPN and other channels offered to any other market participant".  (Am. Compl. ¶ 342.)  The MFN Clauses do not benefit the seller, Disney; rather, they provide the buyers, the SLPTV Providers, the option to demand a better price if Disney is forced to give that better price to someone else.  As a result, courts have looked

favorably upon these clauses as **enhancers** of competition. *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (recognizing MFNs as "standard devices by which buyers try to bargain for low prices" and "the sort of conduct that the antitrust laws seek to encourage"); *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1110 (1st Cir. 1989) ("[A] policy of insisting on a supplier's lowest price . . . tends to further competition on the merits"); *No Spill LLC v. Scepter Can., Inc.*, No. 2:18-cv-2681, 2022 WL 1078435, at *7 (D. Kan. Apr. 6, 2022) ("A most-favored-nation clause does not harm competition absent additional factual allegations.").

While the Court is correct that, hypothetically, "MFN clauses **can** be used for anticompetitive ends" (Order at 20 n.8 (emphasis added)), Plaintiffs do not plausibly allege that the MFN Clauses here in fact **have been** used for anticompetitive ends. *See, e.g.*, *Marshfield Clinic*, 65 F.3d at 1415 (MFN clauses may be "misused to anticompetitive ends in some cases; but there is no evidence of that in this case"). There are no facts plausibly suggesting that conclusion. To the contrary, Plaintiffs allege, repeatedly, that **the MFN Clauses are demanded by the SLPTV providers**. (Am. Compl. ¶¶ 214-19, 342.) It would make no sense for the SLPTV providers to demand the MFN Clauses if their effect were to increase the price of ESPN because, if the price of ESPN increases, an SLPTV provider either would earn a lower margin on its sale of SLPTV subscriptions (because the price of an input has increased) or would pass on the increased price of the input to consumers, resulting in fewer sales. There is no situation in which an SLPTV provider would prefer the price of ESPN to increase, which means that the only plausible explanation for the SLPTV providers demanding the MFN Clauses (as Plaintiffs repeatedly allege they do) is that the MFN Clauses work to lower the price of ESPN, not raise it. That cannot be anticompetitive under any theory.

As the Court held in its prior Order, the controlling authority for this anticompetitive effects analysis is the Ninth Circuit's decision in *Brantley*. In *Brantley*, the Ninth Circuit squarely rejected a challenge to terms that were even more restrictive than the terms at issue here, which is fatal to Plaintiffs' claims.

*Brantley* involved a putative class of linear television network subscribers who sued various linear television programmers, including ESPN, and distributors, such as cable and satellite companies, challenging two provisions in the programmer-distributor contracts:  (i) a tying provision requiring the distributors to include the programmers' low- and high-demand networks in the distributors' cable and satellite packages, rather than allowing the distributors to make only select networks available to their subscribers; and (ii) a base term requiring the distributors to include certain of the programmers' networks in the distributors' basic tier of packages, which forced consumers to take from the distributors networks they did not want. *Brantley*, 675 F.3d at 1195-96, 1200.  The *Brantley* plaintiffs claimed that those contractual provisions, together and independently, "limit[ed] the manner in which Distributors compete with one another in that Distributors are unable to offer a la carte programming [to consumers], which . . . reduc[es] consumer choice, and . . . increas[es] prices".  *Id.* at 1201.

The Ninth Circuit affirmed the grant of a motion to dismiss for failure to state a claim, holding that the complaint did not adequately allege that the challenged restraints caused "a cognizable injury to competition", and, therefore, could not plausibly support a Section 1 claim.  *Id.* at 1202.  As the Ninth Circuit reasoned, "a statement that parties have entered into a contract that limits some freedom of action (in this case, by circumscribing the distributors' ability to offer smaller packages or channels on an unbundled basis) is not sufficient to allege an injury to competition".  *Id.*  Higher prices to consumers and reduced consumer choice are not enough.  *Id.*  Instead, to successfully plead a rule of reason claim, the *Brantley* court held that a plaintiff must allege facts sufficient to make plausible the notion that the challenged practices "***create[d]*** barriers to entry of new competitors in the market".  *Id.* at 1199 (emphasis added) (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984), *abrogated in part on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc*., 547 U.S. 28 (2006)).  The Ninth Circuit concluded that the *Brantley* plaintiffs failed to allege the required causal relationship— that the challenged "practice raises barriers to entry into the programming market", *Brantley*, 675 F.3d at 1201—and affirmed the dismissal.  Here, too, Plaintiffs fail to allege, as they must, that the challenged restraints created any barriers to entry.

