UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HEATHER BIDDLE, et al., | Case No. 22-cv-07317-EJD |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| THE WALT DISNEY COMPANY, | |
| Defendant. | Re: ECF No. 67 |

This antitrust lawsuit concerns The Walt Disney Company's ("Disney" or "Defendant") allegedly anticompetitive conduct in a market for streaming live pay television, *i.e.*, live television streamed over the internet to paying subscribers. *See* Consol. Am. Class Action Compl. ("CACC") ¶ 1, ECF No. 59. Now pending before the Court is Disney's Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint (the "Motion"). *See* Mot., ECF No. 67. For the reasons below, the Court GRANTS IN PART and DENIES IN PART the Motion.

## I.    BACKGROUND

### A.    Factual Allegations

#### 1.    The Evolution of Paid Television Plan Offerings

As recently as 2013, more than 90% of households in the United States were cable or satellite television subscribers. *See* CACC ¶ 104. Although consumers could use a digital television antenna to obtain a handful of digital broadcast channels—such as the major broadcast networks—for free over the air, they needed cable and satellite "pay TV" to obtain important television offerings, including essentially all non-network television channels. *Id.* These pay TV

1    providers used hard cable or satellite infrastructure to distribute multiple television channels, and

2    were known in the industry as Multichannel Video Programming Distributors ("MVPDs").

3            The rise of streaming platforms like HBO, Amazon Prime, and Netflix in the early 2010s

4    began to provide consumers with a viable option to view commercial-free, high-quality

5    entertainment over the internet, *i.e.*, without a cable or satellite television subscription.  *See id.* ¶

6    101.  For example, in October 2014, HBO—whose content was historically available only as part

7    of a cable or satellite television package—announced that it would offer a subscription to its

8    content entirely over the internet.  *Id.* ¶ 110.  HBO's announcement produced a network effect,

9    and formerly cable-only subscription services began to de-bundle their content from cable and

10   satellite television plans.  CACC ¶ 111.  Cable and satellite pay  TV thus began to lose its status as

11   a must-pay gatekeeper for important television content.  *Id.*

12           Following the initial decoupling of content from cable and satellite TV plans, January 2015

13   saw the birth of what would later be referred to as Virtual Multichannel Video Programming

14   Distributors ("vMVPDs") when Dish Network ("Dish")—a satellite pay TV provider—announced

15   a new product through its subsidiary, Sling TV.  CACC ¶¶ 159, 161.  Sling TV was already a

16   provider of live television over the internet, and its new product offered subscribers the ability to

17   watch a subset of traditional cable channels without a cable or satellite TV subscription.  *See id.* ¶

18   159.  This product was the first in the United States to offer a meaningful live TV alternative to

19   cable and satellite TV.  *See id.* ¶ 160.

20           After Sling TV's product announcement, several other vMVPDs emerged and began

21   offering streaming live pay TV ("SLPTV") plans.  *Id.* ¶ 163.  For example, in March 2016, Sony's

22   PlayStation announced an SLPTV plan, PlayStation Vue.  *See id.* ¶ 167.  In November 2016,

23   television giant DirecTV—then owned by telecommunications giant AT&T—announced another

24   SLPTV service, DirecTV Now.  *See* CACC ¶ 164.  In February 2017, Google's YouTube

25   announced the SLPTV offering YouTube TV.  *See id.* ¶ 168.  Hulu then entered the field in May

26   2017 with its SLPTV offering, Hulu + Live TV.  *See id.* ¶ 169.

27           Where MVPDs use proprietary cable or dish transmission media to bring pay TV into

28   Case No.: 22-cv-07317-EJD
     ORDER GRANTING IN PART, DENYING IN PART DEFT.'S MOT. DISMISS CACC

United States District Court
Northern District of California

1    homes, vMVPDs rely on existing internet infrastructure to transmit live pay TV channels.  *See id.*

2    ¶ 161.  These vMVPDs offered to consumers potential alternatives to traditional cable and satellite

3    pay TV subscriptions at significantly lower prices.  *See id.* ¶¶ 163–65.  Where traditional cable and

4    satellite TV providers offered plans at an average of $70 to $120 per month, vMVPDs offered

5    SLPTV plans at monthly prices such as $29.99, $35.00, $39.99, and $44.99.  *See id.* ¶¶ 167–69.

6                      **2.    ESPN and Disney**

7         The Entertainment and Sports Programming Network ("ESPN") provides television sports

8    coverage throughout the United States; its core business is sports broadcasting and commentary.

9    *See* CACC ¶¶ 56, 63–70.  Although ESPN was founded as a channel dedicated to covering local

10   Connecticut sports, it soon expanded into mainstream professional sports; continued growing

11   throughout the 1980s and 1990s; and by 2004 had executed agreements with the NCAA, NBA,

12   NFL, MLB, NHL, and MLS.  *See id.* ¶¶ 56–59.  By 2012, ESPN had proliferated into several

13   sister channels, including ESPN2, ESPNews, ESPN Classic, and ESPNU.  *Id.* ¶ 62.  Together,

14   ESPN and its sister channels had the broadest and largest number of television rights agreements

15   with major sports leagues.  *See id.*  ESPN's control over such a broad cross section of live sports

16   meant that it was a large draw for TV viewers interested in sports.  *See id.* ¶ 64.

17        Disney is a public Delaware corporation headquartered in Burbank, California.  CACC ¶

18   42.  Disney acquired ESPN in August 1995 as part of a larger merger, and now controls ESPN

19   with an 80% share.  *See id.* ¶¶ 44, 56, 67–70.  The Hearst Corporation owns the remaining 20%.

20   *Id.* ¶ 44.  Plaintiffs allege that Disney and ESPN operate as a single economic unit, with ESPN's

21   profits and losses shared and reported as part of Disney's balance sheet.  *See id.* ¶ 47.  Disney

22   exercises operational control over the entire economic entity, and negotiates contracts on behalf of

23   the combined operations.  *Id.*

24                      **3.    Carriage Agreements**

25        Carriage agreements are contracts that govern the terms of channel distribution and

26   broadcasting.  *See, e.g.*, CACC ¶ 94.  For example, cable companies pay channel owners "affiliate

27   fees" to broadcast the channel as part of a package offered to subscribers.  *See id.* ¶ 74.  Disney

28   Case No.: 22-cv-07317-EJD
     ORDER GRANTING IN PART, DENYING IN PART DEFT.'S MOT. DISMISS CACC

United States District Court
Northern District of California

negotiates carriage agreements on behalf of ESPN.  *See id.* ¶ 46.  The crux of this suit is the charge that Disney (1) controls both a highly desired channel (ESPN) and an SLPTV provider (Hulu); (2) negotiated anticompetitive carriage agreements with SLPTV providers for ESPN and its related channels; and (3) thereby raised SLPTV subscription prices, including for Hulu's SLPTV product, Hulu + Live TV.  *See id.* ¶¶ 3–4, 419.

### 4.    Disney's Cable and Satellite Carriage Agreements for ESPN

For decades, Disney negotiated carriage agreements with traditional cable and satellite TV providers that required the providers to include ESPN as part of their basic (and cheapest) cable or satellite TV packages.  *See id.* ¶¶ 82–86.  ESPN was the most expensive channel on basic cable, and almost half of American subscribers would have had a strong preference to purchase a basic cable bundle without it.  *See* CACC ¶¶ 82, 132.  However, there was enough overall demand for ESPN by cable subscribers to ensure that cable providers would pay Disney's high monthly prices to carry ESPN as part of their basic cable package offerings.  *See id.* ¶ 83.  In addition to requiring cable and satellite TV providers to carry ESPN and its sister channels as part of any basic offering, Disney included a most favored nation ("MFN") clause in its carriage agreements that requires Disney to provide its SLPTV counterparty with the lowest price for ESPN and other channels offered to any other market participant.  *Id.* ¶ 342.  Plaintiffs allege that the MFN term ensures that the ESPN affiliate fees negotiated with any given cable operator represents an industrywide price floor.  *Id.* ¶ 84.

By the early 2010s, ESPN had become a significant cost input into cable TV bundles around the country.  *See* CACC ¶ 75.  ESPN dwarfed other channels in the affiliate fees it commanded—it charged $5.13 per subscriber per month in 2012, with the next highest fee at $1.18.  *See id.*  The average fee at the time for a basic channel was $0.26.  *See id.*  By 2015, ESPN's affiliate fees had reached $6.55 per subscriber per month.  *Id.* ¶ 76.  By 2017, cable providers paid affiliate fees totaling as much as 15% or 20% of a basic cable package simply to carry ESPN as part of the bundle.  *See id.* ¶ 81.  Plaintiffs allege that ESPN's constellation of networks were the primary driver of basic cable price hikes for decades.  *See id.* ¶ 75.

