DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, California 90067-6035
Telephone: +1 310 553 6700
Facsimile: +1 310 246 6779

SERGEI ZASLAVSKY (admitted *pro hac vice*)
szaslavsky@omm.com
BRIAN P. QUINN (admitted *pro hac vice*)
bquinn@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: +1 202 383 5300
Facsimile: +1 202 383 5414

*Attorneys for Defendant*
*The Walt Disney Company*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE**

| | |
|---|---|
| Heather Biddle, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>The Walt Disney Company,<br><br>*Defendant*. | Case No. 5:22-cv-07317-EJD-SVK<br><br>**The Walt Disney Company's Notice of Motion and Motion to Dismiss Plaintiffs' Class-Action Claims, Compel Arbitration of Plaintiffs' Individual Claims, and Stay Plaintiffs' Individual Claims and Accompanying Memorandum of Points and Authorities**<br><br>Hearing Date: March 19, 2026<br>Time: 9:00 a.m.<br>Place: Courtroom 4 – 5th Floor<br>Judge: Hon. Edward J. Davila |

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ..... iv

NOTICE OF MOTION AND MOTION ..... 1

ISSUES TO BE DECIDED ..... 1

INTRODUCTION ..... 1

FACTUAL AND PROCEDURAL BACKGROUND ..... 3

- I. The Arbitration Agreement and the Class Waiver, Opt-Out Rights, and Third-Party Rights. ..... 3
- II. Unger and Prescott assented to the Terms and did not opt out of the Arbitration Agreement or Class Waiver Provision. ..... 5
- III. TWDC acquires Fubo in October 2025 and becomes Fubo's affiliate and ultimate parent company ..... 7
- IV. Unger and Prescott allege that they paid higher prices for their Fubo subscriptions because of TWDC's alleged violation of certain antitrust and consumer protection laws. ..... 8

LEGAL STANDARD ..... 8

ARGUMENT ..... 9

- I. The Court should compel arbitration of Unger and Prescott's individual claims. ..... 9
  - A. The Terms clearly and unmistakably delegate to the arbitrator questions of arbitrability. ..... 10
  - B. Should the Court reach the "threshold" issues, it should hold that the Arbitration Agreement is valid, enforceable, and encompasses Unger's and Prescott's claims against TWDC. ..... 14
    - 1. The Arbitration Agreement is enforceable against Unger and Prescott. ..... 14
      - a. Prescott agreed to arbitrate. ..... 15
      - b. Unger agreed to arbitrate. ..... 17
    - 2. TWDC can invoke the Arbitration Agreement directly and through principles of estoppel. ..... 18

## TABLE OF CONTENTS
## (continued)

**Page**


3. Unger's and Prescott's claims fall within the scope of the Arbitration Agreement. ....21

II. The Court should dismiss Unger and Prescott's putative class claims against TWDC. ....23

III. The Court should stay Unger's and Prescott's individual claims pending arbitration. ....24

CONCLUSION ....25

CERTIFICATE OF SERVICE ....27

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Armstrong v. Michaels Stores, Inc.*,
59 F.4th 1011 (9th Cir. 2023) ....................23

*Arshad v. Transp. Sys., Inc.*,
183 F. Supp. 3d 442 (S.D.N.Y. 2016) ....................11, 12

*AT & T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) ....................21

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ....................14, 23, 24

*Awad v. Extended Nursing Pers.*,
2025 WL 753865 (S.D.N.Y. Mar. 10, 2025) ....................13, 18, 19, 20

*Bischoff v. DirecTV, Inc.*,
180 F. Supp. 2d 1097 (C.D. Cal. 2002) ....................21, 22, 23

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) ....................9

*Capriole v. Uber Techs., Inc.*,
7 F.4th 854 (9th Cir. 2021) ....................23

*Caremark, LLC v. Chickasaw Nation*,
43 F.4th 1021 (9th Cir. 2022) ....................10

*Citadel Servicing Corp. v. Castle Placement, LLC*,
431 F. Supp. 3d 276 (S.D.N.Y. 2019) ....................12, 13, 18, 19

*Cloney's Pharmacy, Inc. v. Wellpartner, Inc.*,
2024 WL 4349291 (S.D.N.Y. Sept. 30, 2024) ....................13

*Contec Corp. v. Remote Sol. Co.*,
398 F.3d 205 (2d Cir. 2005) ....................10, 11, 13, 20

*Davitashvili v. Grubhub Inc.*,
131 F.4th 109 (2d Cir. 2025) ....................16

*Feld v. Postmates, Inc.*,
442 F. Supp. 3d 825 (S.D.N.Y. 2020) ....................16

*Fli-Lo Falcon, LLC v. Amazon.com, Inc.*,
97 F.4th 1190 (9th Cir. 2024) ....................9

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
371 F. Supp. 2d 571 (S.D.N.Y. 2005) ....................20

*Fteja v. Facebook, Inc.*,
841 F. Supp. 2d 829 (S.D.N.Y. 2012) ....................15

*Green Tree Fin. Corp.-Ala. v. Randolph*,
531 U.S. 79 (2000) ....................9

## TABLE OF AUTHORITIES
## (continued)

Page(s)


*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63 (2019) .......... 9, 10

*Hooper v. Jerry Ins. Agency, LLC*, 675 F. Supp. 3d 1027 (N.D. Cal. 2023) .......... 25

*In re Uber Techs., Inc.*, 2019 WL 6317770 (C.D. Cal. Aug. 19, 2019) .......... 17

*JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004) .......... 20

*Lobel v. CCAP Auto Lease, Ltd.*, 2022 WL 1073777 (N.Y. Sup. Ct. Apr. 8, 2022) .......... 24

*Meeks v. Experian Info. Servs., Inc.*, 2022 WL 17958634 (9th Cir. Dec. 27, 2022) .......... 10

*Meyer v. Uber Techs, Inc.*, 868 F.3d 66 (2d Cir. 2017) .......... 16

*Miller v. Longs Drug Stores Cal., LLC*, 2025 WL 457094 (9th Cir. Feb. 11, 2025) .......... 25

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) .......... 14, 21

*Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505 (9th Cir. 2023) .......... 9, 14

*Pincaro v. Glassdoor, Inc.*, 2017 WL 4046317 (S.D.N.Y. Sept. 12, 2017) .......... 17

*Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115 (2d Cir. 2010) .......... 19

*Reid v. Tandym Grp., LLC*, 697 F. Supp. 3d 62 (S.D.N.Y. 2023) .......... 24

*Rodriguez v. Equifax Info. Serv. LLC*, 2022 WL 2079710 (S.D. Cal. June 9, 2025) .......... 12

*Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051 (9th Cir. 2020) .......... 10

*Smith v. Spizzirri*, 601 U.S. 472 (2024) .......... 25

*Starke v. Gilt Groupe, Inc.*, 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) .......... 15

*Suski v. Coinbase, Inc.*, 55 F.4th 1227 (9th Cir. 2022) .......... 10

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Unger v. The Walt Disney Co.*,
3:25-cv-01163 (N.D. Cal.) ........ 8

*Unger v. The Walt Disney Co.*,
Case No. 1:25-cv-00375 (S.D.N.Y.) ........ 8

*Vitiello v. Home Buyers Resale Warranty Corp.*,
208 A.D.3d 1517 (N.Y. App. Div., 1st Dep't 2022) ........ 24

*Wu v. Uber Techs., Inc.*,
186 N.Y.S.3d 500 (N.Y. Sup. Ct., Bronx Cnty. 2022), *aff'd*, 219 A.D.3d 1208 (2023), *aff'd*, 43 N.Y.3d 288 (2024) ........ 14

**STATUTES**

9 U.S.C. § 2 ........ 8

9 U.S.C. § 3 ........ 24, 25

9 U.S.C. § 4 ........ 9

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on March 19, 2026 at 9:00 a.m., or as soon thereafter as the matter may be heard, Defendant The Walt Disney Company will and hereby does move the Court, pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4, for an Order dismissing Plaintiffs Cole Unger's and Steven Prescott's class-action allegations, compelling arbitration of Unger's and Prescott's individual claims, and staying this action as to Unger's and Prescott's individual claims. This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Erik Gerson and exhibits thereto, the oral argument of counsel, and all other pleadings and proceedings herein.