In its prior Order, the Court correctly held that, under *Brantley*, Plaintiffs' allegations of reduced consumer choice and increased subscription prices "are insufficient to allege an injury to competition". (Order at 22.)  The Court also correctly held that Plaintiffs' claims could survive only if Plaintiffs plausibly alleged that the challenged "practice raises barriers to entry" into the market.  (*Id.* (citing *Brantley*, 675 F.3d at 1201).)  But in applying that standard, the prior Order overlooked that there must be a causal relationship between the challenged agreements (the antitrust "restraints") and the alleged barriers to entry.  That is, the challenged agreements themselves must be what raise the barriers to entry.  *Brantley*, 675 F.3d at 1201.

Plaintiffs do not allege any such causal relationship here.  The Court found barriers to entry based on Plaintiffs' allegations that (i) streaming "infrastructure is cost-prohibitive" and (ii) "successful entry into the SLPTV market also requires entering into multiple carriage agreements with cable providers".  (Order at 22-23.)  But those are preexisting barriers to entry that are not created, or raised, by the challenged agreements.  Stated differently, Plaintiffs have not alleged—as required under *Brantley*—that the Base Term or MFN Clauses "raised" those barriers to entry.  That is fatal to Plaintiffs' claims.  *See Brantley*, 675 F.3d at 1201 (plaintiffs did "not allege that Programmers' practice of selling 'must-have' and low-demand channels in packages excludes other sellers of low-demand channels from the market, or ***that this practice raises barriers to entry*** into the programming market" (emphasis added)).

With respect to infrastructure requirements, Plaintiffs allege that SLPTV platforms rely upon costly servers with significant computing power that can process high resolution video with minimal latency and sufficient bandwidth to deliver video content over the internet.  (Am. Compl. ¶ 318.)  But Plaintiffs do not even attempt to allege that the Base Term or the MFN Clauses "created" or "raise[d]" any such infrastructure barriers—nor could they.  *Brantley*, 675 F.3d at 1201, 1203.  That is dispositive.[4]

---

[4] Moreover, "[t]he mere fact that entry requires a large absolute expenditure of funds does not constitute a 'barrier to entry'; a new entrant is disadvantaged only to the extent that he must pay more to attract those funds than would an established firm."  *Los Angeles Land Co. v.*

With respect to the alleged difficulty of securing a "critical mass of live television channels" necessary "to become a viable pay television platform" (Am. Compl. ¶ 329), Plaintiffs fail to allege facts plausibly suggesting that the Base Term or MFN Clauses raise that barrier. As an initial matter, the Base Term and MFN Clauses are alleged to apply only to a single network, ESPN, and, thus, cannot possibly create a barrier to a potential entrant acquiring other channels from other sources across the industry. Plaintiffs assert that "without making an actual carriage deal with Disney", "a would-be entrant would lack several notable channels now available on every SLPTV platform, including ESPN". (*Id.* ¶ 331.) But, critically, Plaintiffs do not allege that having the ESPN network is necessary to enter and compete in the SLPTV market; Plaintiffs do not even allege specific facts demonstrating that each SLPTV provider in fact carries ESPN or always has. To the contrary, Plaintiffs specifically allege that there is demand for "skinny bundles" that do not contain ESPN (*id.* ¶¶ 369, 429), and judicially noticeable facts establish that certain SLPTV providers actually have forgone carrying ESPN altogether (*supra* note 1).

In all events, the gist of Plaintiffs' entire case is that, without the Base Term and MFN Clauses, current SLPTV providers would offer skinny bundles that do not contain ESPN as the base package that goes to all subscribers. (*Id.* ¶¶ 131, 369, 429.) That allegation is fatal to Plaintiffs' barrier to entry arguments. New potential entrants do not have agreements with ESPN and, thus, are not subject to the Base Term or MFN Clauses and, thus, according to Plaintiffs' own allegations, are free to enter the market with exactly the ESPN-free skinny bundles that