United States District Court
Northern District of California

### 5.    Threats to ESPN Prices in the 2010s

ESPN hemorrhaged tens of millions of customers from about 2012 through 2017, as online platforms like Netflix, Hulu, and Amazon Prime made non-sports pay TV programming increasingly available outside traditional cable/satellite pay TV distribution. *See* CACC ¶¶ 113, 116, 123, 126, 147, 159. The cord cutting plateaued by 2017, and the remaining subscribers—who wanted live TV—comprised too small a pool to sustain the massive television revenues Disney had historically realized from the high prices it charged for ESPN. *See id.* ¶¶ 129, 147.

Against this backdrop, Plaintiffs allege that the advent of SLPTV offerings by vMVPDs between 2015 and 2017 posed "an existential threat to Disney's ESPN cash cow." CACC ¶ 172; *see id.* ¶¶ 159–69. The multitude of vMVPDs offered SLPTV packages that included much of the same content provided by legacy MVPDs, but without the "bloated" baseline prices caused by Disney's carriage agreements with cable and satellite TV providers. *See id.* ¶ 166. And notably, the new vMVPDs almost all included ESPN as part of their lower-cost offerings, pursuant to contracts negotiated between each vMVPD and Disney. *Id.* ¶ 170. SLPTV offerings appeared to fall outside the bounds of the MFN clauses Disney had negotiated and enforced for years with cable and satellite TV providers, and Disney thus did not have the leverage to negotiate its usual prices. *See id.* ¶¶ 170, 172. And although the contracts with the vMVPDs afforded Disney the opportunity to recapture ESPN subscribers among SLPTV customers, the availability of the programming accelerated the loss of higher-priced cable and satellite subscriptions. *See id.* ¶ 171.

### 6.    Disney Acquires Control of Hulu

When Hulu announced its entry into the SLPTV market in May 2017, it stated that its Hulu + Live TV service would be priced at $39.99 per month and would include about 50 live television channels. CACC ¶ 169. In July 2017, Disney received shareholder approval to acquire 21st Century Fox ("Fox"), which held a one-third stake in Hulu. *See id.* ¶¶ 176, 179. Disney had been quietly acquiring shares of Hulu, and with the acquisition—which was publicly announced in December 2017—it controlled a majority of stakes in Hulu. *See id.* ¶¶ 174–79. In May 2019, Disney seized full operational control of Hulu pursuant to an agreement between Disney and

1    Hulu's last remaining minority stakeholder, Comcast.  *See id.* ¶¶ 9, 179–80.  As of the date of

2    Disney's 2021 annual report, Disney owns 67% of Hulu, with the remaining interest—which

3    Disney has committed to purchasing—held by NBC Universal.  *See id.* ¶ 44.

4    At the time Disney achieved full operational control of Hulu in May 2019, Hulu + Live TV

5    was available at $44.99 per month for the base package.  *See id.* ¶ 183.  Disney repeatedly raised

6    the monthly price of the base package for Hulu + Live TV: to $54.99 in November 2019, $64.99

7    in November 2020, and $74.99 in November 2022.  *See id.* ¶¶ 183–190.

8    Plaintiffs allege that Disney sought to raise prices through Hulu without a competitive

9    check, and thus had to foreclose the option that a competitor could offer a base streamlining live

10   TV plan that excluded ESPN.  *See* CACC ¶¶ 195–96.  That is, Disney had to ensure that the next

11   generation of carriage agreements allowed Disney to control competitors' input costs by forcing

12   ESPN onto base packages.  *Id.* ¶ 195.

13              **7.      Disney's Post-Acquisition Carriage Agreements with SLPTV Providers**

14   The first major carriage agreement re-negotiation Disney faced after taking control of Hulu

15   (and Hulu + Live TV) was with AT&T's DirecTV, which at the time offered an SLPTV product

16   called AT&T TV Now or DirecTV Now (now named DirecTV Stream).  *See id.* ¶¶ 185, 197, 202–

17   05, 227.  The existing carriage agreement was set to expire in fall 2019.  *Id.* ¶ 198.  As the

18   expiration date approached, Disney began to publicly warn DirecTV subscribers that they would

19   soon lose access to ESPN and other Disney-controlled channels, such as those under the ABC and

20   Disney Channel networks.  *Id.*  Disney began running warnings during ESPN's Monday Night

21   Football, which is "far-and-away the most-watched show on cable[] and one of the most-watched

22   programs in the United States," across all television channels and networks.  *Id.* ¶ 199.  Disney

23   wrote messages such as "AT&T has refused to reach a fair, market-based agreement with us" and

24   "ATTENTION CUSTOMERS, DON'T LOSE ESPN.  CALL NOW" with a toll-free number.  *Id.*

25   ¶¶ 199–200.  Five days later, rumors circulated that AT&T had given in to Disney's carriage

26   agreement demands; a deal was announced on September 22, 2019.  *Id.* ¶ 201.  The carriage

27   agreement required AT&T to include ESPN in its SLPTV base package, which pushed AT&T to

28

United States District Court
Northern District of California

1    raise its monthly base package price from $50 to $65 in October 2019—so that Disney's

2    November 2019 price increase for Hulu + Live TV remained about $10 cheaper that AT&T's

3    offering. *See id.* ¶¶ 185, 203–207.

4         Plaintiffs allege that Disney similarly renegotiated its legacy carriage agreement with

5    Google when the prior agreement was set to expire in late 2021, so that YouTube TV also did not

6    offer a base package without ESPN. *See* CACC ¶¶ 207–226.  Negotiations stalled between Disney

7    and Google over MFN terms, with "YouTube[] . . . seeking a most-favored nation (MFN) clause

8    from Disney" to "ensure that a lower price for Disney-owned content (principally, ESPN) offered

9    to another streaming live TV provider would be offered to Google as well." *Id.* ¶ 218.

10        Plaintiffs allege that these carriage agreements meant that by mid-2022, the base packages

11   offered by Hulu + Live TV, YouTube TV, and DirecTV Stream were essentially equal in price to

12   those offered by traditional cable and satellite TV providers. *See id.* ¶ 231.  Dish's Sling TV was

13   the only major streaming live TV service[1] without an MFN agreement with Disney, although its

14   legacy carriage agreement with Disney did require that Sling TV include ESPN as part of its base

15   bundle. *See id.* ¶¶ 228–231.  Sling TV was in some respects an outlier among SLPTV products in

16   that it was "notably less complete contentwise" than the leading services, and its prices were

17   significantly lower than those of the three other products. *Id.* ¶ 231.  However, the legacy carriage

18   agreement expired in fall 2022, and Dish reached a deal with Disney two days after the agreement

19   expired and Disney cut Sling TV and Dish subscribers' access to ESPN and other Disney-

20   controlled channels. *See id.* ¶¶ 234–240.  The new carriage agreement required ESPN to be sold

21   as part of Sling TV's base package, and included an MFN clause. *Id.* ¶ 242.  Shortly thereafter,

22   Dish increased the price of its base Sling TV package for the first time in nearly two years. *See id.*

23   ¶¶ 243–44.

24        Plaintiffs allege that following Disney's new carriage agreements with its major SLPTV

25   competitors, the price of SLPTV base packages has risen substantially across the market. *See*

26

27   _____

[1] Sony had shuttered its PlayStation Vue product by the end of 2019. *See* CACC ¶ 186.

28   Case No.: 22-cv-07317-EJD
     ORDER GRANTING IN PART, DENYING IN PART DEFT.'S MOT. DISMISS CACC
     7

United States District Court
Northern District of California

CACC ¶ 246.  There are no SLPTV package options without ESPN.  *Id.* ¶ 249.  As of July 2022, YouTube TV was the leading SLPTV provider, followed closely by Hulu + Live TV.  *See id.* ¶ 248.  Together, the two services serve approximately 70% of all SLPTV subscribers in the United States.  *Id.* ¶ 249.  The competitors charge roughly the same price for their services; no price increase for either service has been met with price competition in the form of lowered prices by a competitor.  *See id.* ¶ 250–51.  Plaintiffs allege that these effects on SLPTV prices is a direct consequence of Disney's "web" of carriage agreements that force ESPN on providers and consumers and sets a price floor on subscriptions.  *See, e.g.*, CACC ¶¶ 86, 231, 246, 252, 334.  According to Plaintiffs, Disney's carriage agreements allow it to charge YouTube TV, DirecTV Stream, and Sling TV the same price it sets for Hulu + Live TV for any terms covered by the MFN clause, which the base term ensure includes ESPN fees.  *See id.* ¶ 252.  That is, Plaintiffs allege that "Disney maintains a direct cost input to its competitors' base package prices."  *Id.*

### 8.  Plaintiffs

There are 25 named plaintiffs in this action.  *See* CACC ¶¶ 11–25, 29–38.  Each named plaintiff is a current or former paying subscriber of either YouTube TV or DirecTV Stream.  *See id.*  Plaintiffs are residents of Arizona, California, Florida, Illinois, Iowa, Kentucky, Massachusetts, Michigan, Nevada, New York, North Carolina, Tennessee, and Washington.  *See id.*  The below table indicates each plaintiff's name, subscription service, and state of residence.