## ISSUES TO BE DECIDED

1. Whether the Delegation Provision contained in the Arbitration Agreement requires Unger and Prescott to arbitrate issues of arbitrability?

2. Alternatively, if the Court will reach threshold issues of arbitrability, whether Unger's and Prescott's individual claims against TWDC are subject to the Arbitration Agreement and therefore must be arbitrated?

3. Whether Unger and Prescott's class claims should be dismissed pursuant to the Arbitration Agreement's Class Waiver Provision?

4. Whether Unger's and Prescott's individual claims must be stayed pending the completion of arbitration?

## INTRODUCTION

The Court should compel arbitration of Plaintiffs Cole Unger's and Steven Prescott's individual claims, dismiss their putative class claims, and stay their individual claims. Unger and Prescott subscribed to Fubo's live-television streaming service in 2024. When Unger and Prescott signed up for Fubo, they both assented to then-current versions of Fubo's Terms of Service.

Unger initially assented to a version effective on November 1, 2023 and then later to a version effective as of June 3, 2024. Prescott only assented to the June 3, 2024 version. The two versions are substantially similar: both include a broad Arbitration Agreement; a Delegation

Provision vesting the arbitrator with exclusive authority to resolve any disputes over arbitrability; a Class Waiver Provision; and a provision affording users like Unger and Prescott the right to opt out. The June 3, 2024 version merged all previous versions of the Terms of Service and binds both Unger and Prescott.[1] It authorizes Fubo's future affiliates to compel arbitration and invoke the Class Waiver Provision. Neither Unger nor Prescott opted out of the Arbitration Agreement or the Class Waiver Provision of any version of the Terms of Service.

Defendant The Walt Disney Company ("TWDC") acquired a controlling stake in Fubo in a transaction that closed on October 29, 2025. Through that acquisition, TWDC became a Fubo affiliate and thereby gained the right to invoke the Terms as Fubo's affiliate and controlling stakeholder. TWDC now exercises that right against Unger and Prescott. Their claims arise under the Terms. Unger and Prescott allege that TWDC'S carriage agreements pushed up the price of their Fubo subscriptions and restricted the channels available to them through their Fubo subscriptions. *Unger* Plaintiffs' Amended Class Action Complaint ("Amended Complaint or AC") (Apr. 28, 2025), Dkt. No. 60, ¶¶ 115-117. They claim to have experienced an antitrust injury via their purchases of Fubo's services. *Id.* ¶¶ 102-113. Those allegations fall squarely within the ambit of the Arbitration Agreement.

Based on the explicit language in the Terms and principles of estoppel, TWDC now moves this Court to compel mandatory arbitration of Unger's and Prescott's individual claims, stay those claims pending the completion of arbitration, and dismiss their putative class claims. If the Court agrees with TWDC that the Arbitration Agreement clearly and unmistakably evidences Unger's and Prescott's assent to delegate threshold questions of arbitrability to the arbitrator for claims against Fubo or its future affiliates, its work will be done. But even if the Court reaches threshold questions of arbitrability, it should hold that (1) there is an agreement to arbitrate,

---

[1] This brief will refer to the June 3, 2024 version of the Terms of Service as the "Terms" and will refer to the arbitration provision contained therein as the "Arbitration Agreement," and they are attached as Exhibit D to the concurrently filed Declaration of Erik Gerson ("Gerson Decl."). When referring to another version of the Terms of Service, this brief will specify by effective date.

(2) TWDC can invoke it as Fubo's affiliate, and (3) the agreement covers the dispute. And in any event, the Court should enforce the Class Waiver Provision and dismiss Unger's and Prescott's class allegations against TWDC. The Court should grant TWDC's motion.

## FACTUAL AND PROCEDURAL BACKGROUND

Fubo is a live TV streaming platform that sells packages or plans of linear television networks. Gerson Decl. ¶ 2. A user who signs up for a Fubo subscription must assent to the Terms before using the service. *Id.* ¶ 5; Terms at 1. Fubo makes the Terms available to the user throughout the sign-up process and on its website. Gerson Decl. ¶¶ 3, 8, 16.

### I. The Arbitration Agreement and the Class Waiver, Opt-Out Rights, and Third-Party Rights.

The Terms contain a mandatory Arbitration Agreement. It requires that

> all claims, disputes, actions, disagreements, or other controversies concerning or arising in any way out of [the user's] use (or lack of use) of, access (or lack of access to) this Agreement, the Privacy Policy, Content, the Platform, the Services … a Subscription, a Site, an Application, [or] Platform Content,[2] … shall be resolved exclusively through binding arbitration in accordance with [the Terms].

Ex. D, Terms § 22.2(a). The Terms also contain a Class Waiver Provision. *Id.* § 22.2(c). It requires users to bring proceedings to resolve any disputes in the user's "individual capacity and[]

---

[2] The Terms define "Content" as "audiovisual content and other information, data, and content"; "Platform" as content viewed "through the Fubo website and other websites, web services, applications, and video players provided and operated by Fubo"; "Services" as "[t]he Platform, Content and additional services, functionality and resources"; "Subscription" as inclusive of its definitions of "Trial Subscription," "Monthly Paid Subscription," "Quarterly Paid Subscription," "Annual Paid Subscription," and "Annual Billed Monthly Paid Subscription"; "Site" as "the Fubo website and the other websites Fubo may provide or operate for accessing the Platform"; "Application" as "web services, mobile, online and other applications and video players provided and operated by Fubo for accessing the Platform"; and "Platform Content" as "all Content available [on the] Platform." Ex. D, Terms 1-6.

not as part of any class (or purported class), consolidated, multiple plaintiff, collective, or representative action or proceeding." *Id.* (capitalized in original).

The Terms define dispute with "the broadest possible meaning allowable under law," and specify that "[t]he Arbitration Agreement is intended to be interpreted broadly." *Id.* § 22.2(a). Fubo and the user agree that "an arbitrator and not a judge or jury will decide [any] claim, and that rights to discovery and appeals may be limited in arbitration." *Id.* § 22.2(b). The Arbitration Agreement's Delegation Provision makes clear that the Agreement "covers and includes threshold questions of arbitrability" by vesting "[t]he arbitrator, and not any federal, state, or local court or agency, [with] exclusive authority to resolve any and all disputes arising out of or relating to the formation, existence, scope, validity, interpretation, [or] applicability" of the Arbitration Agreement or Terms. *Id.* § 22.2(a).

A user may "opt out and not be bound by the" Arbitration Agreement and Class Waiver Provision. *Id.* § 22.4. But to do so, the user must—within 30 days of beginning service—send a signed, written opt-out notice to an email address that the Terms identify. *Id.* Fubo "honor[s] any valid opt outs if [a user] opted out of arbitration in a prior version of the Terms pursuant to the requirements set forth in that version." *Id.* Fubo prominently notifies users of their right to opt out in the Terms. Ex. D, Terms at 1 (informing users in the fifth paragraph that they have the right to opt out), § 22.4 (describing in detail the opt-out process). Fubo extended to users the right to opt-out of the Arbitration Agreement and Class Waiver Provision when it updated its Terms on June 3, 2024, giving any user who had not previously opted out another opportunity to do so. *Id.* § 22.4.