---

*Brunswick Corp.*, 6 F.3d 1422, 1428 (9th Cir. 1993). Additionally, as the Court previously explained, SLPTV providers do not face the same infrastructure challenges faced by traditional cable providers. That is because "traditional LPTV products", unlike SLPTV products, "require separate transmission infrastructure or technology such as cable boxes or a satellite dish", whereas "SLPTV products rely on existing broadband internet connections". (Order at 17 (internal citations omitted).) By Plaintiffs' own allegations, then, streaming platforms disrupted the cable industry because these new services did *not* require the traditional hardware and infrastructure needed to compete against the legacy cable/satellite pay TV providers. (Am. Compl. ¶ 162.) But when it considered even the more significant hurdles faced by traditional cable providers, the Ninth Circuit in *Brantley* granted defendants' motion to dismiss, concluding that such barriers are irrelevant for purposes of determining harm to competition unless the challenged practice created or raised those barriers. As in *Brantley*, here they do not.

1   Plaintiffs posit would exist absent Disney's supposedly anticompetitive agreements.  No

2   *agreement*—a prerequisite for any Section 1 claim—is stopping them from doing so.

3           Moreover, beyond failing to allege the requisite causal link between the

4   challenged Base Term and MFN Clauses and the purported barriers to entry, the alleged barriers

5   to entry are, themselves, not "plausible on [their] face".  *Bell Atl. Corp. v. Twombly*, 550 U.S.

6   544, 570 (2007).  Plaintiffs' own claims of competitive entrants affirmatively disprove the

7   existence of the barriers.  As alleged, the following SLPTV platforms have all entered the market

8   in recent years:  Sling TV, DirecTV Now, PlayStation Vue, Pluto TV, Xumo, fuboTV, YouTube

9   TV and Hulu + Live TV.  (Am. Compl. ¶¶ 161, 164, 167-69, 261, 303.)  The Amended

10  Complaint thus makes clear that there is vibrant competition in the SLPTV market, with

11  numerous recent new entrants.  Plaintiffs' allegations regarding supposed barriers to entry are

12  "implausible in the face of contradictory market facts alleged in [their own] complaint".  *Somers*

13  *v. Apple, Inc.*, 729 F.3d 953, 964 (9th Cir. 2013).  Accordingly, the Court should dismiss

14  Plaintiffs' rule of reason claim.

15  **III.    PLAINTIFFS  HAVE  NO  CLAIM  FOR  DAMAGES  FOR  FEDERAL  LAW**
        **CLAIMS.**
16

17          In addition to the substantive defects in Plaintiffs' antitrust claims, Plaintiffs are

18  barred from seeking damages for their federal law claims because they are "indirect purchasers",

19  as the Court previously ruled.  (Order at 24.)

20          Indirect purchasers lack standing to pursue damages under the Sherman Act.

21  *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728-35, 746-47 (1977); *see also Somers*, 729 F.3d at

22  961.  Direct purchasers are "those who are the immediate buyers from the alleged antitrust

23  violators", whereas indirect purchasers are those "who are two or more steps removed from the

24  antitrust violator in a distribution chain".  *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019).

25  As applied here, ESPN (manufacturer A) sells its ESPN television network to YouTube TV and

26  DirecTV Stream (retailers B), and YouTube TV and DirecTV Stream (retailers B) sell their

27  SLPTV services (which include the ESPN network) to Plaintiffs (consumers C).  (Am. Compl.

28  ¶ 2.)  Plaintiffs (consumers C) cannot sue ESPN (manufacturer A).  *See Apple*, 139 S. Ct.

at 1521.  Plaintiffs concede this indirect relationship by alleging that SLPTV providers "bear and pass on the cost" from ESPN to subscribers like themselves (Am. Compl. ¶ 354)—precisely the "pass-on" theory of damages that *Illinois Brick* forbids.  *See* 431 U.S. at 743-47; *Somers*, 729 F.3d at 961-62.  Accordingly, as the Court has already held, Plaintiffs are indirect purchasers who may not pursue Sherman Act claims for damages.  (Order at 24.)

## IV.     PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED.

Plaintiffs assert claims alleging violations of the laws of eleven states:  Arizona, California, Florida, Illinois, Iowa, Massachusetts, Michigan, Nevada, New York, North Carolina and Tennessee.  Each state law claim fails as a matter of law.