| Name | Subscription Service | State of Residence |
|---|---|---|
| Heather Biddle | YouTube TV | California |
| Jeffrey Kaplan | YouTube TV | Arizona |
| Zachary Roberts | YouTube TV | Indiana |
| Joel Wilson | YouTube TV | Kentucky |
| Laura Molina | YouTube TV | California |
| Dev Singh | YouTube TV | Florida |
| Nicholas Dowd | YouTube TV | Florida |
| Angel Hernandez | YouTube TV | New York |

| | | |
|---|---|---|
| David Kenward | YouTube TV | North Carolina |
| Utica Cason | YouTube TV | North Carolina |
| David Show | YouTube TV | Michigan |
| Dustin Shapiro | YouTube TV | Michigan |
| Tamika Anderson | YouTube TV | Michigan |
| Connie Harrison | YouTube TV | Tennessee |
| Don Knoch | YouTube TV | Arizona |
| Michelle Fendelander | DirecTV Stream | Nevada |
| Ronda Lee Haines | DirecTV Stream | Massachusetts |
| Michael Hughes | DirecTV Stream | Iowa |
| John Manso | DirecTV Stream | Washington |
| Jasmine McCormick | DirecTV Stream | Illinois |
| Angela Heard | DirecTV Stream | California |
| Steven Tucker | DirecTV Stream | California |
| Scott Thompson | DirecTV Stream | Florida |
| Douglas Yarema | DirecTV Stream | New York |
| William Gaskins | DirecTV Stream | North Carolina |

### 9.     The Relevant Market

Plaintiffs allege that the relevant market is the SLPTV market in the United States.  *See*
CACC ¶¶ 253–333.

#### a.     Relevant Product Market

The SLPTV market is a distinct sub-market of the live pay television ("LPTV") market.
*See id.* ¶ 253.  The providers in the LPTV market are MVPDs, and include cable and satellite TV
providers, while the providers in the SLPTV market are vMVPDs.  *Id.*  The SLPTV market
includes subscription-based services that provide access to live television channels over a
broadband internet connection, provided as bundles of channels.  *Id.* ¶ 254.  SLPTV providers

United States District Court
Northern District of California

create "base" or "basic" packages of channels, where a basic package is the minimum number of bundled channels in a subscription.  *Id.* ¶ 255.  The SLPTV providers, rather than subscribers, choose the individual channels to include in a subscription bundle.  *See id.*  SLPTV products are generally available on multiple devices, including tablets, smart phones, PCs, laptops, televisions, and game consoles.  *Id.* ¶ 257.

Plaintiffs allege the following vMVPDs as SLPTV market participants: Google's YouTube TV, Disney's Hulu + Live TV, AT&T's DirecTV Stream (previously branded DirecTV Now and AT&T Now), Dish's Sling TV, and Fubo TV.  CACC ¶ 303.  As of late 2022, YouTube TV has the largest market share (38%) with over 5,000,000 subscribers, followed by Hulu + Live TV (31%) with approximately 4,100,000 subscribers.  *Id.* ¶ 304.  The shares of Sling TV, Fubo TV, and DirecTV Stream are, respectively, 17%, 8%, and 6%, as depicted in the chart below:



*See id.*  Revenue shares are distributed in approximately the same proportions.  *Id.* ¶ 305.

Plaintiffs allege the SLPTV market is protected by a powerful Carriage and Streaming Infrastructure Barrier to Entry ("CSIBE").  *See* CACC ¶ 317.  "To credibly enter the SLPTV market, a company must traverse the CSIBE not only by obtaining computing power, distributed computing systems, large amounts of data storage, and local data servers, but also by developing

Case No.: 22-cv-07317-EJD
ORDER GRANTING IN PART, DENYING IN PART DEFT.'S MOT. DISMISS CACC
10

1   custom file systems and software infrastructure to optimize streams." *Id.* ¶ 323.  Further, a

2   prospective entrant must secure enough live television channels to become a viable pay television

3   platform.  *Id.* ¶ 330.  Plaintiffs allege that Disney's "web of carriage agreements with all market

4   participants" requires a new entrant to enter into an agreement with Disney to provide content

5   available on other platforms in the SLPTV market, so that Disney can prevent entry "by

6   mandating onerous terms or by outright refusing to license live television content." *Id.* ¶ 333.

7         Plaintiffs allege the SLPTV market is highly concentrated.  CACC ¶ 506.  The Herfindahl-

8   Hirschman Index (HHI) of the market shares is 2,794, which exceeds the 2,500-point guideline

9   threshold set by the Department of Justice for a highly concentrated market.  *Id.* ¶¶ 306–07.

10                    **b.    Relevant Geographic Market**

11        Plaintiffs allege that the relevant geographic market is the United States because (1)

12   vMVPDs provide SLPTV content over broadband internet connections, which are available

13   throughout the country; (2) an extensive network of licensing agreements prevents transmission

14   SLPTV content outside of the United States; (3) live television content is governed by federal law

15   concerning content restrictions; (4) the bundles of channels sold in the SLPTV market generally

16   cater to United States consumers; (5) advertisers on SLPTV promote products and services to

17   United States audiences; and (6) mMVPDs generally enforce United States territorial restrictions

18   by obtaining geolocation information from subscribers and denying access to content outside of

19   licensed regions.  *See id.* ¶¶ 308–16.

20                    **10.    Class Allegations**

21        Plaintiffs allege the existence of two national classes and 15 state subclasses; the class

22   period for each of the 17 classes is April 1, 2019, through the present.  *See* CACC ¶¶ 372–405.

23   The two national classes are the Nationwide YouTube TV Subscriber Class and the Nationwide

24   DirecTV Stream Subscriber Class, defined as "[a]ll persons, business associations, entities, and

25   corporations who paid for a . . . monthly subscription" to the relevant service during the class

26   period.  *See id.* ¶¶ 372–75.  The 15 state subclasses consist of seven YouTube TV subscriber

27   classes for residents of Arizona, California, Florida, Michigan, New York, North Carolina,

28   Case No.: 22-cv-07317-EJD
     ORDER GRANTING IN PART, DENYING IN PART DEFT.'S MOT. DISMISS CACC

United States District Court
Northern District of California

1    Tennessee and eight DirecTV Stream subscriber classes for residents of California, Florida,

2    Illinois, Iowa, Massachusetts, Nevada, New York, and North Carolina.  *See id.* ¶¶ 376–405.

3         **B.**    **Procedural History**

4         This action was initiated on November 18, 2022, as a putative class action on behalf of a

5    nationwide class of YouTube TV subscribers.  *See* Compl. ¶¶ 342–43, ECF No. 1.  On December

6    7, 2022, the Court related the action to *Fendelander v. Walt Disney Co.*, No. 22-cv-07533 (N.D.

7    Cal.), which was initiated on November 30, 2022, as a nearly identical putative class action on

8    behalf of a nationwide class of DirecTV Stream subscribers.  *See* Order Relating Case, ECF No.

9    12; *see also Fendelander* Compl. ¶¶ 345–46, ECF No. 1, No. 22-cv-07533 (N.D. Cal.).  The

10   complaints in each of the two actions alleged a single count for violation of Section 1 of the

11   Sherman Antitrust Act, 15 U.S.C. § 1, on the ground that Disney's carriage agreements are *per se*

12   illegal horizontal agreements between competitors to restrict trade, or alternatively unlawful under

13   the rule of reason as unreasonable restraints on trade.  *See, e.g.*, Compl. ¶¶ 356–75.

14        Disney moved to dismiss both actions, and the Court granted in part with leave to amend

15   and denied in part the motions on September 30, 2023.  *See* Order Granting in Part, Denying in

16   Part Mot. Dismiss Compl. ("First MTD Order"), ECF No. 51.  In the First MTD Order, the Court

17   granted Disney's motions as to Plaintiffs' *per se* theory with leave to amend, and denied the

18   motions as to Plaintiffs' rule of reason theory.  *See id.*

19        The Court consolidated the two actions on October 13, 2023.  *See* ECF No. 53.  Plaintiffs

20   filed the operative CACC on October 18, 2023.  *See* CACC.  The CACC asserts one claim on

21   behalf of each of the 17 alleged classes; the two nationwide class claims are for alleged violations

22   of the Sherman Act, § 1, and the remaining 15 claims assert violations of state competition

23   statutes.  *See* CACC ¶¶ 418–599.

24        Disney filed the instant motion to dismiss on December 1, 2023.  *See* Mot.  The Motion

25   was fully briefed on February 2, 2024.  *See* Opp'n, ECF No. 69; Reply, ECF No. 77.  The Court

26   heard oral argument on February 15, 2024.

27

28   Case No.: 22-cv-07317-EJD
     ORDER GRANTING IN PART, DENYING IN PART DEFT.'S MOT. DISMISS CACC
     12

United States District Court
Northern District of California

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 8 requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Procedure 12(b)(6).  Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face*." Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While a plaintiff must allege "more than a sheer possibility that a defendant has acted unlawfully," the plausibility standard "is not akin to a probability requirement." *Id.*

When evaluating a Rule 12(b)(6) motion, courts generally "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Courts need not, however, "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam).  Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).  Courts may also "look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment.  *Shaw v. Hahn*, 56 F.3d 1128, 1129 (9th Cir. 1995).