Users cannot access Fubo's streaming service without affirmatively agreeing to the Terms. Gerson Decl. ¶ 5. All new users must proceed through a "signup journey," and as part of that journey, they must click a button indicating that they assent to the Terms. *Id.* ¶¶ 5, 8, 16. If users do not click that button, they never gain access to the service and never become paying Fubo users. *Id.* ¶ 5.

While the Terms and the Delegation Provision entitle Fubo to invoke the Arbitration Agreement and Class Waiver Provision, they also explicitly vest that same right in certain non-

signatories to the Terms. Specifically, the Terms specify that Fubo's "past, present, and *future* affiliates and agents, as well as any of [its] successors and assigns, *can invoke Fubo's rights under this agreement* in the event they become involved in a dispute" with a Fubo user. Ex. D, Terms § 22.[3] As the text indicates, the Terms contemplate that Fubo may affiliate with another company in the future and empower such a company to invoke the Terms in disputes with Fubo users. TWDC is now a Fubo affiliate, so it "can invoke Fubo's rights under th[e] agreement." *See* Ex. D, Terms § 22; Gerson Decl. ¶ 22.

## II. Unger and Prescott assented to the Terms and did not opt out of the Arbitration Agreement or Class Waiver Provision.

Unger and Prescott assented to the Terms and did not invoke their rights to opt out of the Arbitration Agreement or Class Waiver Provision. Prescott signed up on September 15, 2024, terminated that account shortly after signing up, and then reactivated his account on October 26, 2024. Gerson Decl. ¶ 14. Prescott's paid subscription continued until February 26, 2025. *Id.* Upon both the September 15, 2024 and October 26, 2024 signups, Prescott assented to the June 3, 2024 version of the Terms of Service. *Id.* ¶ 15.

Unger created a free trial account on March 28, 2024.[4] Gerson Decl. ¶ 6. That free trial converted to a paid monthly subscription on March 31, 2024, and stayed active until November 29, 2024. *Id.* Upon signing up on March 28, 2024, Unger assented to the November 1, 2023 version of the terms. *Id.* ¶ 7. Unger—still a user as of June 4, 2024—received email notice of the

---

[3] Unless otherwise stated, all emphasis is added and quotations are omitted.

[4] Unger's counsel represents that the Fubo account associated with the email address ungercole@gmail.com serves as the basis for Unger's claims. Fubo's records indicate this account is associated with the name Hannah Woodman. Gerson Decl. ¶ 6. TWDC reserves the right to challenge in arbitration whether Unger may bring a claim based on an account that is in Hannah Woodman's name. For purposes of this motion, TWDC refers to the account associated with the ungercole@gmail.com email address as Unger's account.

June 3, 2024 updated Terms on June 4, 2024. *Id.* ¶ 10.[5] The email notice informed Unger that by continuing to use Fubo, he was agreeing to the updated Terms; Unger continued using Fubo and thereby agreed to the Terms. *Id.* ¶¶ 10-11.

The June 3, 2024 and November 1, 2023 versions of the Terms of Service are very similar. They both include an arbitration agreement, an opt-out provision, a delegation provision, a class waiver provision, and provide conspicuous notice of both the arbitration agreement and class waiver provisions. Ex. A, November 1, 2023 Terms §§ 22.2 ("Binding Arbitration"), 22.4 ("30-Day Right to Opt Out"), 22.2(a) ("Mutual Arbitration Agreement"), 1 ("THESE TERMS MAY IMPACT YOUR LEGAL RIGHTS"); Ex. D, Terms §§ 22.2 ("Binding Arbitration"), 22.4 ("30-Day Right to Opt Out"), 22.2(a) ("Mutual Arbitration Agreement"), 1 ("THESE TERMS CONTAIN A CLASS WAIVER AS WELL AS A MANDATORY ARBITRATION PROVISION THAT MAY IMPACT YOUR LEGAL RIGHTS…"). The June 3, 2024 version adds the following language "Our past, present, and future affiliates and agents, as well as any of our successors and assigns, can invoke Fubo's rights under this agreement in the event they become involved in a dispute." Ex. D, Terms § 22.

The June 3, 2024 version of the Terms governs Unger's relationship with Fubo, including for claims arising prior to Unger's agreement to the June 3, 2024 Terms. Ex. D, Terms §§ 22.2 (the Arbitration Agreement "applies to claims that arose, were asserted, or involve facts occurring before the existence of this Arbitration Agreement or any prior agreement"), 28 ("Unless otherwise amended as provided herein, this Agreement will exclusively govern Your access to and use of the Platform, including all Content and Services, and is the complete and exclusive understanding and agreement between the parties, and *supersedes any oral or written proposal, agreement or other communication between the parties*, regarding Your access to and use of the Platform and all Content and Services.").

---

[5] The November 1, 2023 Terms that were operative when Unger signed up authorized Fubo to notify users of "any material changes to [the Terms] … via email." Ex. A, November 1, 2023 Terms § 4.

Unger and Prescott each had to complete a three-step sign-up journey to access the Fubo service. Gerson Decl. ¶¶ 8, 16; Ex. B, F. First, they entered their email addresses, chose passwords, and entered their zip codes on the Fubo website. Gerson Decl. ¶¶ 8, 16; Ex. B, F. After entering that information, each selected "Continue." Gerson Decl. ¶¶ 8, 16; Ex. B, F. Below the "Continue" button, the screen said: "By continuing, I agree to the Terms of Service." Gerson Decl. ¶¶ 8, 16; Ex. B, F. The words "Terms of Service" were underlined and in a different color, and clearly hyperlinked to the full Terms. Gerson Decl. ¶¶ 8, 16; Ex. B, F. After clicking "Continue," Unger and Prescott moved to step two, in which each chose a plan. Gerson Decl. ¶¶ 8, 16; Ex. B, F. This page, again, contained a hyperlink to the Terms of Service. Gerson Decl. ¶¶ 8, 16; Ex. B, F. Finally, at step three, Unger and Prescott each entered their payment information, including the name associated with the payment method. Gerson Decl. ¶¶ 8, 16; Ex. B, F. The text that appeared directly above the button completing the sign-up process indicated: "By clicking [the button], you acknowledge that you have read and agree to Fubo's Terms of Service." Gerson Decl. ¶¶ 8, 16; Ex. B, F. "Terms of Service" linked directly to the Terms. Gerson Decl. ¶¶ 8, 16; Ex. B, F. Unger and Prescott both had to agree to the Terms of Service to complete the sign-up process. Gerson Decl. ¶¶ 8, 16; Ex. B, F.

Unger and Prescott could have exercised the right to opt out of the Arbitration Agreements, including the Class Waiver Provision, after they initially signed up for the Fubo service, and Unger had another opportunity to opt out after Fubo updated the Terms on June 3, 2024. Gerson Decl. ¶¶ 12, 18. Fubo contacted all active users on June 4, 2024 to provide notice of the update. *Id.* ¶ 11. But neither Unger nor Prescott opted out at any point. *Id.* ¶¶ 13, 19.

## III. TWDC acquires Fubo in October 2025 and becomes Fubo's affiliate and ultimate parent company.

On January 6, 2025, TWDC announced that it had entered into an agreement to acquire a controlling stake in Fubo and combine Fubo with TWDC's Hulu + Live TV business. Gerson Decl. ¶ 22; Ex. K. That transaction cleared regulatory review and then closed on October 29, 2025. Gerson Decl. ¶ 22; Ex. L. Post-acquisition, TWDC now holds a controlling 70% stake in the newly created Fubo entity; existing Fubo shareholders hold the remaining 30% interest. Gerson

Decl. ¶ 22; Ex. L. TWDC is now an affiliate of Fubo, a signatory of the Terms. Terms at 1, § 22; Gerson Decl. ¶ 22; Ex. L.