### A.      Plaintiffs Have Not Plausibly Alleged Agreements Violating the Antitrust Law of Nine of the Eleven States.

Federal caselaw generally determines the outcome of state-law antitrust claims where the state follows federal antitrust law.  *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 n.4 (9th Cir. 1988).  This remains true for states (such as those for which Plaintiffs bring state-law antitrust claims) that have repealed the *Illinois Brick* damages bar for indirect purchasers:  those states otherwise interpret their state antitrust statutes consistently with the Sherman Act.  Arizona, California, Illinois, Iowa, Michigan, Nevada, New York, North Carolina and Tennessee follow federal antitrust caselaw:

- **Arizona**:  *Mothershed v. Justs. of Supr. Ct.*, 410 F.3d 602, 609 (9th Cir. 2005) ("The Arizona Uniform State Antitrust Act is interpreted in conformity with the federal [antitrust laws].");  Ariz. Rev. Stat. § 44-1412;

- **California**:  *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (because it was modeled after the Sherman Act, "[t]he analysis under California's antitrust law mirrors the analysis under federal law");

- **Illinois**:  *Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 765 n.7 (N.D. Ill. 2015) (sections of the Illinois Antitrust Act prohibiting illegal monopolization and unreasonable restraint of trade "are based on Sections 1 and 2 of the Sherman Act, and therefore the applicable legal standards are the same"); 740 Ill. Comp. Stat. Ann. 10/11;

- **Iowa**: *Mahaska Bottling Co. v. PepsiCo Inc.*, 271 F. Supp. 3d 1054, 1080 (S.D. Iowa 2017) ("[T]o the extent [Plaintiff's] allegations fail to state a claim under federal antitrust law, . . . they also fail to state a claim under the Iowa Competition Law"); Iowa Code Ann. § 553.2;

- **Michigan**: *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 535 F. Supp. 3d 638, 644 n.2 (E.D. Mich. 2021) ("Because the Michigan Anti-Trust statute and the Sherman Anti-Trust Act mirror each other, [the court] appl[ies] the same analysis to both the federal and state anti-trust claims."); Mich. Comp. Laws § 445.784;

- **Nevada**: *Boulware v. Nev., Dep't of Hum. Res.*, 960 F.2d 793, 800 (9th Cir. 1992) ("The Nevada statute also adopts by reference the case law applicable to the federal antitrust laws"); Nev. Rev. Stat. Ann. § 598a.050;

- **New York**: *Anheuser-Busch, Inc. v. Abrams*, 520 N.E.2d 535, 539 (N.Y. 1988) ("[T]he Donnelly Act—often called a 'Little Sherman Act'—should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result");

- **North Carolina**: *Rose v. Vulcan Materials Co.*, 194 S.E.2d 521, 530 (N.C. 1973) ("[T]he body of law applying the Sherman Act, although not binding upon this Court in applying G.S. § 75–1, is nonetheless instructive in determining the full reach of that statute.");

- **Tennessee**: *Spahr v. Leegin Creative Leather Prods., Inc.*, No. 2:07-CV-187, 2008 WL 3914461, at *13-14 (E.D. Tenn. Aug. 20, 2008) (observing that Tennessee state law antitrust cases have "relied heavily on federal precedent" and finding "no good reason why the Tennessee courts would not follow" federal antitrust precedent).

Thus, for the same reasons Plaintiffs' federal-law claims fail (*see supra* §§ I-II), Plaintiffs' state-law claims under Arizona, California, Illinois, Iowa, Michigan, Nevada, New York, North Carolina and Tennessee law fail too and should be dismissed.

1

**B.      Plaintiffs Fail To State a Claim Under Massachusetts and Florida Law.**

2          Plaintiffs also pursue claims under the unfair trade practices law of Massachusetts

3  and Florida.  While those states permit plaintiffs to bring antitrust claims under their unfair trade

4  practices statute, they do not permit claims that do not state a claim under the Sherman Act to

5  proceed.  Because the only unfair trade practices that Plaintiffs allege are the claimed antitrust

6  violation, those claims must fail for the same reasons as Plaintiffs' Sherman Act claims fail (*see*

7  *supra* §§ I-II).