## III.    REQUEST FOR JUDICIAL NOTICE

Disney requests that the Court take judicial notice pursuant to Federal Rule of Evidence 201(b) of the facts that Fubo TV did not carry the ESPN network from its inception in 2015 until 2020, and that another SLPTV provider, Philo TV, has never carried the ESPN network at all.  *See* Mot. 7 & n.1 (citing Todd Spangler, *ESPN Is Finally Coming to FuboTV Lineup*, Variety (June 24, 2020), https://variety.com/2020/digital/news/espn-available-fubotv-lineup-1234648449/; *Channel Lineup & TV Guide*, Philo, https://www.philo.com/go/ channels).  Plaintiffs do not oppose the request.  *See generally* Opp'n.

United States District Court
Northern District of California

1    The doctrine of judicial notice codified in Federal Rule of Evidence 201 is one of the two

2    mechanisms by which a district court may consider material outside the pleadings without

3    converting a motion to dismiss into a motion for summary judgment; the other is the judicially-

4    created doctrine of incorporation by reference.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899

5    F.3d 988, 998, 1002 (9th Cir. 2018).  Federal Rule of Evidence 201 provides that a court may

6    judicially notice a fact "not subject to reasonable dispute," *i.e.*, a fact that is "generally known" or

7    that "can be accurately and readily determined from sources whose accuracy cannot reasonably be

8    questioned." Fed. R. Evid. 201(b)(1)–(2).  If a judicially noticeable document contains disputed

9    facts, the court may notice the existence of the document, but not the disputed facts therein.  *See*

10   *Khoja*, 899 F.3d at 999 ("[A] court cannot take judicial notice of disputed facts contained in

11   [judicially noticeable] public records.") (citation omitted).

12       The Court grants Disney's request for judicial notice of the availability of ESPN on Fubo

13   TV and Philo TV, as the two webpages at issue are publicly accessible and Plaintiffs do not

14   contest the accuracy of the facts therein.  *See, e.g.*, *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d

15   1190, 1205 (N.D. Cal. 2014) ("The Court GRANTS LinkedIn's request for judicial notice of

16   LinkedIn's Help Page . . . .  Plaintiffs do not oppose this request or otherwise contend that the

17   document is inaccurate."); *In re Meta Pixel Tax Filing Cases*, ---F. Supp. 3d ----, 2024 WL

18   1251350, at *3 (N.D. Cal. Mar. 25, 2024) (taking judicial notice of existence and contents of terms

19   of service available on defendant's website "because the document is publicly available from a

20   source whose accuracy cannot reasonably be questioned and its contents can be accurately

21   determined"); *Vizcarra v. Michaels Stores, Inc.*, --- F. Supp. 3d ----, 2024 WL 64747, at *5 n.2

22   (N.D. Cal. Jan. 5, 2024) ("The Court takes judicial notice of the existence and contents of the

23   webpages Michaels has submitted which show certain Michaels private brand products for sale on

24   Amazon.com and Walmart.com.").

25   **IV.    DISCUSSION**

26       The CACC asserts claims under the Sherman Act and under various state statutes of 11

27   states:  Arizona, California, Florida, Illinois, Iowa, Massachusetts, Michigan, Nevada, New York,

United States District Court
Northern District of California

North Carolina, and Tennessee law.  *See* CACC ¶¶ 418–599.  Disney argues that the CACC should be dismissed in its entirety because (1) Plaintiffs fail to allege either a *per se* or rule of reason violation of § 1 of the Sherman Act and (2) the state law claims either fall with the federal claims; are independently insufficiently pleaded in the cases of Massachusetts and Florida; and are otherwise barred in the cases of Illinois and Tennessee.  *See generally* Mot.  The Court turns to these arguments in turn.

### A.      Sherman Act § 1 Claims

The Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  A plaintiff asserting a claim under § 1 must plead: "(1) a 'contract, combination or conspiracy among two or more persons or distinct business entities'; (2) which is intended to restrain or harm trade; (3) 'which actually injures competition'; and (4) harm to the plaintiffs from the anticompetitive conduct."  *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1129 (9th Cir. 2015) (quoting *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012)).  "Because § 1 . . . does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."  *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 553).  Certain restraints are deemed unlawful *per se*, but restraints of trade are generally tested for legality under the rule of reason standard.  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885–86 (2007) (citations omitted).

Plaintiffs assert a Sherman Act § 1 claim on behalf of each of the nationwide YouTube TV and DirecTV Stream subscriber classes, alleging that Disney's carriage agreements are horizontal agreements with competitors that are *per se* illegal or, alternatively, unlawful under the rule of reason analysis.  *See* CACC ¶¶ 418–61.  Disney argues that Plaintiffs fail to state a claim under either theory, and Plaintiffs, unsurprisingly, disagree.  Disney additionally argues that Plaintiffs lack standing to seek damages under the Sherman Act because they are indirect purchasers.

United States District Court
Northern District of California

1

Before turning to the parties' arguments, the Court notes at the outset that although it

2
addressed many of the Sherman Act arguments in the First MTD Order, an amended complaint

3
supersedes any prior complaint and is fairly subject to renewed challenge on a motion to dismiss.

4
*See, e.g.*, *Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir.1992) ("[A]fter amendment the original

5
pleading no longer performs any function and is treated thereafter as non-existent."); *In re Sony*

6
*Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d

7
1077, 1098 (S.D. Cal. 2010) (evaluating renewed arguments brought by defendant on motion to

8
dismiss amended complaint on the ground that "[w]hen Plaintiffs filed the FACC, it superseded

9
their previous complaint, and Sony was therefore free to move again for dismissal"); *see also City*

10
*of L.A., Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001) (holding that

11
the law of the case doctrine "simply does not impinge upon a district court's power to reconsider

12
its own interlocutory order provided that the district court has not been divested of jurisdiction

13
over the order").

14
### 1.   *Per Se* Theory

15
The Supreme Court has held that certain categories of restraints are "necessarily" or *per se*

16
illegal; such categorization "eliminates the need to study the reasonableness of an individual

17
restraint in light of the real market forces at work." *Leegin*, 551 U.S. at 886 (citing *Bus. Elecs.*

18
*Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)); *see also Nat'l Soc'y of Prof. Eng'rs v.*

19
*United States*, 435 U.S. 679, 692 (1978) ("[A]greements whose nature and necessary effect are so

20
plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality

21
. . . are illegal *per se*.") (internal quotation marks omitted).  "[T]he *per se* rule is appropriate only

22
after courts have had considerable experience with the type of restraint at issue, . . . and only if

23
courts can predict with confidence that it would be invalidated in all or almost all instances under

24
the rule of reason." *Id.* at 886–87 (internal punctuation and citations omitted).  Courts have found

25
restraints to be *per se* unlawful where they "include horizontal agreements among competitors to

26
fix prices . . . or to divide markets." *Id.* at 886 (internal punctuation and citations omitted); *see*

27
*also, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.* ("*NCAA*"), 468 U.S.

28
Case No.: 22-cv-07317-EJD
ORDER GRANTING IN PART, DENYING IN PART DEFT.'S MOT. DISMISS CACC

85, 100 (1984) ("Horizontal price fixing and output limitation are ordinarily condemned as a matter of law under an 'illegal per se' approach because the probability that these practices are anticompetitive is so high."). A vertical restraint, on the other hand, "is not illegal *per se* unless it includes some agreement on price or price levels." *Bus. Elecs. Corp.*, 485 U.S. at 735–36. Courts are "reluctan[t] to adopt *per se* rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Leegin*, 551 U.S. at 887 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).

Here, Disney argues that Plaintiffs fail to state a claim for a *per se* violation of § 1 of the Sherman Act. *See* Mot. 10–13. Specifically, Disney argues that the challenged restraints here are vertical because the carriage agreements are between ESPN and SLPTV providers, rather than between competitors in the same market, so that the *per se* rule cannot apply. *See id.* at 11–13. Disney further notes that the Court previously found these agreements to be vertical, and argues that the same conclusion applies here because Plaintiffs have not amended or expanded any relevant allegations in the CACC. *See id.* at 10–11. Plaintiffs counter that the CACC alleges that Disney, ESPN, and Hulu operate as a single economic entity with a unity of purpose, and that Disney's negotiations with SLPTV providers on ESPN's behalf necessarily also constitute negotiations between Hulu and its competitors. *See* Opp'n 11–14.

The parties implicitly agree that the carriage agreements can be considered horizontal only if they are made between SLPTV providers. Further, there is agreement that SLPTV providers such as YouTube TV are on one side of the negotiating table for the ESPN carriage agreements. Thus, for a provider such as YouTube TV to enter a horizontal agreement with a Disney-affiliated company, it must be possible to name Hulu + Live TV as the counterparty. Plaintiffs argue that the unity of purpose between Disney, ESPN, and Hulu permits this conclusion; Disney disagrees.