### IV. Unger and Prescott allege that they paid higher prices for their Fubo subscriptions because of TWDC's alleged violation of certain antitrust and consumer protection laws.

Unger filed this lawsuit on January 14, 2025 in the United States District Court for the Southern District of New York, eight days after TWDC and Fubo announced the aforementioned transaction. *Unger v. The Walt Disney Co.*, Case No. 1:25-cv-00375 ("S.D.N.Y Unger Dkt.") (S.D.N.Y. Jan. 14, 2025), Dkt. 1. On February 5, 2025, the court in New York transferred the action to this Court. S.D.N.Y. Unger Dkt. No. 19. Three months later, Unger filed an Amended Complaint adding Prescott as a class representative. *Unger v. The Walt Disney Co.*, 3:25-cv-01163 (N.D. Cal. Apr. 28, 2025), Dkt. 60.

The Amended Complaint alleges that TWDC's carriage agreements with distributors push up the price of streaming subscriptions, specifically Fubo subscriptions. *E.g.*, AC ¶ 115. It also asserts that a provision in TWDC's carriage agreement with Fubo forces Fubo to require that its users pay for programming they do not want. *Id.* ¶¶ 157-66; 187-99. Unger and Prescott assert that, but for TWDC's anticompetitive conduct, Fubo would "offer[] the sports-centric package of channels that its consumers want." *Id.* ¶¶ 5, 117. Unger and Prescott further allege that "Fubo readily admits that it had to nearly double the prices it charges to consumers as a result of D[isney's] anticompetitive conduct." *Id.* ¶ 12. They say that they "are injured by [TWDC's conduct,] which has caused them to pay higher prices for Fubo's services." *Id.* ¶ 102.

## LEGAL STANDARD

Section 2 of the Federal Arbitration Act (FAA) specifies that "[a] written provision in any … contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the FAA enables "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court … for an order directing that such arbitration proceed in the

manner provided for in such agreement." 9 U.S.C. § 4. "In response to a motion to compel arbitration the district court must hear the parties." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000).

"Generally, in deciding whether to compel arbitration, a court must determine two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). "However, these gateway issues can be expressly delegated to the arbitrator where the parties clearly and unmistakably provide otherwise." *Id.* "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract" and "possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019); *see also Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1199 (9th Cir. 2024) ("When the parties' agreement to delegate threshold arbitrability questions to the arbitrator is clear and unmistakable, then a court may not decide the arbitrability issue.").

## ARGUMENT

Unger and Prescott agreed to arbitrate their claims against Fubo and its future affiliates, and agreed that the arbitrator would decide threshold questions of arbitrability. TWDC is now a Fubo affiliate. The Court need only find clear evidence that Unger and Prescott delegated arbitrability to the arbitrator in order to grant TWDC's motion to compel arbitration. While the Court need not and should not reach threshold questions of arbitrability, if it does, it should find that the Arbitration Agreement is valid and enforceable, that it covers Unger's and Prescott's claims, and that it entitles TWDC to compel arbitration. For many of the same reasons, the Court should dismiss Unger and Prescott's class claims. The Court should grant TWDC's motion to compel arbitration, dismiss Unger and Prescott's class claims, and stay their individual claims.

### I. The Court should compel arbitration of Unger and Prescott's individual claims.

Because Unger and Prescott agreed to arbitrate claims arising out of their use of Fubo; agreed to delegate threshold arbitrability questions to the arbitrator; and agreed that non-

signatories could invoke the Arbitration Agreement, the Court should compel arbitration of their individual claims against TWDC. The Arbitration Agreement and the Delegation Provision pertain to interstate commerce, Ex. D, Terms § 22.2(a), so the FAA applies to them. *See Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1058 (9th Cir. 2020). And "[t]he [FAA] allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." *Henry Schein*, 586 U.S. at 65; *see Meeks v. Experian Info. Servs., Inc.*, 2022 WL 17958634, at *2 (9th Cir. Dec. 27, 2022) (explaining that the parties delegated threshold arbitrability issues to an arbitrator, so the arbitrator must resolve scope disputes). If the Court holds that the arbitrator must decide arbitrability questions, it should compel arbitration and go no further. But even if it reaches threshold arbitrability questions, the Court should hold that a valid agreement to arbitrate exists and encompasses Unger's and Prescott's dispute with TWDC.

### A. The Terms clearly and unmistakably delegate to the arbitrator questions of arbitrability.

The first and only question that the Court need answer to send the case to arbitration is whether Unger and Prescott agreed to arbitrate arbitrability with Fubo's future affiliates. There is clear and unmistakable evidence that the answer is "yes." And having answered that question "yes," the Court should leave it to the arbitrator to decide all other questions, including whether TWDC indeed qualifies as Fubo's affiliate and whether Unger's and Prescott's claims fall within the ambit of the Arbitration Agreement.

Start with the basics. In deciding how to construe a delegation provision, courts look for "'clear and unmistakable' evidence that 'the parties agreed to arbitrate arbitrability.'" *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022); *accord Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005). Courts apply state-law contract principles to make that finding. *See Suski v. Coinbase, Inc.*, 55 F.4th 1227, 1230 (9th Cir. 2022) ("When determining whether parties have agreed to submit to arbitration, courts apply state-law principles of contract formation and interpretation."); *accord Contec Corp.*, 398 F.3d at 208 ("[W]e have held that the issue of arbitrability may only be referred to the arbitrator if there is clear and unmistakable

evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." (emphasis omitted)). Here, Prescott and Unger agreed that New York law—to the extent it did not conflict with federal law—would exclusively govern their rights and obligations under the Terms. Ex. D, Terms § 23. New York has a substantial relationship to the agreement because Fubo, which provided the service at issue, is based in New York. *Id.* § 29.

Here, Unger and Prescott agreed to a Delegation Provision that specifies that the Arbitration Agreement

> covers and includes threshold questions of arbitrability. The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any and all disputes arising out of or relating to the formation, existence, scope, validity, interpretation, applicability, or of this Disputes section (Section 22) or of these Terms of Service— including but not limited to any claim that all or any part of these terms are void or voidable, whether a claim is subject to arbitration, and any dispute regarding the payment, nonpayment, or timing of any administrative or arbitrator fees.

*Id.* § 22.2(a). They also agreed that National Arbitration and Mediation ("NAM") rules and procedures would apply to any arbitration. *Id.* § 22.2(e)(i). The NAM rules specify that "[t]he Arbitrator(s) shall have the authority to determine jurisdiction and arbitrability including, but not limited to, any issue regarding the validity, existence, formation, or scope of the agreement under which Arbitration is being sought, and the proper parties to the Arbitration." Ex. H, Rule No. 17; Ex. I, Rule No 17.

Unger and Prescott unequivocally agreed to delegate arbitrability questions to the arbitrator. Courts applying New York law to delegation provisions hold that "[c]lear and unmistakable evidence exists when an arbitration clause explicitly delegates arbitrability determinations to the arbitrator, or when it incorporates by reference arbitration rules that do so." *Arshad v. Transp. Sys., Inc.*, 183 F. Supp. 3d 442, 446 (S.D.N.Y. 2016) (citing *Contec Corp.*, 398 F.3d at 208). The Arbitration Agreement here checks both boxes. It expressly delegates arbitrability to the arbitrator. Ex. D, Terms § 22.2(a). And it incorporates by reference arbitration rules that do the same. Gerson Decl. ¶ 20; Ex. D, Terms § 22.2(e)(i); Ex. H, Rule No. 17; Ex. I Rule No. 17. The evidence of delegation in this case is even more compelling than it was in

*Arshad. See* 183 F. Supp. 3d at 447 (holding that arbitration agreement that incorporated AAA rules by reference clearly and unmistakably delegated question of arbitrability to arbitrator); *cf. Rodriguez v. Equifax Info. Serv. LLC*, 2022 WL 2079710, at *4-5 (S.D. Cal. June 9, 2025) (applying Nevada law, and holding that the language of delegation provision itself "clearly and unmistakably delegate[d] to the arbitrator questions of arbitrability" where agreement provided that "any claims, including but not limited to the applicability of this arbitration clause, shall be resolved by binding neutral arbitration").