8          *1.      Massachusetts*

9          Plaintiffs bring Count Fourteen under the Massachusetts Consumer Protection

10  Act.  (Am. Compl. ¶¶ 567-76.)  To state a claim under this statute, a plaintiff must allege facts

11  sufficient to establish four elements:  (i) that the defendant has committed an unfair or deceptive

12  act or practice; (ii) that the unfair or deceptive act or practice occurred "in the conduct of any

13  trade or commerce"; (iii) that the plaintiff suffered an injury; and (iv) that the defendant's unfair

14  or deceptive conduct was a cause of the injury.  *See* Mass. G.L. c. 93A, § 2(a); *see also Rafferty*

15  *v. Merck & Co., Inc.*, 92 N.E.3d 1205, 1222 (Mass. 2018).

16          In support of this claim, Plaintiffs merely incorporate by reference "the conduct

17  alleged in [the] Complaint, including Disney's violation of federal antitrust laws".  (Am. Compl.

18  ¶ 568).  As a result, Plaintiffs' cause of action under the Massachusetts Consumer Protection Act

19  is coextensive with their federal antitrust claims.  Thus, because the Amended Complaint fails to

20  state a claim for antitrust violations, it also fails to state a claim under Massachusetts's consumer

21  protection law.  *See In re Nat'l Ass'n of Music Merchs., Musical Instruments & Equip. Antitrust*

22  *Litig.*, No. 09-cv-2002, 2011 WL 3702453, at *8 (S.D. Cal. Aug. 22, 2011) ("[B]ecause the

23  complaint fails to state a claim for antitrust violations, it also fails under California's and

24  Massachusetts' consumer protection laws because the antitrust violation is the sole claim.").

25  Therefore, Count Fourteen should be dismissed.

26          *2.      Florida*

27          Plaintiffs bring Counts Five and Eleven under the Florida Deceptive and Unfair

28  Trade Practices Act (the "FDUTPA").  (Am. Compl. ¶¶ 484-96, 540-52.)  To state a claim under

this statute, "a plaintiff must establish: (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages." *State v. Beach Blvd. Auto. Inc*., 139 So. 3d 380, 393 (Fla. Dist. Ct. App. 2014) (citing *Baptist Hosp., Inc. v. Baker*, 84 So. 3d 1200, 1204 (Fla. Dist. Ct. App. 2012)). Plaintiffs fail to state a FDUTPA claim.

Plaintiffs do not allege that Disney's conduct is likely to confuse the public, and, thus, Plaintiffs fail to allege a deceptive act.  *See Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350, 1364 (M.D. Fla. 2007) ("A deceptive practice is one that is likely to mislead consumers"); *see also Bei Jing Han Tong San Kun Ke Ji You Xian Gong Si v. Atl. Med. Prods., LLC*, No. 8:20-CV-2972-CEH-TGW, 2022 WL 88167, at *12 (M.D. Fla. Jan. 7, 2022) (dismissing a FDUTPA claim because of plaintiff's failure to allege a likelihood of consumer confusion).

Plaintiffs also fail to allege an unfair trade practice.  "An act or practice is 'unfair' for the purposes of FDUTPA if it causes consumer injury that is (1) substantial, (2) not outweighed by any countervailing benefits to consumers or competition, and (3) one that consumers themselves could not have reasonably avoided." *Parziale v. HP, Inc*., 445 F. Supp. 3d 435, 445 (N.D. Cal. 2020).  Plaintiffs allege that "[b]ut for Disney's conduct set forth in [the] Complaint, the price of SLPTV products, including DirecTV Stream subscription prices, would have been lower".  (Am. Compl. ¶ 546.)  As explained (*see supra* §§ I-II), Plaintiffs fail to plead facts sufficiently plausible to sustain their federal claim.  Because the Amended Complaint fails to state a claim for antitrust violations, it also fails under the FDUTPA because Plaintiffs' sole basis for this claim is the alleged antitrust violation.  *See, e.g.*, *JES Props., Inc. v. USA Equestrian, Inc.*, No. 8:02-CV-1585-T24MAP, 2005 WL 1126665, at *19 (M.D. Fla. May 9, 2005) (finding that plaintiffs failed to establish the elements of a FDUTPA claim when their "FDUTPA claim [wa]s based on the same allegations as their antitrust claims" because the court "found no violation of the Federal antitrust laws").  Therefore, the FDUTPA claims should be dismissed.