In *Copperweld Corporation v. Independent Tube Corporation*, the Supreme Court held that a parent and its wholly-owned subsidiary are incapable of conspiring in violation of § 1 of the Sherman Act because they "always have a 'unity of purpose or a common design.'" 467 U.S. 752, 771 (1984). However, although *Copperweld* holds that "a subsidiary shares the purposes and

United States District Court
Northern District of California

1   intentions of the parent when it acts in coordination with the parent," it "does not supply a theory

2   of unbounded vicarious liability for the *acts* of legally distinct entities" and "does not support

3   holding a subsidiary liable for the parent's independent conduct."  *Arandell Corp. v. Centerpoint*

4   *Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018) (citing *Lenox MacLaren Surgical Corp. v.*

5   *Medtronic, Inc.*, 847 F.3d 1221, 1237 (10th Cir. 2017)).[2]  Accordingly, a subsidiary is not

6   presumed liable for the act of another subsidiary of the same parent company.  *See id.*

7        Thus, the question of whether Hulu can be said to be the Disney-affiliated entity

8   negotiating ESPN carriage agreements with SLPTV providers such as YouTube TV must be

9   answered in the negative.  Plaintiffs have alleged that Disney negotiates the carriage agreements

10  on behalf of ESPN.  *See* CACC ¶ 46.  That Disney owns 67% of Hulu and has full operational

11  control of the entity, *see id.* ¶ 44, does not mean that Hulu can be said to have been the negotiator

12  of or signatory to the ESPN carriage agreements.  The CACC alleges that Disney, Hulu, and

13  ESPN act as a single economic entity with unity of purpose, *see id.* ¶¶ 3, 44, but even taking this

14  allegation as true, *Arandell* teaches that such unity of purpose under *Copperweld* does not mean

15  that the acts of one entity in a family of companies may be imputed to any other wholly-related

16  entity.  *See Arandell*, 900 F.3d at 633–34.  The Court therefore refuses once again to extend

17  *Copperweld* to hold that Disney's carriage agreement negotiations on behalf of ESPN may be

18  imputed to Hulu.  *See* First MTD Order 9–15.

19       Accordingly, the Court will dismiss Plaintiffs' claims under § 1 of the Sherman Act to the

20  extent they allege a *per se* violation.[3]  Further, because the Court has previously granted leave to

21  amend, it finds that leave would be futile, and the dismissal will be without leave to amend.

22

23

24  _____

   [2] Plaintiffs in *Arandell* sued for violation of a Wisconsin antitrust statute, but Wisconsin courts'
25  "interpretation of Wisconsin Statute § 133.03 'is controlled by federal court decisions under the
   Sherman Act.'"  *Arandell*, 900 F.3d at 629 (quoting *Ford Motor Co. v. Lyons*, 405 N.W.2d 354,
26  367 (Wis. Ct. App. 1987)).

27  [3] Plaintiffs do not argue that the carriage agreements might be *per se* illegal vertical restraints, so
   the Court does not evaluate this question.  *See* Opp'n 11–14.
28  Case No.: 22-cv-07317-EJD
   ORDER GRANTING IN PART, DENYING IN PART DEFT.'S MOT. DISMISS CACC

United States District Court
Northern District of California

1

## 2.   Rule of Reason Theory

Plaintiffs assert their two Sherman Act claims in the alternative as unlawful violations of §

1 under the rule of reason standard.  *See* CACC ¶¶ 428, 450.  "The rule of reason is the accepted

standard for testing whether a practice restrains trade in violation of § 1."  *Leegin*, 551 U.S. at 885

(citing *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)).  A § 1 rule of reason claim requires four

separate elements:

> (1) a contract, combination or conspiracy among two or more persons
> or distinct business entities;
> (2) by which the persons or entities intended to harm or restrain trade
> or commerce among the several States, or with foreign nations;
> (3) which actually injures competition[]" . . . [and]
> (4) [plaintiffs] are the proper parties to bring the antitrust action
> because they were harmed by the defendants' contract, combination,
> or conspiracy, and the harm they suffered was caused by the anti-
> competitive aspect of the defendants' conduct.

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.* ("*Sunday Ticket*"), 933 F.3d 1136,

1150 (9th Cir. 2019) (quoting *Brantley*, 675 F.3d at 1197) (internal quotation marks and citations

omitted).  The "threshold step" is to "accurately define the relevant market, which refers to 'the

area of effective competition.'"  *FTC v. Qualcomm Inc.* ("*Qualcomm*"), 969 F.3d 974, 992 (9th

Cir. 2020) (quoting *Ohio v. Am. Express Co.* ("*AmEx*"), 585 U.S. 529, 543 (2018)).  But where a

plaintiff plausibly alleges that a defendant has "imposed 'a naked restriction' on output," "'no

elaborate industry analysis is required.'"  *Sunday Ticket*, 933 F.3d at 1155–56 (quoting *NCAA*, 468

U.S. at 109); *see also City of Oakland v. Oakland Raiders*, 445 F. Supp. 3d 587, 600 n.9 (N.D.

Cal. 2020) ("In some cases involving naked restrictions on output, a plaintiff may not be required

to establish a relevant market, even under the rule of reason.") (internal quotation marks and

alterations omitted) (citing *Sunday Ticket*, 933 F.3d at 1152), *aff'd*, 20 F.4th 441 (9th Cir. 2021).

Disney argues that Plaintiffs fail to plead the relevant antitrust market and have not

identified agreements that unreasonably restrain trade, *i.e.*, fail to plead the second and third

elements of a rule of reason claim.  *See* Mot. 14–25.  The court addresses these arguments in turn.

### a.   Relevant Market

A relevant market is comprised of a relevant geographic market and a relevant product

Case No.: 22-cv-07317-EJD
ORDER GRANTING IN PART, DENYING IN PART DEFT.'S MOT. DISMISS CACC

19

United States District Court
Northern District of California

market.  *See Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989).

Plaintiffs allege that the relevant market consists of the SLPTV market in the United States, *i.e.*,

the United States market in which SLPTV providers sell bundles of live TV channels, which are

delivered over a broadband internet connection, to subscribers.  *See* CACC ¶¶ 253–54, 308.

Disney makes three arguments as to the failures of Plaintiffs' proposed market, but only one—the

purported failure to allege that Disney has market power in the SLPTV market, *see* Mot. 18—is

properly evaluated in the relevant market analysis.  The other two arguments, *i.e.*, that Plaintiffs

allege a market restraint outside the SLPTV market and that Plaintiffs lack antitrust standing, *see*

*id.* at 14–18, go to the enumerated elements of a rule of reason claim, and the Court will address

those arguments below.[4]

Before turning to Disney's argument about allegations of market power, the Court must

first determine the relevant market.  The Court previously found that Plaintiffs plausibly alleged

that the SLPTV market is a distinct submarket of the broader LPTV market because, for example,

industry participants distinguish SLPTV providers for distributing content over the internet; the

SLPTV market has distinct customers from the LPTV market in that they skew younger and prefer

to view content using hand-held devices, rather than television consoles; and SLPTV channel

packages have historically included fewer channels than LPTV bundles and are accordingly

cheaper and less sensitive to price changes.  *See* First MTD Order 17; *see also Newcal Indus., Inc.*

*v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (noting practical indicia of economically

distinct submarket include "industry or public recognition of the submarket as a separate economic

entity, the product's peculiar characteristics and uses, unique production facilities, distinct

customers, distinct prices, sensitivity to price changes, and specialized vendors") (quoting *Brown*

---

[4] The Court recognizes that it previously addressed the former argument in its evaluation of the relevant market, *see* First MTD Order 18, but now notes that *Qualcomm*, on which it relied, merely emphasizes the need for a well-defined relevant market in conducting the rule of reason analysis.  *See Qualcomm*, 969 F.3d at 992 (stating that "[c]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market," including because, "in assessing alleged antitrust injuries, courts must focus on anticompetitive effects 'in the market where competition is allegedly being restrained'") (internal alterations and citations omitted).

United States District Court
Northern District of California

*Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).  Those allegations are unchanged, *see*

CACC ¶¶ 258–302, and the Court sees no reason to deviate from that holding here as to the

relevant product market.  Disney does not appear to dispute that the United States is the relevant

geographic market.  *See generally* Mot. 14–18.  The Court therefore finds that the relevant market

is the SLPTV market in the United States, in which SLPTV providers sell live TV services.

In addition to alleging a relevant market, a plaintiff "must allege . . . that the defendant has

power within that market."  *Newcal*, 513 F.3d at 1044.  Disney argues that neither Disney nor

ESPN participates in the SLPTV market of selling live TV to subscribers, and that Plaintiffs do

not allege that Hulu—whose product, Hulu + Live TV, has a 31% market share—gives Disney

market power in the SLPTV market.  *See* Mot. 18.  As Disney notes, "[m]arket power is the ability

to raise price profitably *by restricting output*."  Mot. 6 (quoting *AmEx*, 585 U.S. at 549).  Here,

Plaintiffs allege that Disney, through its control and negotiations on behalf of ESPN, is able (1) to

restrict SLPTV providers from selling subscription packages without ESPN through the carriage

agreement requirement that SLPTVs carry ESPN even in basic bundles, and therefore (2) to raise

prices through its control of Hulu and the MFN clause, which allows Disney to impose the price

Hulu pays for ESPN on the other SLPTV providers.  *See* CACC ¶¶ 246–52.  Because Plaintiffs

have specifically alleged that the terms of the MFN provision permit Disney to set a price floor

and raise its competitors' ESPN prices (which translate to the subscription package prices)

whenever it raises Hulu's prices, the Court finds Plaintiffs' allegations sufficient to plead Disney's

market power in a well-defined SLPTV market in the United States.