The evidence that Unger and Prescott agreed to arbitrate arbitrability with Fubo's future affiliates is just as clear and compelling. The "Disputes" section of the Terms—which contains the Arbitration Agreement and its Delegation Provision—expressly specifies that Fubo's "past, present, and future affiliates and agents, as well as any of [Fubo's] successors and assigns, can invoke Fubo's rights under this agreement in the event they become involved in a dispute." Ex. D, Terms § 22. The agreement empowers Fubo to have "[t]he arbitrator, and not any federal, state, or local court or agency … [exercise] exclusive authority to resolve any and all disputes arising out of or relating to the formation, existence, scope, validity, interpretation, [or] applicability" of the Disputes section or Terms. *Id.* § 22.2(a). So it affords Fubo's future affiliates that same right in the event they become involved in a dispute. TWDC has become a Fubo affiliate, and in doing so it gained the right to invoke the Arbitration Agreement.

Unger and Prescott may insist that they never agreed to arbitrate arbitrability with non-signatories to the Terms, but that argument won't work. *Citadel Servicing Corp. v. Castle Placement, LLC*, 431 F. Supp. 3d 276 (S.D.N.Y. 2019), is on point. New York law governed the arbitration agreement in question, which "require[ed] that Citadel and StoneCastle and/or any of their agents arbitrate their disputes[.]" *Id.* at 278-79.[6] Citadel and StoneCastle, the signatories, agreed that "all controversies between [them] *and/or any of their agents*" would be determined by arbitration. *Id.* at 280. Castle, a wholly owned subsidiary of StoneCastle, sought to compel

[6] "New York law … follows the same standard as federal law with respect to who determines arbitrability." *Id.* at 285 n.3.

arbitration with Citadel, and asserted an entitlement to invoke arbitration as StoneCastle's agent. *Id.* at 281-82. The court granted the motion to compel. *Id.* at 290. In "explicitly stating that agents were entitled to arbitrate controversies arising out of or concerning the [Agreement]," the court held, "the signatories provided clear and unmistakable evidence of an intent to delegate the determination of agency to the arbitrator." *Id.* at 286-87. It concluded that the arbitrator had to resolve the "antecedent issue" of whether Castle qualified as an "agent," because the contract evinced the signatories' intent to "delegate[] the determination of th[at] issue to the arbitrator. *Id.*[7]

The same scenario presents itself here. Unger and Prescott both agreed to the Delegation Provision and both declined to opt out. Ex. D, Terms §§ 22.2(a), 22.4; Gerson Decl. ¶¶ 12-13, 18-19. The Arbitration Agreement explicitly authorizes Fubo's "past, present, and future affiliates and agents, as well as any of [its] successors and assigns" to "invoke Fubo's rights under this agreement in the event they become involved in a dispute." Ex. D, Terms § 22; *see Citadel*, 431 F. Supp. 3d at 286-88. And the Arbitration Agreement—in "explicitly stating that [future affiliates are] entitled to arbitrate controversies arising out of or concerning the [Agreement]"—"provided clear and unmistakable evidence of an intent to delegate the determination of [affiliates' right to arbitrate] to the arbitrator." *See Citadel*, 431 F. Supp. 3d at 286-87; *see also Contec Corp.*, 398 F.3d at 211 (agreeing with district court that non-signatory's right to enforce arbitration agreement was "a matter of the Agreement's continued existence, validity and scope, and is therefore subject to arbitration under the terms of the arbitration clause").

---

[7] *Accord Awad v. Extended Nursing Pers.*, 2025 WL 753865, at *7 (S.D.N.Y. Mar. 10, 2025) (applying New York law, holding that non-signatory could compel arbitration because agreement "explicitly vested" signatories' affiliates, successors, and assigns with right to arbitrate); *Cloney's Pharmacy, Inc. v. Wellpartner, Inc.*, 2024 WL 4349291, at *11 (S.D.N.Y. Sept. 30, 2024) (holding arbitrator should decide question of whether signatory's affiliate could enforce arbitration clause, because agreement explicitly vested signatory's "current, future, or former employees, parents, subsidiaries, affiliates, agents, and assigns" with rights to arbitrate).

The upshot is that Unger and Prescott clearly and unmistakably agreed to arbitrate arbitrability with Fubo's current and future affiliates. TWDC is now a Fubo affiliate. Gerson Decl. ¶ 22; Ex. L. And the Arbitration Agreement delegates to the arbitrator "exclusive authority to resolve any and all disputes" pertaining to its "formation, existence, scope, validity, interpretation, [or] applicability." Ex. D, Terms § 22.2(a).[8] The arbitrator must resolve the antecedent issue of whether TWDC qualifies as a Fubo affiliate. The Court should compel arbitration and leave the threshold question of arbitrability to the arbitrator, as the Terms provide.

### B. Should the Court reach the "threshold" issues, it should hold that the Arbitration Agreement is valid, enforceable, and encompasses Unger's and Prescott's claims against TWDC.

While the Court need not decide whether Unger and Prescott assented to the Arbitration Agreement, they plainly did. When deciding whether a valid arbitration agreement exists, courts generally apply "ordinary state-law principles that govern the formation of contracts." *Oberstein*, 60 F.4th at 517. Any doubts about the scope of arbitrable issues must be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). If an arbitration agreement exists and covers the dispute at issue, the FAA "requires courts to compel arbitration in accordance with the terms of the agreement." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). The Arbitration Agreement here is valid and enforceable, and Unger's and Prescott's claims fall within its ambit.

#### 1. The Arbitration Agreement is enforceable against Unger and Prescott.

The Arbitration Agreement is valid and enforceable, and TWDC can invoke it as a non-signatory. State law governs whether a valid arbitration agreement exists, including whether parties assented to the arbitration agreement. *See Oberstein*, 60 F.4th at 517; *Wu v. Uber Techs., Inc.*, 186 N.Y.S.3d 500, 516 (N.Y. Sup. Ct., Bronx Cnty. 2022), *aff'd*, 219 A.D.3d 1208 (2023), *aff'd*, 43 N.Y.3d 288 (2024). As noted earlier, Unger and Prescott agreed that New York law

---

[8] TWDC reserves the right to argue to the arbitrator that Unger is not a proper claimant because Fubo has no record of an account under his name, only one under Hannah Woodman's name that his counsel represents is the basis on which he seeks relief here.

would govern the "the interpretation of the rights and obligations of the parties under this Agreement, including, to the extent applicable, any negotiations, arbitrations or other proceedings." Ex. D, Terms § 23. So the question is whether the Arbitration Agreement is valid and enforceable under New York law.

In evaluating whether a valid agreement to arbitrate exists, courts applying New York law look for "whether a reasonably prudent person would be put on notice of the provision in the contract, and whether the terms of the agreement were reasonably communicated to the user." *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 833, 835 (S.D.N.Y. 2012); *Starke v. Gilt Groupe, Inc.*, 2014 WL 1652225, at *2-3 (S.D.N.Y. Apr. 24, 2014). For Prescott and Unger, the answer to both questions is "yes."