1
2

**C.      Plaintiffs' Claim Under Illinois Law Should Be Dismissed Because Illinois Does Not Permit Indirect Purchasers To Bring Class Actions.**

3        Plaintiffs' claim under Illinois law (Count Twelve) fails for an additional reason:

4  the Illinois Antitrust Act bars indirect purchaser class actions.  Under the Illinois Antitrust Act,

5  only the Illinois Attorney General may bring a class action asserting indirect purchaser antitrust

6  claims.  *See* 740 Ill. Comp. Stat. Ann. 10/7(2) ("[N]o person shall be authorized to maintain a

7  class action in any court of this State for indirect purchasers asserting claims under this Act, with

8  the sole exception of this State's Attorney General, who may maintain an action *parens patriae*

9  as provided in this subsection.").  "[T]he no indirect purchaser class action rule was expressly

10  adopted as an integral part of the Illinois Antitrust Act's repeal of *Illinois Brick*."  *United Food &*

11  *Com. Workers Loc. 1776 & Participating Emps. Health and Welfare Fund v. Teikoku Pharma*

12  *USA, Inc.*, 74 F. Supp. 3d 1052, 1084 (N.D. Cal. 2014).  Permitting an indirect purchaser class

13  action, thus, "would 'abridge, enlarge or modify' Illinois' substantive rights, and therefore

14  Illinois' restrictions on indirect purchaser actions must be applied in federal court".  *Id.* (quoting

15  *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670, 677 (E.D. Pa. 2010)).

16        Because Illinois state law does not permit indirect purchasers class actions under

17  the Illinois Antitrust Act, Plaintiffs cannot maintain their class claim.  *See, e.g.*, *In re Xyrem*

18  *(Sodium Oxybate) Antitrust Litig.*, 555 F. Supp. 3d 829, 885 (N.D. Cal. 2021) ("Class Plaintiffs

19  cannot maintain their class claims against Defendants under Illinois law."); *Staley v. Gilead*

20  *Scis., Inc.*, 446 F. Supp. 3d 578, 626 (N.D. Cal. 2020); *Jones v. Micron Tech. Inc.*, 400

21  F. Supp. 3d 897, 927 (N.D. Cal. 2019).  Accordingly, Count Twelve should be dismissed.

22
23

**D.      Plaintiffs' Claim Under Tennessee Law Should Be Dismissed Because the Tennessee Trade Practice Act Does Not Apply to "Services".**

24        Plaintiffs' claim under the Tennessee Trade Practice Act (the "TTPA") (Count

25  Nine) fails also because the conduct alleged does not fall within the scope of the TTPA.  "The

26  law is well settled that the TTPA applies only to tangible goods, not intangible services."

27  *Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 751 (Tenn. Ct. App. 2006).  Because the challenged

28  conduct here relates to a service, the TTPA does not apply.

1        This principle was recognized by the Tennessee Supreme Court in *McAdoo*

2  *Contractors, Inc. v. Harris*, 439 S.W.2d 594, 597 (Tenn. 1969), where the court distinguished

3  between a contract for tangible goods, where the TTPA would apply, and a contract for

4  intangible services, to which the TTPA would not apply.  Since *McAdoo*, Tennessee "courts have

5  consistently followed this distinction and held that the TTPA only prohibits 'arrangements' or

6  'combinations' which involve products, not those that involve services".  *Bennett*, 198 S.W.3d at

7  752 (citing *Beaudreau v. Larry Hill Pontiac/Oldsmobile/GMC, Inc.*, 160 S.W.3d 874, 881-

8  82 (Tenn. Ct. App. 2004)); *see also Jo Ann Forman, Inc. v. Nat'l Council on Comp. Ins., Inc.*, 13

9  S.W.3d 365, 373 (Tenn. Ct. App. 1999).[5]

10        Tennessee law defines "goods" to mean things that "are movable at the time of

11  identification to the contract for sale".  *GenTech Constr., LLC v. Natare Corp.*, No. 1:07-cv-192,

12  2011 WL 1257943, at *19 (E.D. Tenn. Mar. 31, 2011) (quoting Tenn. Code Ann. § 47-2-105).