Despite this conclusion, the Court notes here that Plaintiffs' allegations regarding the MFN

term appear somewhat inconsistent.  In one bucket of allegations, Plaintiffs assert that the MFN

clause permits Disney to "force a functional price [floor] on the market" because if it "raises Hulu

+ Live TV prices, it can raise MFN terms up to that price point." *Id.* ¶ 252; *see also, e.g.*, *id.* ¶ 98

("[T]he MFN Price Term allows Disney to set the lowest price available for ESPN across the

entire market.").  But in another bucket, Plaintiffs allege that SLPTV providers desire MFN terms

and that Disney is reluctant to include them in carriage agreements because they set a price ceiling

1   and may require Disney to lower its prices.  *See, e.g.*, CACC ¶ 94 ("[An MFN provision] means

2   that when ESPN makes a deal with DirecTV for better terms than what ESPN first gave Dish,

3   ESPN is then obligated to equal the playing field."); *id.* ¶ 218 (describing stalled negotiations

4   between Disney and Google for YouTube TV carriage agreement based on Google seeking MFN

5   clause); *id.* ¶ 238 (describing difficulty for "cable network owner," *i.e.*, content owner such as

6   ESPN, to budge on channel price because MFNs require owner to pass lower prices given to one

7   distributor to other operators with same size subscriber base); *id.* ¶ 343 ("Put simply, the MFN

8   Price Term ensures that if Disney provides another service a lower price, then that price becomes

9   the applicable price for its counterparty.").  In yet a third bucket, Plaintiffs allege that "using MFN

10  clauses in carriage agreements . . . ensure[d] that ESPN remained part of AT&T/DirecTV's base

11  streaming live TV offering," *id.* ¶ 206, even though this result seems more likely the result of the

12  base term rather than the MFN term.  These varied allegations muddy the waters with respect to

13  the specific terms and likely effects of the MFN clauses in Disney's ESPN carriage agreements

14  with SLPTV providers.  Nonetheless, at this stage of the action, the Court will draw all inferences

15  in Plaintiffs' favor and presume that any contradiction in Plaintiffs' allegations resolves in favor of

16  the MFN clause permitting Disney to set a price floor using Hulu.  Further, the Court will use this

17  inference regarding the MFN term throughout this order.

18          Accordingly, drawing all inferences in Plaintiffs' favor, the Court once again finds

19  Plaintiffs' allegations sufficient to plead Disney's market power in a well-defined SLPTV market

20  in the United States.  *See* First MTD Order 19.

21                    **b.      Restraint of Trade Which Actually Injures Competition**

22          Because the Court finds that Plaintiffs have adequately alleged a well-defined relevant

23  market and Disney's power therein, it now turns to the question of whether Plaintiffs have

24  sufficiently pleaded the second and third elements of a rule of reason claim, *i.e.*, have pleaded a

25  restraint of trade which actually injures competition.  Disney argues, as noted above, *see supra*, at

26  Part IV(A)(2)(a), that the CACC is deficient because Plaintiffs do not allege that competition is

27  being restrained in the relevant SLPTV market in the United States in which SLPTV providers sell

28  Case No.: 22-cv-07317-EJD
    ORDER GRANTING IN PART, DENYING IN PART DEFT.'S MOT. DISMISS CACC

TV subscription packages to consumers, but rather in the upstream market in which SLPTV providers purchase channels and content, such as ESPN.  *See* Mot. 14.  Disney also argues that Plaintiffs have failed to allege that the restraints at issue—the ESPN base term and MFN term— actually injure competition in the relevant market because (1) the base term's effect of raising prices and reducing consumer choice is an insufficient injury as a matter of law and (2) the MFN term helps rather than harms competition because (a) it permits an SLPTV provider to demand a lower price if Disney gives any other provider that lower price and (b) Plaintiffs have not alleged facts plausibly suggesting that Disney has used the MFN term for anticompetitive ends.  *See* Mot. 19–20.  Disney further argues that the Court should deviate from the First MTD Order and find that Plaintiffs do not sufficiently allege that the challenged restraints were the cause of any barriers to entry in the market, and that the alleged barriers are not plausible. *See id.* at 20–24 (citing *Brantley*, 675 F.3d at 1195–1203).  Plaintiffs respond that the Court has already found their allegations sufficient to state a rule of reason claim, and that it should do so once again because the CACC plausibly alleges that the carriage agreements injure competition in relevant SLPTV market.  *See* Opp'n 14–21.  Plaintiffs also argue that *Brantley* is inapplicable because its reasoning concerned only tying claims.  *See id.* at 16–19.

As a threshold matter, the Court finds that Plaintiffs allege conduct restraining competition in the relevant SLPTV market—*i.e.*, the market in which subscribers purchase live TV packages— rather than in the upstream market in which SLPTV providers purchase channels and content.  It is true that the carriage agreements at issue are made between parties in the upstream market, *i.e.*, between ESPN and the SLPTV providers.  *See, e.g.*, CACC ¶¶ 197–245.  Crucially, however, Plaintiffs allege that Disney uses the carriage agreements *and its control of Hulu* to decrease competition in the relevant downstream SLPTV market to sell subscription packages to consumers.  *See id.* ¶ 194 ("From the moment it obtained control over Hulu, Disney raised prices [in the SLPTV market] *with impunity*—as well as the primary cost input of its competitors.") (emphasis added); ¶ 204 ("In short, through its new carriage agreement with AT&T, Disney not only ensured that AT&T[] could not undercut Hulu + Live TV on price[,] . . . it ensured that . . .

United States District Court
Northern District of California

1    AT&T's costs were high enough for streaming live TV programming that AT&T[] had to push its

2    base price, which had to include ESPN, well above Hulu + Live TV's price, even after an

3    additional hike by Disney.").  Plaintiffs therefore plausibly allege that Disney's combined actions

4    in the upstream and downstream markets prevent players in the relevant downstream SLPTV

5    market—*e.g.*, AT&T's DirectTV Stream—from engaging in competitive actions such as lowering

6    price to gain additional subscribers.  The harm to competition caused by the Disney's conduct

7    with the carriage agreements and its control of Hulu is thus alleged as taking place in the correct

8    relevant market, *i.e.*, the SLPTV provider market to sell subscriptions to consumers.  *See*

9    *Qualcomm*, 969 F.3d at 992 (noting that the rule of reason analysis "must focus on . . . [']the

10   market where competition is allegedly being restrained'") (alterations omitted) (quoting *Am. Ad.*

11   *Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999)); *cf. Feitelson v. Google*

12   *Inc.*, 80 F. Supp. 3d 1019, 1027–28 (N.D. Cal. 2015) (granting motion to dismiss where plaintiffs

13   alleged anticompetitive harm occurred in downstream phone market, but anticompetitive conduct

14   occurred solely in upstream internet search and handheld search markets).

15          Turning to Disney's other arguments, the Court first reiterates its prior finding that the

16   CACC permits a reasonable inference that Disney has used the MFN term in conjunction with the

17   ESPN base term to raise Hulu + Live TV's prices without suffering from price competition.  *See*

18   *supra*, at Part IV(A)(2)(a).  Further, although Disney asserts that Plaintiffs only allege harm to

19   consumers, rather than competition, Plaintiffs in fact allege that Disney's conduct prevents normal

20   price competition among rivals in the SLPTV market.  *See* CACC ¶¶ 251–52.

21          Plaintiffs also allege that Disney's conduct harms competition by raising barriers to entry

22   in the SLPTV market by adding an expensive ESPN carriage agreement to the already significant

23   costs of entry.  *See* CACC ¶¶ 317–34.  The Court agrees with Disney that this allegation does not

24   state an injury to competition.  First, barriers to entry are not typically considered as injurious to

25   competition in and of themselves, but are instead "consider[ed] . . . in the course of assessing the

26   market power of a firm or firms in order to judge whether that power is too great to permit certain

27   horizontal agreements, mergers, or exclusionary acts."  Areeda & Hovenkamp, *Antitrust Law: An*

28   Case No.: 22-cv-07317-EJD
     ORDER GRANTING IN PART, DENYING IN PART DEFT.'S MOT. DISMISS CACC

United States District Court
Northern District of California

*Analysis of Antitrust Principles and Their Application (CCH)* ("*Antitrust Law*") ¶ 421b (2024 Suppl.).  Even if entry barriers were relevant in the present analysis, Plaintiffs' allegations do not meet the antitrust definition of such barriers.  *See Los Angeles Land Corp. v. Brunswick Corp.*, 6 F.3d 1422, 1427 (9th Cir. 1993) (*"Barriers to entry may be defined as either 'additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants,' or 'factors in the market that deter entry while permitting incumbent firms to earn monopoly returns.'"*) (quoting *Antitrust Law* ¶ 409 (1992 Suppl.)).  However, Plaintiffs are not required to specifically allege barriers to competition to show an actual antitrust injury; the Court's finding as to the plausible allegation of harm to price competition in the relevant market is sufficient.  *See, e.g.*, *Sunday Ticket*, 933 F.3d at 1151–56 (finding agreement placing artificial restraint on televised programs alleged injury to competition where injury was "naked restriction on output" and omitting any discussion of entry barriers).