**a. Prescott agreed to arbitrate.**

Fubo provided sufficient notice to Prescott of the Arbitration Agreement and reasonably communicated the terms of that Agreement to him, and Prescott did not opt out. When Prescott signed up for Fubo, the June 3, 2024 version of the Terms applied. Gerson Decl. ¶ 15. Fubo made the Terms available throughout the "sign-up journey" that Prescott completed to activate his Fubo subscriptions. *See id.* ¶ 16. In fact, as part of that sign-up journey, Prescott had to confirm the following: "By continuing, I agree to the Terms of Service, acknowledge the Privacy Policy, and agree to receive promotional emails regarding Fubo." *Id.* Fubo made the terms available again for reference at step two of the journey. *Id.* And finally, at step three, Prescott had to click the "start free trial" button that indicated: "By clicking 'Start free trial', you acknowledge that you have read and agree to Fubo's Terms of Service." *Id.*

The Terms themselves prominently identified the Arbitration Agreement. They alerted Prescott to its existence (and the Class Waiver Provision) in capital letters in the fifth paragraph from the top:

> THESE TERMS CONTAIN A CLASS WAIVER AS WELL AS A MANDATORY ARBITRATION PROVISION THAT MAY IMPACT YOUR LEGAL RIGHTS IN THE EVENT OF A DISPUTE. SPECIFICALLY, PLEASE REFER TO SECTION 22 BELOW, WHICH REQUIRES THE USE OF BINDING ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES[.]

Terms at 1. The Terms also informed users of their right to opt out of the Arbitration Agreement and Class Waiver Provision by sending an email to privacy@fubo.tv within 30 days of signing up for service. Ex. D, Terms § 22.4. Prescott never did. Gerson Decl. ¶¶ 18-19.

Fubo provided conspicuous notice to Prescott that he was agreeing to the Terms by signing up for Fubo's service:

- Text on multiple pages in the sign-up journey explicitly told Prescott that by continuing and starting a free trial, he was agreeing to the Terms. Gerson Decl. ¶ 16, Ex. F.
- This warning text was in close proximity to the buttons Prescott had to click to complete the sign-up process. Gerson Decl. ¶ 16, Ex. F.
- The "Terms of Service" hyperlink was underlined and appeared in different color than the rest of the text, putting a reasonable user on notice that he could click on the link to view the Terms. Gerson Decl. ¶ 16, Ex. F.

Courts regularly hold that a user agrees to the Terms of Service where, as here, the user is presented with hyperlinked Terms during the sign-up process along with text informing the user that by continuing, she is agreeing to the Terms. *See Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 116-17 (2d Cir. 2025) (plaintiffs agreed to arbitrate with Grubhub by completing checkout page that included the text "[b]y placing your order, you agree"); *Meyer v. Uber Techs, Inc.*, 868 F.3d 66, 77-80 (2d Cir. 2017) (plaintiff agreed to arbitrate with Uber by completing registration page that included text "[b]y creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY"); *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 830-32 (S.D.N.Y. 2020) (plaintiff agreed to arbitrate with Postmates by completing sign-up page that included the text "[b]y clicking the Sign Up or Facebook button, you agree to our Terms of Service and Privacy Policy")[9]. Just like in these cases, Fubo clearly informed Prescott he was agreeing to Terms by signing up for Fubo's service. That sufficed to form a valid arbitration agreement.

---

[9] *Meyer* and *Feld* applied California law, but the Second Circuit noted that "New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term." *Meyer*, 868 F.3d at 74.

**b. Unger agreed to arbitrate.**

When Unger signed up for a Fubo account, the November 1, 2023 version of the Terms applied. Gerson Decl. ¶ 7. They included an arbitration agreement, an opt-out provision, a provision delegating threshold questions of arbitrability to the arbitrator, and a class action waiver. Ex. A, November 1, 2023 Terms, §§ 22.2, 22.4, 22.2(a), 22.2(c). Unger had to complete the sign-up journey and agree to that version of the Terms to access the Fubo service. Gerson Decl. ¶¶ 5, 8. Unger did not opt out of the Arbitration Agreement or Class Waiver Provision after signing up for Fubo service. *Id.* ¶¶ 12-13.

Unger received notice of the updated June 3, 2024 version of the Terms via an email from Fubo—Section 4 of the November 1, 2023 Terms authorized Fubo to notify users of material changes in the Terms via email. Gerson Decl. ¶ 10; Ex. A, November 1, 2023 Terms § 4. That email included a link to the revised Terms, and it explained that Fubo had updated them "to reflect how [Fubo] resolves disputes with you [the user]." Ex. E. The email also informed Unger: "By continuing to use our service after today, you confirm that you agree to these updates." *Id.* The Terms afforded Unger a renewed opportunity to opt out of the Arbitration Agreement and Class Waiver Provision. Ex. D, Terms § 22.4. Unger did not opt out. Gerson Decl. ¶ 13.

Fubo's sign-up process provided conspicuous notice of the November 1, 2023 Terms to Unger, and he—like Prescott—validly agreed to them by affirmatively clicking multiple buttons communicating his assent and understanding. Unger assented to the June 3, 2024 version of the Terms when he continued subscribing to Fubo even after receiving email notification of the update. *See In re Uber Techs., Inc.*, 2019 WL 6317770, at *4 (C.D. Cal. Aug. 19, 2019) (plaintiff was bound by updated Uber terms when he continued to use Uber after Uber sent an email stating that it "revised the arbitration agreement and that continued use of the Uber App would serve as consent to the updated terms"); *Pincaro v. Glassdoor, Inc.*, 2017 WL 4046317, at *6 (S.D.N.Y. Sept. 12, 2017) (holding users expressed "unambiguous consent" after receiving an email with updated terms of service and "continu[ing] to access and use Glassdoor.com").

After Unger agreed to the June 3, 2024 version of the Terms, those Terms superseded the prior version and governed his relationship with Fubo. *See* Ex. D, Terms § 28 ("Unless otherwise

amended as provided herein, this Agreement will exclusively govern Your access to and use of the Platform, including all Content and Services, and is the complete and exclusive understanding and agreement between the parties, and supersedes any oral or written proposal, agreement or other communication between the parties, regarding Your access to and use of the Platform and all Content and Services."). The Arbitration Agreement in the June 3, 2024 Terms "applies to claims that arose, were asserted, or involve facts occurring before the existence of this Arbitration Agreement or any prior agreement." *Id.* § 22.2(a). So the June 3, 2024 version of the Terms apply to all of Unger's claims, including those that arose prior to June 3, 2024.

**2. TWDC can invoke the Arbitration Agreement directly and through principles of estoppel.**

Even though it is a non-signatory to the Terms, TWDC can enforce the Arbitration Agreement against Unger and Prescott directly and through principles of estoppel. Start with TWDC's direct right to enforce the Terms. The Terms specify that Fubo's "past, present, and future affiliates … can invoke Fubo's rights under [the Terms] in the event they become involved in a dispute." Ex. D, Terms § 22. TWDC acquired a controlling stake in Fubo on October 29, 2025. *See* Gerson Decl. ¶ 22. By dint of that acquisition, it became an affiliate of Fubo—a signatory to the Terms. *See id.*; Ex. L ("FuboTV Inc. is an affiliate of the Walt Disney Company."). So the Arbitration Agreement explicitly vests TWDC—a Fubo affiliate—with the right to compel arbitration with Unger and Prescott. *See Citadel*, 431 F. Supp. 3d at 287 (holding that non-signatory could compel arbitration because arbitration provision "explicitly vest[ed] rights to arbitrate in any of [the signatories' agents]").