13  Here, Plaintiffs repeatedly allege that Plaintiffs purchased *services*.  (*See* Am. Compl. ¶ 526

14  (alleging that the relevant class plaintiffs "purchased YouTube TV *services* within the State of

15  Tennessee"; ¶ 24 (plaintiffs "pay[ ] $72.99 per month for YouTube TV streaming *services*");

16  ¶ 303 (YouTube TV is one of the "brands [that] provided and/or provide live television *services*

17  over the Internet"); ¶ 348 (services like YouTube TV  "must pay the cost of ESPN set by Disney

18  plus the other costs of their *service*") (emphases added)).  Moreover, YouTube TV's Terms of

19  Service are clear that by subscribing to YouTube TV, subscribers are paying for a service, not a

20  good.[6]  This is consistent with other contexts under the law, where video streaming services, like

21  YouTube TV, Netflix and Hulu, are routinely characterized as services.  *See, e.g.*, *City of*

22

---

23       [5] "Since *McAdoo* was decided in 1969, many separate attempts have been made in the

24  General Assembly to amend the Trade Practices Act in order to expand its scope."  *Jo Ann Forman, Inc.*, 13 S.W.3d at 372 (citing bills from 1975 to 1987).  The Tennessee legislature has

25  never amended the statute, and the distinction between goods and services under the Tennessee Trade Practice Act remains.

26       [6] "YouTube enables access to certain premium features or content in exchange for one-time

27  or recurring fees (each a 'Paid Service').  The Paid Services include YouTube rentals and purchases, channel memberships, paid subscriptions, and other YouTube services which may be

28  offered by Google."  *YouTube Paid Service Terms of Service*, YouTube https://www.youtube.com/t/terms_paidservice (last visited Dec. 1, 2023).

DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT; CASE NO. 5:22-CV-07317

1  *Knoxville v. Netflix, Inc.*, 656 S.W.3d 106, 114 n.4 (Tenn. 2022) ("courts have concluded that

2  Netflix's and Hulu's streaming services fall within the exception to the definition of 'video

3  service' for 'video programming provided . . . via a service that enables end users to access

4  content'"); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016)

5  (distinguishing "Amazon's own streaming service, 'Instant Video,' or third-party streaming

6  services such as Netflix" from Amazon's "Firestick", a hardware device (a good) used for

7  streaming content); *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 690 (D.C. Cir. 2016) (under the

8  Communications Act, "providers, like Netflix, Google, and Amazon, 'provide content, services,

9  and applications over the Internet'").

10         Plaintiffs themselves pleaded and alleged that they purchased a service, which

11  cannot give rise to liability under the TTPA as a matter of law.  This claim should be dismissed.

12                                        **<u>CONCLUSION</u>**

13         For the foregoing reasons, Disney respectfully submits that Plaintiffs' Amended Complaint

14  should be dismissed with prejudice for failure to state a claim.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:        December 1, 2023          FARELLA BRAUN + MARTEL LLP

                                        */s/ Christopher C. Wheeler*
                                        Douglas R. Young (SBN 073248)
                                        Christopher C. Wheeler (SBN 224872)
                                        Daniel A. Contreras (SBN 329632)
                                        One Bush Street, 9th Fl.
                                        San Francisco, CA 94104
                                        Tel.: (415) 954-4400
                                        dyoung@fbm.com
                                        cwheeler@fbm.com
                                        dcontreras@fbm.com


                                        CRAVATH, SWAINE & MOORE LLP


                                        */s/ J. Wesley Earnhardt*
                                        Antony L. Ryan (*pro hac vice*)
                                        J. Wesley Earnhardt (*pro hac vice*)
                                        David H. Korn (*pro hac vice*)
                                        Worldwide Plaza
                                        825 Eighth Avenue
                                        New York, NY 10019
                                        Tel.:  (212) 474-1000
                                        aryan@cravath.com
                                        wearnhardt@cravath.com
                                        dkorn@cravath.com


                                        *Counsel for Defendant*

DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT; CASE NO. 5:22-CV-07317

1

## **CERTIFICATE OF SERVICE**

2         I HEREBY CERTIFY that on December 1, 2023, I electronically filed the

3   foregoing document with the Clerk of the Court using CM/ECF.  I further certify that the

4   foregoing document is being served this day on all counsel of record via transmission of Notices

5   of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel

6   or parties who are not authorized to receive Notices of Electronic Filing.

7

8

9      Dated:  December 1, 2023

10                                                  */s/ Christopher C. Wheeler*

11                                                  Christopher C. Wheeler

12                                                  (CA Bar No. 224872)

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28