Accordingly, the Court finds that Plaintiffs have plausibly alleged that Disney's conduct restrains trade and injures competition in the relevant SLPTV market.  The Court will therefore deny Disney's motion to dismiss Plaintiffs' claims for a violation of § 1 of the Sherman Act under a rule of reason theory.

### 3.    Standing to Sue for Damages Under the Sherman Act

Disney last challenge to Plaintiffs' federal claim concerns Plaintiffs' ability to pursue damages for violations of the Sherman Act, as opposed to merely injunctive relief.  *See* Mot. 24–25; CACC, Prayer for Relief ¶¶ C, D.  Federal law provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees.  15 U.S.C. § 15(a). However, the Supreme Court has rejected the use of a "pass-on" theory of damages, wherein the alleged antitrust injury first increased costs for a direct purchaser who then passed on the price increase (or other injury) to the plaintiffs.  *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736–47 (1977).  The *Illinois Brick* decision "established a bright-line rule that authorizes suits [for damages] by *direct* purchasers but bars suits by *indirect* purchasers."  *Apple Inc. v. Pepper*, 587

U.S. 273, 279 (2019) (citing *Illinois Brick*, 431 U.S. at 746).[5]  Direct purchasers are "the immediate buyers from the alleged antitrust violators," *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990), and thus indirect purchasers are "two or more steps removed from the antitrust violator in a distribution chain," *Apple*, 587 U.S. at 280.

The Ninth Circuit has stated that the principles underlying *Illinois Brick* "apply differently when the injury to plaintiffs is caused by a multi-level conspiracy to violate antitrust laws[,]" such as where producers and retailers conspire to fix retail prices.  *Sunday Ticket*, 933 F.3d at 1156 (citing *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208 (9th Cir. 1984)).  This so-called "co-conspirator exception" to the *Illinois Brick* rule "'is not really an exception at all,' but rather describes a situation in which *Illinois Brick* is simply not applicable."  *Id.* at 1157 (quoting *In re ATM Antitrust Fee Litig.*, 686 F.3d 741, 750 (9th Cir. 2012)).  Thus, if a plaintiff alleges that "co-conspirators have jointly committed the antitrust violation," then "a plaintiff who is the immediate purchaser from any of the conspirators is directly injured by the violation" because "there is no pass-on theory involved."  *Id.* at 1157 (citing *Pepper*, 587 U.S. at 282–83).  The Ninth Circuit has held that the co-conspirator exception applies equally to price-fixing and output-restricting conspiracies.  *See id.* at 1157–58.

Disney argues that Plaintiffs are indirect purchasers with a pass-on theory of damages because they allege that the SLPTV providers from whom they purchased subscription packages "bear and pass on the cost" of ESPN.  Reply 14 (quoting CACC ¶ 354); *see also* Mot. 24–25.  Plaintiffs argue that they "purchased SLPTV products directly from one of Disney's co-conspirators, YouTube TV and DirecTV" and are therefore direct purchasers similar to the plaintiffs in *Sunday Ticket*.  Opp'n 27; *see id.* at 25–28.

The CACC alleges that "Plaintiffs[] . . . are SLPTV direct purchasers from Disney's co-conspirators and counterparties YouTube TV and DirecTV Stream."  CACC ¶ 10.  However, the

---

[5] The Supreme Court noted that *Apple*, like *Illinois Brick*, did not address indirect purchaser standing to seek injunctive relief.  *See* 587 U.S. at 279 n.1.  The Ninth Circuit has found indirect purchasers to have standing to seek such relief.  *See Sunday Ticket*, 933 F.3d at 1156 n.6.

United States District Court
Northern District of California

1    Court need not accept as true the allegation's legal conclusion that Plaintiffs are direct purchasers,

2    particularly as the CACC makes clear that Plaintiffs' theory of harm is that "Disney's web of

3    carriage agreements force ESPN on *rivals* and consumers, which has allowed Disney to raise

4    prices," and that the carriage agreements "allow[] [Disney] to impose costs on competitors,"

5    which are passed through to SLPTV subscribers.  CACC Section Headings VII(A), (C)

6    (capitalizations omitted and emphasis added); *see also, e.g.*, *id.* ¶¶ 353 ("ESPN is the largest cost

7    for any SLPTV provider[,] [who] must pass that cost onto consumers."), 363 ("These horizontal

8    agreements harm competition in the SLPTV Market by allowing Disney to set and maintain

9    market-wide prices and to impose costs on rivals that it does not bear.").  In sum, Plaintiffs' non-

10   conclusory allegations establish that Plaintiffs purchased their subscriptions from YouTube TV

11   and DirecTV after Disney allegedly raised those providers' costs by forcing them to agree to the

12   ESPN base term and MFN term.  *See, e.g.*, CACC ¶¶ 197–206 (alleging that Disney's new

13   carriage agreement with AT&T "ensured that its rival AT&T's costs were high enough . . . that

14   AT&T/DirecTV Now had to push its base price" above Hulu's and that "[t]he price differential

15   was ruinous" for DirecTV).

16          These allegations establish that Plaintiffs are not similarly situated to the plaintiffs in

17   *Sunday Ticket*, who purchased subscriptions from DirecTV *and* alleged that DirecTV was a direct

18   co-conspirator who agreed with the NFL to limit output by executing agreements forbidding

19   individual NFL teams from selling telecast rights "because they would cause the teams to compete

20   with each other and DirecTV." *Sunday Ticket*, 933 F.3d at 1151.  The CACC, by contrast, does

21   not allege that Plaintiffs purchased SLPTV subscription packages from a member of a conspiracy,

22   but rather from a victim of Disney's anticompetitive conduct.[6]  *See also supra*, at Part IV(A)(1)

23   (dismissing *per se* claim for failure to establish horizontal conspiracy with SLPTV providers).

24   Because Plaintiffs allege that they purchased the subscriptions at a higher price due to costs passed

25   _____

26   [6] The Court notes that the analysis would perhaps be different if Plaintiffs were Hulu + Live TV
     subscribers.  However, Plaintiffs would then also have to establish Hulu's capacity to conspire

27   with Disney and ESPN, and would also doubtless face different obstacles in considering the
     relevant market in which antitrust injury occurred.

28   Case No.: 22-cv-07317-EJD
     ORDER GRANTING IN PART, DENYING IN PART DEFT.'S MOT. DISMISS CACC

1   on from YouTube TV and DirecTV, they are indirect purchasers without standing to maintain a

2   claim for damages under the Sherman Act.  *See Pepper*, 587 U.S. at 279, 282–83.

3       **B.    State Claims**

4       Plaintiffs also assert 15 claims based on Disney's alleged anticompetitive conduct under

5   the laws of Arizona, California, Florida, Illinois, Iowa, Massachusetts, Michigan, Nevada, New

6   York, North Carolina, and Tennessee on behalf of the relevant state subscriber subclasses.  *See*

7   CACC ¶¶ 462–599.  The Florida and Massachusetts claims are brought under broader consumer

8   protection and unfair trade practices acts which permit antitrust claims, and the remaining claims

9   are brought under specific antitrust and competition laws of Arizona, California, Illinois, Iowa,

10  Michigan, Nevada, New York, North Carolina, and Tennessee.  *See id.*

11      Disney moves to dismiss each of these state law claims.  *See* Mot. 25–31.  Disney argues

12  that each of the nine states with antitrust statutes interprets those statutes consistently with the

13  Sherman Act, so that the claims under Arizona, California, Illinois, Iowa, Michigan, Nevada, New

14  York, North Carolina, and Tennessee laws must fail for the reasons Disney argued that Plaintiffs'

15  Sherman Act claims fail.  *See id.* at 25–26.  Disney likewise argues that the Florida and

16  Massachusetts consumer protection and unfair trade practices claims must be dismissed because

17  those states do not permit claims based on anticompetitive conduct that does not state a claim

18  under the Sherman Act.  *See id.* at 27–28.  These arguments fail because the Court has found

19  Plaintiffs to have stated a Sherman Act rule of reason claim.  *See supra*, at Part IV(A)(2).

20      Disney makes additional arguments with respect to Plaintiffs claims under Illinois and

21  Tennessee law.  First, Disney argues that the Illinois Antitrust Act ("IAA") bars indirect purchaser

22  class actions (though not individual claims), and that the restriction must be applied in federal

23  court.  *See* Mot. 29.  Second, Disney argues that Tennessee's antitrust act (the "Tennessee Trade

24  Practices Act" or "TTPA") applies only to tangible goods and not to services such as the SLPTV

25  subscription services at issue here.  *See id.* at 29–31.  Plaintiffs counter that the IAA only bars

26  indirect purchaser class actions in Illinois state courts, *see* Opp'n 29–32, and that the TTPA covers

27  "software-based streaming product[s]" like those sold by SLPTV providers, *see id.* at 34–35.