*Awad* is on point. 2025 WL 753865, at *6-8. One home health care agency acquired another, and an employee brought suit against both companies. *Id.* at *1-3. The acquiring company (a non-signatory) moved to compel arbitration with the employee based on his arbitration agreement with the acquired company. *Id.* at *6. The acquired company's arbitration agreement with the employee specified that "the Company, its current or former officers, directors, members, employees, vendors, clients, customers, agents, parents, subsidiaries, affiliated companies, successors, or assigns" could compel arbitration of claims covered by the

agreement. *Id.* at *7. The court held that the acquiring company could compel arbitration. *Id.* "If [the acquiring company] is affiliated with, a 'related business entity' or successor of [the acquired company]," the court explained, "then it is explicitly vested with the right to have an arbitrator preside over [the] employment dispute because the Arbitration Agreement explicitly gives affiliates, successors, and assigns of [the acquired company] that right." *Id.*; *see also Citadel*, 431 F. Supp. 3d at 288, 290 (holding that a non-signatory was "explicitly vested with the right to have the arbitrator decide whether [it was an affiliate] of [the signatory], and therefore entitled to proceed in arbitration despite being [a] non-signator[y] to the [relevant agreement and its Arbitration Clause]").

That logic applies with equal force here. TWDC acquired a company that had an Arbitration Agreement with the Plaintiffs. *See Awad*, 2025 WL 753865, at *1-3. The Arbitration Agreement vests affiliates and successors with the right to compel arbitration with signatories. *See id.* at *7. TWDC is now an affiliate of the acquired company. *See id.* So it gets to compel arbitration with Unger and Prescott "because the Arbitration Agreement explicitly gives affiliates, successors, and assigns of [Fubo] that right." *See id.*

Principles of estoppel supply another, independent basis upon which TWDC can compel arbitration, regardless of whether the Arbitration Agreement expressly vests affiliates with the right to compel arbitration. "Under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of the relationship among the parties, the contracts they signed, and the issues that had arisen among them discloses that the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126-27 (2d Cir. 2010) (cleaned up). So courts applying New York law examine two principal factors when asked to compel arbitration based on estoppel: (1) "intertwinement" between the dispute and the contract with the arbitration clause, and (2) the "relationship of the [parties]." *Awad*, 2025 WL 753865, at *8.

*First*, Unger and Prescott's claims against TWDC are inherently "intertwined" with the Terms. The Second Circuit has found (in analogous circumstances) that claims are intertwined

with an arbitration agreement where the agreement relates to purchases of products or services at "allegedly inflated price terms that give rise to the claimed injury." *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 178 (2d Cir. 2004) (abrogated on other grounds). Plaintiffs assert that they have paid supracompetitive prices for their Fubo subscriptions as a result of TWDC's alleged anticompetitive behavior. Thus, as stressed above in the "arbitrability" analysis and below in the review of the Arbitration Agreement, Unger's and Prescott's claims against TWDC and alleged injuries necessarily relate to their Fubo subscriptions—their Fubo subscriptions are *central* to their alleged injuries.

*Second*, a non-signatory successor entity can satisfy the relationship-of-the-parties requirement through an acquisition. Revisit *Awad*. In addition to holding that the arbitration agreement explicitly vested the non-signatory with the right to arbitrate, that court alternatively held that principles of estoppel pointed to the same outcome. The plaintiff in *Awad* signed an arbitration agreement with his employer immediately after he was hired. 2025 WL 753865, at *1. The employer then terminated the plaintiff and the plaintiff brought claims in federal court against it. *Id.* at *2. After that termination, a separate company acquired the employer. *Id.* The court granted the acquiring company's motion to compel arbitration and agreed that the acquiring company qualified as "a 'related business entity' of [employer]," demonstrating that the employer and acquiring company "[we]re sufficiently related" because the "non-signatory defendant ha[d] a corporate relationship to a signatory party." *Id.* at *8; *see also Contec Corp.*, 398 F.3d at 209 (holding that post-merger survivor corporation could compel arbitration pursuant to agreement signed by corporation subsumed in merger).

TWDC, just like the acquiring entity in *Awad*, now has a corporate relationship with Fubo that satisfies New York's "relation of the parties" requirement. *See Awad*, 2025 WL 753865, at *8 ("Defendants are sufficiently related under this test if non-signatory defendant has a corporate relationship to a signatory party including cases involving subsidiaries, affiliates, agents, and other related business entities."); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 371 F. Supp. 2d 571, 577-78 (S.D.N.Y. 2005) (finding that a non-signatory parent company could compel arbitration against plaintiffs).

The application of estoppel is all the more justified here because Unger and Prescott knew that TWDC would likely become Fubo's affiliate even before they sued. TWDC and Fubo announced the acquisition on January 6, 2025, and Unger sued eight days later on January 14, 2025. Gerson Decl. ¶ 22; Ex. K. There is no surprise here: Unger and Prescott knew or should have known when they sued TWDC that TWDC would be able to invoke Fubo's Terms if the acquisition closed.

**3. Unger's and Prescott's claims fall within the scope of the Arbitration Agreement.**

Though the Court need not reach the issue of whether Unger's and Prescott's claims fall within the ambit of the Arbitration Agreement, they fit comfortably within the scope of the Terms.[10] Begin with Supreme Court precedent. In construing arbitration agreements, the Court has explained, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25; *accord AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986). "The general policy in favor of arbitration applies equally to antitrust claims." *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1103 (C.D. Cal. 2002). And this *specific* Arbitration Agreement echoes the presumption in favor of arbitration. The signatories agreed that "[t]h[e] Arbitration Agreement is intended to be interpreted broadly, and it applies to claims that arose, were asserted, or involve facts occurring before the existence of this Arbitration Agreement or any prior agreement as well as claims that may arise after the termination of this Arbitration Agreement, in accordance with the notice and opt-out provisions set forth in Sections 22.4 and 22.5." Ex. D, Terms § 22.2(a).

The Arbitration Agreement adopted a commensurately broad approach to the types of claims that must be arbitrated. It specifies that

[10] Per the Terms, the FAA governs whether the claims fall within the scope of the Arbitration Agreement.

> [users] and Fubo agree that all claims, disputes, actions, disagreements, or other controversies concerning or arising in any way out of [users'] use (or lack of use) of, access [to] (or lack of access to) this Agreement, the Primary Policies, Content, the Platform, the Services, … whether based in contract, warranty, tort, statute, regulation, ordinance, or another legal or equitable basis, shall be resolved exclusively through binding arbitration in accordance with this Section 22.2 (collectively, the "Arbitration Agreement").

*Id.* Claims concerning the prices and channel offerings of Fubo packages—the crux of Unger's and Prescott's grievances here—arise out of the use of Fubo and pertain to the "Content, the Platform, [and] the Services." *See id.* Fundamentally, Unger and Prescott say that the Fubo service was more expensive and its quality poorer than it would have been but for TWDC's conduct. That's a dispute arising out of their use or access to Fubo. *See* Ex. D, Terms § 22.2(a).