28  Case No.: 22-cv-07317-EJD
    ORDER GRANTING IN PART, DENYING IN PART DEFT.'S MOT. DISMISS CACC

**1.      Illinois Antitrust Act**

The Illinois Antitrust Act provides that "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General, who may maintain an action parens patriae." 740 Ill. Comp. Stat. Ann. 10/7(2) (West 2010).  Plaintiffs emphasize the "of this State" language to argue that the statute does not purport to bar class actions in federal court, and further argue that the analysis is controlled by *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393, 398–99 (2010), which found that (1) a New York law prohibiting class actions in suits seeking penalties or minimum damages conflicted with Federal Rule of Civil Procedure 23 and (2) the Federal Rule was valid under the Rules Enabling Act and thus the New York law could not apply in federal courts sitting in diversity.

As explained a detailed analysis by a district court in the Eastern District of Pennsylvania on the effect of *Shady Grove* on indirect purchaser class actions under the IAA, a majority of the Supreme Court agreed with the first *Shady Grove* holding, but there was no majority agreement as to the proper Enabling Act analysis.  *See In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670, 673–75 (E.D. Penn. 2010).  the district court reasoned that because the Supreme Court's binding holding in circumstances without majority agreement is the narrowest grounds taken by the concurring justices, a federal rule will not "displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Id.* at 674 (quoting *Shady Grove*, 559 U.S. at 423 (Stevens, J., concurring in part)).  Applying this analytical approach to the IAA, the *Wellbutrin* district court rejected the plaintiffs' argument that importing the IAA's ban on indirect purchaser class actions to federal court would violate Rule 23 and be contrary to the Enabling Act:

> The Illinois restrictions on indirect purchaser actions are intertwined with Illinois substantive rights and remedies because (1) the restrictions apply only to the IAA, (2) they are incorporated in the same statutory provision as the underlying right, not a separate procedural rule, and (3) the restrictions appear to reflect a policy judgment about managing the danger of duplicative recoveries. Because the indirect purchaser restrictions of the IAA are

United States District Court
Northern District of California

1

> "intertwined" with the underlying substantive right, application of
> Rule 23 would "abridge, enlarge or modify" Illinois' substantive
> rights, and therefore Illinois' restrictions on indirect purchaser actions
> must be applied in federal court.

2

3   *Id.* at 677.

4        This Court, like others in this district, is persuaded by the *Wellbutrin* analysis and finds

5   that the IAA's indirect purchaser class action bar is substantive and thus "displaces Federal Rule

6   of Civil Procedure 23's usual allowance of class actions in diversity actions."  *In re Xyrem*

7   *(Sodium Oxybate) Antitrust Litig.*, 555 F. Supp. 3d 829, 885 (N.D. Cal. 2021) (citation omitted);

8   *see also Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 927 (N.D. Cal. 2019) ("The Court

9   agrees with th[e] reasoning [in *Wellbutrin*]. . . . Accordingly, applying Rule 23 at the expense of

10  the IAA is inappropriate."); *United Food and Com. Workers Local 1776 & Participating Emps.*

11  *Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1083–84 (N.D. Cal.

12  2014) ("I agree with Judge McLaughlin's analysis [in *Wellbutrin*], especially as the no indirect

13  purchaser class action rule was expressly adopted as an integral part of the Illinois Antitrust Act's

14  repeal of *Illinois Brick*."); *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 625–26 (N.D. Cal.

15  2020) (dismissing IAA claim under indirect purchaser class action limitation and noting Ninth

16  Circuit's reliance on *Shady Grove* "for the proposition that 'there are some state procedural rules

17  that federal courts must apply in diversity cases because they function as part of the State's

18  definition of the substantive rights and remedies'") (quoting *Makaeff v. Trump Univ., LLC*, 736

19  F.3d 1180, 1187 (9th Cir. 2013)).

20       Accordingly, the Court finds that the IAA's bar on indirect purchaser class actions applies

21  to the instant action, so that Plaintiffs' IAA claim at Count 12 must be dismissed with prejudice.

22                    **2.       Tennessee Trade Practices Act**

23       The parties dispute whether the conduct alleged in this lawsuit falls within the scope of the

24  TTPA based on whether Plaintiffs purchased "goods" or "services."  This distinction comes from

25  a line of Tennessee law holding that the TTPA's private right of action for injury from

26  anticompetitive conduct under Tennessee Code Annotated § 47-25-101 "applies only to tangible

27  goods, not intangible services."  *Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 751 (Tenn. Ct. App.

28  Case No.: 22-cv-07317-EJD
ORDER GRANTING IN PART, DENYING IN PART DEFT.'S MOT. DISMISS CACC

United States District Court
Northern District of California

1    2006) (citing *McAdoo Contractors, Inc. v. Harris*, 439 S.W.2d 594 (1969)).  However, it appears that

2    in April 2024—after the parties briefed and argued this Motion—the Tennessee legislature amended

3    the TTPA.  In relevant part, the state legislature deleted and replaced Tennessee Code Annotated § 47-

4    25-101 in its entirety.  When *Bennett* was decided, the statute provided:

5               All arrangements, contracts, agreements, trusts, or combinations
6               between persons or corporations made with a view to lessen, or which
                tend to lessen, full and free competition in the ***importation or sale of***
                ***articles*** imported into this state, or in the manufacture or sale of
7               articles of domestic growth or of domestic raw material, and all
                arrangements, contracts, agreements, trusts, or combinations between
8               persons or corporations designed, or which tend, to advance, reduce,
                or control the price or the cost to the producer or the ***consumer of any***
9               ***such product or article***, are declared to be against public policy,
                unlawful, and void.
10

11   *See Bennett*, 198 S.W.3d at 750 (quoting Tenn. Code Ann. § 47-25-101 (2005)) (emphases added).

12          The statute now provides:

13              All arrangements, contracts, agreements, trusts, or combinations
                between persons or corporations made with a view to lessen, or which
14              tend to lessen, full and free competition in trade or commerce
                affecting this state, and all arrangements, contracts, agreements,
15              trusts, or combinations between persons or corporations designed or
                which tend to advance, reduce, or control the price or the cost to the
16              producer or the consumer ***of any product or service*** in trade or
                commerce affecting this state, are declared to be against public policy,
17              unlawful, and void.

18   Tenn. Code Ann. § 47-25-106 (West 2024) (emphasis added).

19          The Court can find no case examining the change in statutory language.  However,

20   Tennessee courts have previously noted that "after the *McAdoo* decision, many attempts had been

21   made in the General Assembly to expand the scope of the TTPA, including one in 1978 to add

22   'services' to § 47-25-101," and "[n]one was successful."  *Sherwood v. Microsoft Corp.*, No.

23   M2000-01850-COA-R9-CV, 2003 WL 21780975, at *26 (Tenn. Ct. App. July 31, 2004) (citation

24   omitted).  Accordingly, it appears to the Court that the Tennessee legislature has done away with

25   the TTPA's distinction between goods and services for purposes of the TTPA, as indicated by the

26   plain language of the current statute.  The Court therefore rejects Disney's argument about the

27   scope of the TTPA as moot.

28   Case No.: 22-cv-07317-EJD
     ORDER GRANTING IN PART, DENYING IN PART DEFT.'S MOT. DISMISS CACC
                                      31

United States District Court
Northern District of California

United States District Court
Northern District of California

1

**V.      CONCLUSION**

2

For the foregoing reasons, the Court hereby ORDERS as follows:

3

    1.   Disney's motion to dismiss Plaintiffs' Sherman Act § 1 claims (*i.e.*, Counts 1 and

4

        2) is GRANTED WITHOUT LEAVE TO AMEND as to Plaintiffs' *per se* theory

5

        and DENIED as to the alternative rule of reason theory;

6

    2.   Disney's motion to dismiss Plaintiffs' claims for damages under the Sherman Act

7

        is GRANTED WITHOUT LEAVE TO AMEND;

8

    3.   Disney's motion to dismiss Plaintiffs' claim under the Illinois Antitrust Act (*i.e.*,

9

        Count 12) is GRANTED WITHOUT LEAVE TO AMEND; and

10

    4.   Disney's motion to dismiss the remaining state law claims (*i.e.*, Counts 3–11 and

11

        13–17) is DENIED.

12

    5.   Disney shall answer the CACC within 14 days of the entry of this order.

13

    *6.*   The Court will separately schedule a case management conference.

14

15

**IT IS SO ORDERED.**

16

Dated: June 25, 2024

17

18

_____

19

EDWARD J. DAVILA
United States District Judge

20

21

22

23

24

25

26

27

28