Courts hold that similar claims based on alleged antitrust injuries fall within the scope of commensurately broad arbitration agreements. Take *Bischoff*, a case in which DirecTV customers sued DirecTV and alleged that it had entered into "illegal conspiracies with other parties in an effort to violate anti-trust laws." 180 F. Supp. 2d at 1106. The customers alleged that they "paid higher prices for [DirecTV's] services and equipment than they otherwise would have but for DirecTV's alleged anti-competitive acts." *Id.* The arbitration agreement between the customers and DirecTV "extend[ed] to 'any Claim either of [the customer or DirecTV] assert[ed],' where a Claim is defined as 'any legal claim relating to th[e DirecTV Service] Agreement ... or [the customer's] Service." *Id.* The court held that the customer's antitrust claims fell within the scope of the arbitration provision. *Id.* The consumers' allegations, it explained, "center[ed] around DirecTV's services, disputes which clearly f[e]ll within the scope of the arbitration clause." *Id.*

*Bischoff* points to the correct result here. Prescott and Unger allege that they "paid higher prices for [Fubo's] services … than they otherwise would have but for [TWDC's] alleged anti-competitive acts," particularly its agreements with Fubo. *See Bischoff*, 180 F. Supp. 2d at 1106; AC ¶¶ 30, 31. The Arbitration Agreement encompasses "any legal claim relating to th[e Fubo Service]." *See Bischoff*, 180 F. Supp. 2d at 1102. It covers "all claims, disputes, actions, disagreements, or other controversies *concerning or arising in any way out of [users'] use (or lack of use) of, access [to] (or lack of access to) [Fubo] Content, the Platform, [or] the Services[.]*" Ex. D, Terms

§ 22.2(a). So Unger's and Prescott's claims "center around [Fubo's] services, disputes which clearly fall within the scope of the arbitration clause." *See Bischoff*, 180 F. Supp. 2d at 1106.

**II. The Court should dismiss Unger and Prescott's putative class claims against TWDC.**

Unger and Prescott agreed to give up their right to litigate claims as part of a class under the Terms. And their agreement binds them now, regardless of whether the FAA or principles of New York contract law govern the issue. *See Capriole v. Uber Techs., Inc.*, 7 F.4th 854, 869 (9th Cir. 2021) ("[T]he Supreme Court has recognized that arbitration agreements may contain waivers of the class action mechanism and require the parties to pursue their claims individually."); *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1013 (9th Cir. 2023) ("[T]he Supreme Court decided *Epic Systems*, overruling Ninth Circuit precedent and holding that arbitration agreements that require individual arbitration, rather than class or collective actions, are enforceable under the Federal Arbitration Act."). The Court should dismiss their class claims.[11]

The FAA empowers contracting parties to waive their right to litigate as part of a class. *AT&T Mobility*, 563 U.S. at 352 (holding that the FAA preempted a California judicial rule that rendered class-action waivers unenforceable). That's exactly what Unger and Prescott did when they signed up for Fubo and agreed to the Terms, which contain the following provision:

> You and Fubo acknowledge and agree that, to the maximum extent allowed by applicable law, and except as otherwise set out in this Section 22.2(c) and Section 22.2(e)(vi) below, any proceeding to resolve any dispute, claim, or controversy will be brought and conducted only in the respective party's individual capacity and[] not as part of any class (or purported class), consolidated, multiple[ ]plaintiff, collective, or representative action or proceeding ("class action"). You and Fubo agree to waive the right to participate as a plaintiff or class member in any class action. You and Fubo expressly waive any ability to maintain a class action in any forum.

Ex. D, Terms § 22.2(c) (all caps in original).

---

[11] Because the Terms specify that "any issue concerning the validity of the class action, class arbitration, and collective action waiver … must be decided by a court," Terms § 22, the Court must adjudicate this issue rather than an arbitrator.

Even if New York law counseled a different result,[12] it would have been preempted by the FAA under *AT&T Mobility*. But that question is academic, because broad class-waiver provisions are valid and enforceable under New York law. *Lobel v. CCAP Auto Lease, Ltd.*, 2022 WL 1073777, at *10 (N.Y. Sup. Ct. Apr. 8, 2022) (holding that a "broad arbitration agreement …, including the class waiver provision therein, is a valid and enforceable agreement between the parties under both the FAA and New York law"); *Vitiello v. Home Buyers Resale Warranty Corp.*, 208 A.D.3d 1517, 1521 n.5 (N.Y. App. Div., 1st Dep't 2022) ("[W]e find that the arbitration clause explicitly waives [plaintiffs'] right to pursue a class action and, therefore, Supreme Court properly dismissed her class claims.").

For all the same reasons identified earlier, the Terms explicitly vest TWDC with the right to invoke the Class Waiver Provision against Unger and Prescott. Ex. D, Terms § 22 (explicitly vesting "future affiliates" with the ability to "invoke Fubo's rights under this agreement"), 22.2(c) (Class Waiver Provision of Section 22 ("Disputes")); *see Reid v. Tandym Grp., LLC*, 697 F. Supp. 3d 62, 86 (S.D.N.Y. 2023) (applying New York law to dispute between signatory and non-signatory to arbitration agreement and holding that non-signatory could invoke class-waiver provision to compel signatory to arbitrate claims on an individual basis).

Because the Terms contain a valid Class Action Waiver that TWDC is entitled to invoke, the Court should dismiss Unger and Prescott's class claims against TWDC. *See Vitiello*, 208 A.D.3d at 1519 (affirming the lower court's decision to dismiss class claims on the basis that the plaintiff had waived her right to bring claims on a class basis); *Reid*, 697 F. Supp. 3d at 86.

## III. The Court should stay Unger's and Prescott's individual claims pending arbitration.

Because the Arbitration Agreement governs Unger's and Prescott's individual claims, Section 3 of the FAA applies. 9 U.S.C. § 3. For cases pending in federal court that are "referable to arbitration under an agreement in writing for such arbitration," "the court in which such suit is pending … shall on application of one of the parties stay the trial of the action until such

---

[12] Along with federal law, New York law (without regard to its conflict of laws provisions) exclusively governs the rights and obligations under the Terms. Ex. D, Terms § 23.

arbitration has been had in accordance with the terms of the agreement." *Id.*; *see also Miller v. Longs Drug Stores Cal., LLC*, 2025 WL 457094, at *1 (9th Cir. Feb. 11, 2025) (quoting *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 … compels the court to stay the proceeding."); *Hooper v. Jerry Ins. Agency, LLC*, 675 F. Supp. 3d 1027, 1034 (N.D. Cal. 2023) (granting a motion to stay litigation "[w]here the claims alleged in a complaint are subject to arbitration"). TWDC respectfully requests that the Court stay Unger's and Prescott's individual claims pending arbitration.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Unger and Prescott's class-action allegations, compel arbitration of Unger's and Prescott's individual claims, and stay this action as to Unger's and Prescott's individual claims.

Dated: December 19, 2025

Respectfully submitted,

By: */s/ Daniel M. Petrocelli*
Daniel M. Petrocelli (S.B. #97802)

dpetrocelli@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067-6035
Telephone: +1 310 553 6700
Facsimile: +1 310 246 6779

SERGEI ZASLAVSKY (admitted *pro hac vice*)
szaslavsky@omm.com
BRIAN P. QUINN (admitted *pro hac vice*)
bquinn@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: +1 202 383 5300
Facsimile: +1 202 383 5414

*Attorneys for Defendant*
*The Walt Disney Company*

## CERTIFICATE OF SERVICE

I, Daniel M. Petrocelli, declare and state as follows:

I am a resident of the State of California and over the age of eighteen years and not a party to the within action. My business address is O'Melveny & Myers LLP, 1999 Ave of the Stars Floor 8, Los Angeles, CA 90067. On December 19, 2025, I caused to be filed the foregoing Notice of Motion and Motion to Dismiss Plaintiffs' Class-Action Claims, Compel Arbitration of Plaintiffs' Individual Claims, and Stay Plaintiffs' Individual Claims and Accompanying Memorandum of Points and Authorities with the Clerk of the Court via the Court's electronic filing system, which served copies on all parties of record.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: December 19, 2025

*/s/ Daniel M. Petrocelli*

Daniel M. Petrocelli

*Attorney for Defendant The Walt Disney Company*