United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HEATHER BIDDLE, et al.,<br>Plaintiffs,<br>v.<br>THE WALT DISNEY COMPANY,<br>Defendant. | Case No. 5:22-cv-07317-EJD<br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION, DISMISSING CLASS CLAIMS**<br>Re: ECF No. 210 |

Plaintiffs Unger and Prescott (collectively "Plaintiffs") filed this lawsuit against The Walt Disney Company ("Defendant" or "TWDC") alleging that TWDC's carriage agreements inflated the price of their Fubo live-television streaming service subscriptions and restricted the channels available to them through their subscriptions. Am. Class Action Compl. ("Am. Compl.") ¶¶ 115–17, ECF No. 60, Case No. 5:25-cv-01163-EJD. Before the Court is TWDC's motion to compel arbitration of Plaintiffs' individual claims, dismiss Plaintiffs' class claims, and stay Plaintiffs' individual claims pending arbitration. Def.'s Mot. to Dismiss, Compel Arb. ("Mot."), ECF No 210.

For the reasons stated below, the Court grants TWDC's motion to compel arbitration as to Plaintiff Unger and Prescott's individual claims, grants TWDC's motion to dismiss Plaintiffs' putative class claims, and stays the action pending arbitration of Plaintiffs' individual claims.

## I. BACKGROUND

In 2015, Fubo launched as a streaming live pay television provider that sought to offer its subscribers sports channels at a lower cost than some competitor providers. Am. Compl. ¶ 10. To

improve its business model, Fubo added ESPN—owned by TWDC—to its package of channels in August 2020 and saw a resulting surge in its subscriber base. *Id.* TWDC, however, required Fubo to package ESPN with other entertainment channels, like Freeform. *See id.* ¶¶ 74–78, 89. Plaintiffs allege this packaging requirement drove consumer prices to nearly double what they would have been if Fubo was permitted to offer ESPN on its own. *Id.* ¶ 12. Plaintiffs further allege that barring TWDC's "anticompetitive conduct," Fubo would have offered the "sports-centric package of channels that its consumers" wanted. *Id.* ¶ 5.

Users who sign up for Fubo subscriptions must assent to the Terms of Service ("Terms") before using the service. Mot. 3. According to Defendant, this process occurs through a "sign-up journey," during which users "must click a button indicating that they assent to the Terms." *Id.* at 4, 7 (describing the three-step sign-up journey). Plaintiff Unger signed up for Fubo's service in March 2024. Pls' Opp'n to Mot. ("Opp'n") 5, ECF No. 217; Mot. 5–6. At the time of Plaintiff Unger's sign up, Fubo's November 1, 2023, Terms ("2023 Terms") were operative. Mot. 1, 5–6. Plaintiff Prescott signed up for Fubo's service in September 2024, cancelled the service, and then signed up again in October 2024. Opp'n 5. In September and October 2024, Fubo's June 3, 2024, Terms ("Terms") were operative. Mot. 1–2, 5–8. The 2024 Terms merged all previous versions of the terms of service, such that both Plaintiffs Unger and Prescott were bound by them after they became effective (or, in Plaintiff Prescott's case, when he signed up in September and October 2024). Mot. 2. Fubo informed existing subscribers of the updated Terms by email, stating that Fubo's "Terms of Service have been updated to reflect how we resolve disputes with you. You do not need to take any action to continue using Fubo, but we encourage you to review our updated Terms of Service. By continuing to use our service after today, you confirm that you agree to these updates." Opp'n 5 (citing Gerson Declaration in Support of Mot. ("Gerson Declaration"), Ex. E, ECF No. 210-6).

Among other things, the Terms include a mandatory arbitration provision, a future affiliates clause, and a waiver of class claims. Gerson Declaration, Ex. D, ECF No. 210-5 ("Terms"). Section 22 of the Terms governs disputes and includes a future affiliates provision,

United States District Court
Northern District of California

providing that Fubo's "past, present, and future affiliates and agents, as well as any of our successors and assigns, can invoke Fubo's rights under this agreement in the event they become involved in a dispute." *Id.* at 17 (the "**Future Affiliates Provision**"). Further, within this section, the Terms include a subsection titled, "Binding Arbitration." Terms § 22.2. This subsection, collectively referred to as the "**Arbitration Agreement**" states:

> [Y]ou and Fubo agree that all claims, disputes, actions, disagreements, or other controversies concerning or arising in any way out of your use (or lack of use) of, access (or lack of access to) this Agreement, the Privacy Policy, Content, the Platform, the Services, an Account, your provision and any use of your personal information and any other information or data, a Subscription, a Site, an Application, Platform Content, Your Content, Third Party Content and Services, User Information, any Technology, this website, these Terms of Service, any other product or service, and any advertising, marketing, promotion, or other communications, whether based in contract, warranty, tort, statute, regulation, ordinance, or another legal or equitable basis, shall be resolved exclusively through binding arbitration in accordance with this Section 22.2 (collectively, the "Arbitration Agreement"). "Dispute" will be given the broadest possible meaning allowable under law.
>
> This agreement to arbitrate covers and includes threshold questions of arbitrability. The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any and all disputes arising out of or relating to the formation, existence, scope, validity, interpretation, applicability, or of this Disputes section (Section 22) or of these Terms of Service— including but not limited to any claim that all or any part of these terms are void or voidable, whether a claim is subject to arbitration, and any dispute regarding the payment, nonpayment, or timing of any administrative or arbitrator fees.

*Id.* Subsection 22.2(c), "Class Action, Class Arbitration and Collective Relief Waiver" states that "You and Fubo acknowledge and agree that, to the maximum extent allowed by applicable law . . . any proceedings to resolve any dispute, claim or controversy, will be brought and conducted only in the respective party's individual capacity and not as a part of any class (or purported class)" (the "**Class Waiver Provision**"). *Id.* § 22.2(c). Subscribers are provided with the right to opt out and not be bound by the Arbitration Agreement and Class Waiver Provision by sending written notice to a specified email address; Fubo continued to honor any valid opt-outs responsive to previous versions of the Terms of Service. *Id.* § 22.4. Plaintiffs did not invoke their rights to opt out of the Arbitration Agreement or Class Waiver Provision. Mot. 5.

In January 2025, after Plaintiffs assented to the Terms and the opt out window had passed, TWDC announced that it had entered into an agreement to acquire a controlling stake in Fubo and to combine Fubo with TWDC's Hulu + Live TV business. *Id.* at 7. The acquisition closed on October 29, 2025. *Id.* Accordingly, TWDC holds a controlling 70% stake in the newly created Fubo entity, making TWDC an affiliate of Fubo. *Id.* at 7–8.

TWDC filed the present Motion to Dismiss, Compel Arbitration, and Stay arguing that (1) the Court should compel arbitration of Plaintiff Unger and Prescott's individual claims because each Plaintiff agreed to the Terms' Arbitration Agreement; (2) consistent with the Arbitration Agreement, Unger and Prescott agreed to delegate arbitrability questions to the arbitrator; (3) even as a non-signatory, TWDC can enforce the Arbitration Agreement directly and through principles of estoppel; (4) the Court should dismiss Plaintiffs' putative class claims against TWDC pursuant to the Class Waiver Provision; and (5) the Court should stay Unger and Prescott's individual claims pending arbitration. *See generally* Mot. Plaintiffs oppose the Motion, arguing primarily that TWDC may not compel arbitration because it is not a signatory to the Terms. Opp'n 1. They further argue that compelling arbitration would be manifestly unconscionable because, "[i]f TWDC's theory were accepted, any defendant in a class action could sidestep judicial scrutiny simply by acquiring a company whose customers (who are themselves class-action plaintiffs) had agreed to an arbitration clause, effectively turning corporate restructuring into a tool for erasing plaintiffs' rights *ex post facto*." *Id.* at 2.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") requires district courts to "direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed," reflecting a "liberal federal policy favoring arbitration agreements." *Kilgore v. KeyBank, Nat. Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (citing *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218 (1985)); *Guerrero v. GoPuff*, 2025 WL 3539105, at *6 (S.D.N.Y. Dec. 10, 2025). In particular, Section 2 of the FAA specifies that, "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or

transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 provides that, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

The FAA reflects the "fundamental principle that arbitration is a matter of contract." *Olson v. World Fin. Grp. Ins. Agency, LLC*, No. 5:24-CV-00477-EJD, 2025 WL 2637562, at *2 (N.D. Cal. Sept. 9, 2025) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)); *see also Karasyk v. Marc Commodities Corp.*, 770 F. Supp. 824, 827 (S.D.N.Y. 1991). When presented with a motion to compel arbitration, courts must first determine whether a valid agreement to arbitrate exists, and then, if so, determine whether the dispute at issue is covered by the agreement. *Kilgore*, 718 F.3d at 1058 (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). "The [arbitration] agreement may also delegate gateway issues to an arbitrator, in which case the court's role is limited to determining whether there is clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Cortez v. Cambridge Real Est. Servs., Inc.*, No. 22-CV-07332-HSG, 2023 WL 4534946, at *2 (N.D. Cal. June 16, 2023). The party seeking to compel arbitration bears the initial burden of demonstrating that an agreement to arbitrate was made, a matter of state contract law. *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101–02 (2d Cir. 2022); *Cortez*, 2023 WL 4534946, at *2. If the moving party meets their initial burden, the burden shifts to the party seeking to avoid arbitration to show the agreement to be inapplicable or invalid. *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017); *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010). Generally applicable contract defenses as defined by state law may render an arbitration agreement unenforceable. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 343 (2011).

Where the "making of an arbitration agreement" is "in issue" district courts apply the summary judgment standard of Rule 56 of the Federal Rules of Civil Procedure to determine the issue. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021). "[W]here the

undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and 'avoid the need for further court proceedings.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund*, 661 F.3d 164, 172 (2d Cir. 2011)); *see also Alarcon v. Vital Recovery Servs., Inc.*, 706 F. App'x 394 (9th Cir. 2017).

## III. DISCUSSION

Arbitration is a "creature of contract," such that the threshold question facing any court considering a motion to compel arbitration is whether the parties have formed a contract in which they have agreed to arbitrate. *See Awad v. Extend Nursing Personnel*, 2025 WL 753865, at *4 (S.D.N.Y. 2025); *see also Chiron Corp. v. Ortho Diagnostic Sys., Inc.,* 1998 WL 865284, at *4 n.2 (N.D. Cal. Dec. 7, 1998)*, aff'd,* 207 F.3d 1126 (9th Cir. 2000). State law governs questions of contract formation. *Montes v. Thorntons LLC*, 831 F. Supp. 3d 860, 866 (N.D. Cal. 2026). The Parties disagree as to whether New York or California law applies. TWDC contends that New York law applies because of a choice of law provision within the Terms. *See* Terms § 23 ("Governing Law and Venue"; stating that "the interpretation of rights and obligations of the parties under this Agreement, including, to the extent applicable, any negotiations, arbitrations or other proceedings hereunder, will be governed in all respects exclusively by" New York law to the extent not inconsistent with federal law). Plaintiffs suggest that this provision is irrelevant if the Court finds that Fubo's Terms do not govern the dispute or that enforcing the Arbitration Agreement would contravene the forum state's public policy. Opp'n 6–7 n.3. Plaintiffs further argue that because Plaintiff Prescott was a California resident when litigation was initiated, California law should apply. *Id.*

Relying on contractual provisions before the Court finds that a contract has been formed, and is enforceable, is inappropriate. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012). Therefore, either the law of California—the forum state and state in which Plaintiff Prescott was a citizen at the time litigation was initiated—or New York may apply to this dispute.

United States District Court
Northern District of California

*Id.*; *Pincaro v. Glassdoor, Inc.*, 2017 WL 4046317, at *5 (S.D.N.Y. Sept. 12, 2017). California and New York law "apply substantially similar rules for determining whether the parties have mutually assented to a contract term." *Meyer*, 868 F.3d at 74; *see also Blackburn v. ClassPass USA LLC*, No. 25-cv-06109-WHO, 2026 WL 962734, at *4 n.2 (N.D. Cal. Apr. 9, 2026) ("New York and California law are substantively the same insofar as contract validity is concerned."). As Plaintiffs note, the choice-of-law question is thus immaterial to the determination of whether a valid agreement to arbitrate was formed. *See Pincaro*, 2017 WL 4046317, at *5.

**A. Agreement to Arbitrate**

Courts examining motions to compel arbitration must first determine whether the parties have entered into a valid agreement to arbitrate. *Lopez v. Debevoise & Plimpton,* 2026 WL 2123273, at *3 (S.D.N.Y. July 23, 2026). "When deciding whether the parties agreed to arbitrate a certain matter, courts generally should apply ordinary state-law principles that govern the formation of contracts." *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016); *Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505, 510 (9th Cir. 2023). Contract formation requires a "manifestation of mutual assent [that is] sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Bristol v. Securitas Sec. Servs. USA, Inc.*, 597 F. Supp. 3d 574, 578 (S.D.N.Y. 2022) (citation omitted). Where the contract is online, "courts look for evidence that a website user had actual or constructive notice of the terms of using the website." *Resorb Networks, Inc. v. YouNow.com*, 51 Misc. 3d 975, 980 (N.Y. Sup. Ct. 2016). Where, as in many online contracts, the assent to terms is "mostly passive . . . courts seek to know 'whether a reasonably prudent offeree would be on notice of the term at issue' and whether the terms of the agreement were 'reasonably communicated' to the user." *Id.* (citing *Fteja v. Facebook, Inc.* 841 F. Supp. 2d 829, 833, 835 (S.D.N.Y. 2012); *Starke v. Gilt Groupe, Inc.,* 2014 WL 1652225, *2–3, (S.D.N.Y. 2014); *Jerez v. JD Closeouts, LLC,* 36 Misc. 3d 161, 168 (Nassau Dist. Ct. 2012)).

TWDC argues that Plaintiffs agreed to the Terms when they created their accounts and proceeded through the "sign-up journey." Because the Terms include the Arbitration Agreement

and Class Waiver Provision, Plaintiffs necessarily agreed to arbitrate by using Fubo's services. *See* Mot. 5–7, 9. Although provided with the opportunity to do so, Plaintiffs did not opt out of the Arbitration Agreement or Class Waiver Provision. *Id.* If Plaintiffs had opted out of the Arbitration Agreement or the Class Action Waiver, they would not have been bound by these provisions of the Terms and could have sought relief in court, rather than an arbitral forum. *See* Terms § 22.4. To opt out, Plaintiffs were required to send a written notice, signed by them, of their decision to a specified email address. The Terms require that the notice be sent within 30 days of the effective date of the updated Terms, or the users' first use of the Services, whichever occurred later. *Id.* Additionally, Fubo "continue[d] to honor any valid opt outs . . . [from] a prior version of the Terms." *Id.*

TWDC continues that the Terms explicitly vest the right to invoke the Arbitration Agreement and Class Waiver Provision in certain non-signatories to the Terms through the Future Affiliates Provision. Mot. 4–5. Plaintiffs contend, on the other hand, that TWDC fails to meet its burden to show that Plaintiffs agreed to arbitrate *this* dispute *with TWDC*. Opp'n 1. But Plaintiffs do not appear to dispute that they agreed to the Terms *with Fubo*. *See id.* at 5 ("Taking Disney's assertions at face value, both Fubo Plaintiffs agreed to arbitration terms *with Fubo* while Fubo and Disney were entirely independent companies and litigating against each other over the same anticompetitive conduct alleged here."). The question is therefore whether a reasonably prudent offeree would be on notice of the Terms' Arbitration Agreement, including the Future Affiliates Provision, and whether they were reasonably communicated to Plaintiffs.

TWDC explains that to sign up for Fubo's services, a putative subscriber must assent to the Terms, which are available via hyperlink to a subscriber throughout their sign-up process and publicly on the website. Mot. 3. Users' assent is indicated by clicking a button confirming that by proceeding, they agree to the terms. Gerson Decl. in Support of Mot. ¶¶ 5, 8, 16.

Courts have consistently found that even where terms are reasonably conspicuous, a "user must agree to the terms, not merely see them." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1158 (9th Cir. 2025); *Shepherd v. Belkin Int'l, Inc.*, 683 F. Supp. 3d 282, 285 (E.D.N.Y. 2023) (noting

that the Second Circuit remanded in *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 103 (2d Cir. 2022) because the online merchant had not provided evidence that the terms and conditions were conspicuous displayed). To evaluate whether terms are reasonably conspicuous, courts look to the design of the relevant interface, including factors such as whether the terms are "spatially coupled" with the checkout button, whether the "checkout button is 'temporally coupled' with the hyperlink to the terms of use" (meaning that the checkout button and hyperlinked terms of use are presented at the same time) and whether the language is clear. *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 116 (2d Cir. 2025); *see also Meyer*, 868 F.3d at 75, 78–79 (considering the relevant interface on which the putative user was required to click "Register" below which the screen stated that, "[b]y creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY," with hyperlinks to both and finding that it provided reasonable notice); *Oberstein*, 60 F.4th at 515 (looking to conspicuousness and placement of the "Terms of Use" hyperlink). Turning to the interface at issue here, the Court concludes that Fubo provided conspicuous notice to Plaintiffs that they were agreeing to the Terms. On the first step of a putative subscriber's sign-up journey, in addition to entering their email and password, there is a notice that states: "By continuing, I agree to the Terms of Service, acknowledge the Privacy Policy, and agree to receive promotional emails regarding fuboTV." Gerson Decl. Ex. F-2, ECF No. 210-7; Gerson Decl. Ex. B-2, ECF No. 210-3. "Terms of Service" and "Privacy Policy" are hyperlinked and are in a different font color than the rest of the text. This text appears on the same page and above the "Continue" button, such that people seeking to subscribe would see it before clicking "Continue." Gerson Decl. Ex. F-2; Gerson Decl. Ex. B-2. Additionally, before a putative subscriber can submit their payment information and checkout, there is a notice above the submit button that states "By clicking 'Submit', you acknowledge that you have read and agree to Fubo's Terms of Service." Again, "Terms of Service" appears in a slightly different color and is hyperlinked. Gerson Decl. Ex. F-6, ECF No. 210-7; Gerson Decl. Ex. B-5, ECF No. 210-3.

The second consideration, whether the putative subscriber takes "some action that

United States District Court
Northern District of California

unambiguously manifests assent—is relatively straightforward." *Oberstein.*, 60 F.4th at 515. Courts have repeatedly held that the click of a button can be construed as an unambiguous manifestation of assent" where the user is explicitly advised that the act of clicking will constitute assent to the terms. *Id; Meyer*, 868 F.3d at 79–80 ("A reasonable user would know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not."). Here, the Court finds that Plaintiffs manifested unambiguous assent by pressing both "Continue" in Step 1 of the sign-up journey, and "Submit" in Plaintiff Unger's case, or "Start free trial" in Plaintiff Prescott's case in Step 3 of the sign-up journey.

Plaintiff Unger signed up when the 2023 Terms were in effect, so the Court must also consider whether Unger was provided reasonably conspicuous notice of the updated Terms. When the updated Terms became effective in June 2024, Fubo sent its subscribers, including Unger, an email informing them that by continuing to use Fubo, they agreed to the updated Terms. Mot. at 5–6; Gerson Decl. Ex. E, ECF No. 210-6; *see also* Terms § 28 (explaining that the Agreement supersedes previous agreements between the parties). In this email, which bore the subject line "Important Account Update," Fubo wrote that its "Terms of Service [had] been updated to reflect how we resolve disputes with you. You do not need to take any action to continue using Fubo, but we encourage you to review our updated Terms of Service. By continuing to use our service after today, you confirm that you agree to these updates." Gerson Decl. Ex. 1. References to the "Terms of Service" are bolded and hyperlinked in the email. Plaintiff Unger remained active until November 29, 2024, and did not seek to opt out of the Arbitration Agreement or Class Waiver, or otherwise delete his account. Mot. at 5. Consistent with other courts, this Court finds that Fubo provided conspicuous notice of the updated Terms and that, by continuing to use Fubo, Unger assented to the Terms. *See Pincaro* 2017 WL 4046317, at *6; *Sacchi v. Verizon Online LLC*, 2015 WL 765940, at *5 (S.D.N.Y. Feb. 23, 2015); *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016). Having found that Plaintiffs and Fubo entered into an Arbitration Agreement when they agreed to the Terms, the Court turns to Plaintiffs' arguments

that provisions within the Terms are unenforceable or invalid.

### B. TWDC May Compel Arbitration Pursuant to the Future Affiliates Provision

Plaintiffs principally argue that because TWDC is a non-signatory to the Terms, it cannot invoke the Arbitration Agreement included therein by relying on the Future Affiliates Provision. Opp'n 8–9. Plaintiffs argue that "future affiliates" do not have rights to enforce this Section because (1) TWDC was not a party to the Terms when Plaintiffs assented to them; (2) rights exist only to the extent that a party has assumed corresponding obligations, and here, TWDC has not; and (3) the parties to the Terms could not have reasonably expected the Arbitration Agreement to extend to TWDC. Opp'n 9–10. In response, TWDC argues that: (1) Plaintiffs do not dispute that they assented to the Terms; (2) there is no legal requirement for a party to a contract to assume reciprocal obligations and that, in any event TWDC did undertake obligations to follow the Arbitration Agreement and abide by other provisions in the Terms; and (3) uncertainty about possibly arbitrating with some non-signatory entity is inherent in *any* contract that binds future affiliate or successors, and not a reason to hold such a provision unenforceable. Reply 5–6, ECF No. 222. The Court considers each argument in turn.

#### 1. Enforceability of Contractual Obligation by Non-Signatory

***First***, Plaintiffs argue that contract formation principles foreclose any argument that when they agreed to the Terms, Plaintiffs were also "agreeing with TWDC, and every other unknown or unrelated future entity." Opp'n 9. Although framed as a contract formation inquiry, Plaintiffs' argument raises questions of contract *enforceability*: whether a non-party to a contract can enforce its terms where such a scenario is accounted for within the terms. *See id.* at 9 ("Thus TWDC is *not* a party to the agreement and has no direct enforcement rights."). Plaintiffs suggest that they did not intend to arbitrate with TWDC, such that there was no "mutual intention of the parties," as is necessary to form a contract to arbitrate with TWDC. *See id.* at 8 (explaining that contract formation requires mutual intent to be bound that is sufficiently definite to demonstrate the parties' agreement with respect to all material terms). Based on the four corners of the Terms, Plaintiffs claim that they understood the counterparty to the contract to be "fuboTV Media, Inc.

'and its parents and affiliates'" not any possible future affiliate, especially where, as here, the Future Affiliates Provision is mentioned solely in the Arbitration Agreement, not in the "Definitions" section defining Fubo. *Id.* at 9.

In support of this position, Plaintiffs rely primarily on two cases, both of which are inapposite. In the first, *Ellington v. EMI Music, Inc.*, the plaintiff argued that as it appeared in a contractual term, the phrase "any other affiliate" was ambiguous. *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 245 (2014) ("The second phrase plaintiff claims is ambiguous is within the definition of Second Party. The Agreement defines 'Second Party' as consisting of a group of music publishers including 'MILLS MUSIC, INC., a New York corporation, AMERICAN ACADEMY OF MUSIC, INC., GOTHAM MUSIC SERVICE, INC., and their predecessors in interest, and any other affiliate.' Plaintiff asserts that the affiliated foreign subpublishers are included in the term 'any other affiliate.'"). In that action, the New York Court of Appeals considered whether a contractual royalty payment provision was clear and unambiguous in a breach of contract and fraudulent concealment suit between an heir of Duke Ellington and EMI Music. *Id.* at 242. The underlying contract required the court to interpret the term "any other affiliate" in a United States copyright renewal agreement. *Id.* at 245. The court found that the phrase "any other affiliate" was not ambiguous within the contract and noted that "absent explicit language demonstrating the parties' intent to bind future affiliates of the contracting parties, the term 'affiliate' includes only those affiliates in existence at the time that the contract was executed." *Id.* at 246. Plaintiffs suggest that the *Ellington* court's conclusion—that "affiliate" includes only affiliates existing at the time of the contract's formation—should operate to exclude TWDC from invoking the Arbitration Agreement here, as a future affiliate. *See* Opp'n 9. This suggestion is unpersuasive where the Arbitration Agreement's Future Affiliates Provision clearly states that "future affiliates . . . can invoke Fubo's rights under this agreement in the event they become involved in a dispute." Terms § 22. There was no additional clause in *Ellington* that described "future affiliates" and indeed, the court suggested that "language demonstrating the parties' intent to bind future affiliates of the contracting parties," may operate to do just that—bind future parties. *See Ellington*, 24

United States District Court
Northern District of California

N.Y.3d at 246.

The second case, a Ninth Circuit decision, grappled with whether DirecTV could compel arbitration based on a wireless services agreement between the plaintiff and "AT&T mobility," which was defined to include its "affiliates." *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 715 (9th Cir. 2020). After the plaintiff entered into the wireless services agreement, DirecTV was acquired by AT&T. *Id.* at 715. As in *Ellington*, in *Revitch* the court considered the definition of "affiliate," not *future* affiliate, and whether "affiliate" included DirecTV when it was acquired by AT&T *after* the plaintiff signed the wireless services agreement. *See id.* at 717–18 ("Because the word is not elsewhere defined in the contract, we rely on the ordinary definition . . . An affiliate is normally understood as a 'company effectively controlled by another or associated with others under common ownership or control"). The court concluded that, combined with the circumstances surrounding DirectTV's motion to compel arbitration (a claim entirely unrelated to the plaintiff's mobile phone services agreement), enforcing the arbitration agreement would lead to "absurd results:" "Under this reading, Revitch would be forced to arbitrate any dispute with any corporate entity that happens to be acquired by AT&T, Inc." *Id.* at 718. Like the *Ellington* court, the *Revitch* court suggested that the result may have been different had the contract referred to "any affiliates, both present and future." *Id.*; *see also McDonough v. Bidwill*, 2025 WL 487171, at *9 (D. Ariz. Feb. 13, 2025) (commenting that *Revitch* was distinguishable from the action before the court because the arbitration provision contained "some of the sort of forward-looking language that was absent in *Revitch*" where the provision referenced arbitrating any claim that *ever* arises between the plaintiff and defendant's agent).

In each of these cases, the courts explained that, where the terms of a contract are clear and unambiguous, the intent of the parties is determined by looking within "the four corners of the contract." *Ellington*, 24 N.E. 3d at 244. Here, Plaintiffs do not dispute the plain meaning of the Future Affiliates Provision but rather argue that Disney is not a party to the Terms and therefore has no direct enforcement rights. Opp'n 9 ("The June 2024 Terms define Fubo as fuboTV Media, Inc. 'and its parents and affiliates,' a category that did not include Disney at the time. Thus,

Disney is *not* a party to the agreement and has no direct enforcement rights."). The cited case law only confirms that TWDC is not a party to the Terms, which TWDC does not dispute. *Ellington* and *Revitch* do not contemplate a situation such as this, where non-parties are explicitly vested with enforcement rights in the contract. Indeed, as discussed below, courts have found clauses such as the Future Affiliates Provision enforceable. *See infra* § III.B.2. Looking to the ordinary definitions of the words within the Future Affiliates Provision, the Court finds that the Provision is clear and unambiguous, such that the Court will rely on its terms so long as this reliance would not lead to an absurd result. *See infra* § III.B.3.

**2. Requirement of Corresponding Obligations**

***Next***, Plaintiffs argue that the Future Affiliates Provision cannot be construed as a contractual obligation between Plaintiffs and TWDC because "a legal right . . . exists only against a party who has assumed a corresponding obligation." Opp'n 9–10 (citing 1 Corbin on Contracts § 1.2). TWDC counters that this argument is a "red-herring." Reply 5. The cases on which Plaintiffs rely to support this argument do not contemplate the situation at hand—a non-signatory in which Plaintiffs agreed to vest enforcement rights being required to undertake reciprocal obligations. *See id.* at 5–6. The Court agrees with TWDC and finds Plaintiffs' argument unpersuasive.

The first case on which Plaintiffs rely in support of their argument that TWDC must have undertaken certain obligations to enforce the Arbitration Agreement, *Wilson v. Triller, Inc.*, analyzes whether the plaintiff was "aware of the Terms . . . [and] whether the Terms constitute[d] an enforceable contract." 598 F. Supp. 3d 82, 94 (S.D.N.Y. 2022). The court concluded that there was a valid contract between the parties because the terms of service "were sufficiently conspicuous to put the user on inquiry notice." *Id.* at 96. But the court's holding as to the existence of a valid contract did not address the necessity of "reciprocal obligations." Likewise, the second case to which Plaintiffs direct the Court, *Casa del Caffe Vargnano S.P.A. v. ItalFlavors, LLC*, underscores that parties to a contract must mutually consent to be bound by their agreement. 816 F.3d 1208, 1211–12 (9th Cir. 2016). Neither of these cases, nor any case that

Plaintiffs cite, "require[s] a non-signatory in TWDC's shoes to show that it undertook reciprocal obligations." Reply 5–6.

Instead, TWDC offers several cases in which courts applying New York law have found that contracts containing arbitration clauses, which extend to "successor[s]" or "affiliates" are enforceable, without undertaking a separate analysis of whether affiliates took on "reciprocal" obligations. *See, e.g.*, *Awad*, 2025 WL 753865, at *4, 6; *Citadel Servicing Corp. v. Castle Placement, LLC*, 431 F. Supp.3d 276, 287–88 (S.D.N.Y. 2019). These cases hold that a "signatory to an arbitration agreement may be required to arbitrate a dispute with a non-signatory when . . . the arbitration clause 'explicitly vests rights to arbitrate,' in non-signatories.'" *Awad*, 2025 WL 753865, at *6 (citing *Choctaw Generation Ltd. P'ship v. American Home Assurance Co.*, 271 F.3d 403, 404 (2d Cir. 2001)); *see also Citadel*, 431 F. Supp. 3d at 287–88 (finding that the defendants were explicitly vested with the right to decide whether they were agents of a contractual party, and therefore were entitled to proceed in arbitration despite being non-signatories to the relevant agreement); *McPheeters v. McGinn, Smith & Co.*, 953 F.2d 771, 772 (2d Cir. 1992) ("[U]nder general contract principles, we may deem non-signatories to fall within the scope of an arbitration agreement where that is the intent of the parties.").

### 3. Absurd Results

***Lastly***, Plaintiffs argue that enforcing the Arbitration Agreement, including the Future Affiliates Provision, produces absurd results and that doing so would be contrary to the parties' reasonable expectations. Opp'n 10. Plaintiffs emphasize language in the Arbitration Agreement compelling arbitration for "controversies concerning or arising in any way out of . . . this Agreement. . . [or] *any other product or service*," to argue that a former Fubo subscriber could be compelled to arbitrate claims "wholly unrelated to Fubo, such as a slip-and-fall at a Disney resort." *Id.* at 11. But in making this argument, Plaintiffs excise the "any other product or service" language from a list of Fubo-related services and a reference to the Terms themselves. Indeed, the Arbitration Agreement governs:

> all claims, disputes, actions, disagreements, or other controversies concerning or arising in any way out of your use (or lack of use) of,

> access (or lack of access to) this Agreement, the Privacy Policy, Content, the Platform, the Services, an Account, your provision and any use of your personal information and any other information or data, a Subscription, a Site, an Application, Platform Content, Your Content, Third Party Content and Services, User Information, any Technology, this website, these Terms of Service, *any other product or service*, and any advertising, marketing, promotion, or other communications.

Terms § 22.2(a) (emphasis added). Plaintiffs ignore the context of the surrounding terms, which makes clear that the Arbitration Agreement is intended to apply to disputes arising from use of Fubo's streaming services, such as subscription-related disputes, disputes about how the information or data that customers provide to Fubo may be used, and the like.

Plaintiffs again look to *Revitch* and *Wexler* to support their argument that courts have rejected "narrower attempts" to stretch arbitration clauses beyond parties' reasonable expectations of the agreement's scope. Opp'n 11–12 (contemplating arbitration of any claim brought by a Fubo subscriber, even if unrelated to Fubo and brought years after terminating Fubo services). But the *Revitch* court reached its decision that the plaintiff could not reasonably have expected that he would be compelled to arbitrate an unrelated dispute based on the fact that DirecTV was an unaccounted-for future affiliate, not solely because arbitration would produce an "absurd result," because of the breadth of the provision's written language. *See Revitch*, 977 F. 3d at 717–18. Plaintiffs' reliance on *Wexler* is more apt, but suggests that the Court consider what a "reasonable person" would be expressing an intent to agree to arbitrate, a suggestion that is consistent with TWDC's reliance on the *ejusdem generis* canon of interpretation, discussed *infra*. *Wexler* 211 F. Supp. 3d at 504. In *Wexler*, the court found that even where AT&T had an expansive arbitration clause in a wireless services contract:

> no reasonable person would think that checking a box accepting the "terms and conditions" necessary to obtain cell phone service would obligate them to arbitrate literally every possible dispute he or she might have with the service provider, let alone all of the affiliates under AT&T's corporate umbrella—including those who provide services unrelated to cell phone coverage. Rather, a reasonable person would be expressing, at most, an intent to arbitrate disputes connected in some way to the service agreement."

*Id.* The *Wexler* court found that plaintiff could not have reasonably expected to arbitrate Telephone Consumer Protection Act ("TCPA") claims related to unsolicited telephone calls and

text messages when she entered into a mobile phone service agreement containing an arbitration clause because plaintiff's TCPA claims did not relate to the service agreement. *See id.* at 505–06. Here, despite Plaintiffs' presentation of a hypothetical slip-and-fall at a Disney resort, Plaintiffs claims relate to Fubo's streaming services. Thus, these claims *are* connected to the Terms to which Plaintiffs agreed, unlike the situation in *Wexler*.

This conclusion is further supported when the Court considers *ejusdem generis*, a canon of interpretation under which "general terms that follow specific ones are interpreted to embrace only objects of the same kind or class as the specific ones." *United States v. Amato*, 540 F.3d 153, 160 (2d Cir. 2008), *abrogated on other grounds by Lagos v. United States*, 584 U.S. 577 (2018); *see also Madison Hill Corp. v. Cont'l Baking Co.*, 251 N.Y.S.2d 300, 303–04 (N.Y. App. Div. 1964). The general catchall terms "any other product or service" follow terms that relate to Fubo's streaming services, such that the catchall is interpreted to capture only products or services relating to Fubo's streaming services, or the Terms themselves. Accordingly, the Court finds that the Arbitration Agreement is appropriately limited and not so broad as to create absurd results.

In addition to raising a challenge to the Arbitration Agreement's reference to "any other product or service," Plaintiffs also challenge a literal reading of the Future Affiliates Provision because they could not have "reasonably expected" the arbitration clause to extend to TWDC. *See* Opp'n 10–12 ("[N]o reasonable Fubo subscriber could have expected in mid-to-late 2024 that, someday, an unrelated claim that he or she has against TWDC would live or die by Fubo's Terms."). Again, Plaintiffs rely on cases considering arbitration clauses binding only "affiliates," rather than "future affiliates," or that contain other forward-looking language. *See id.* at 11–12 (relying on *Revitch*, which bound only "affiliates" to arbitrate, not *future* affiliates, and *Wexler*, which concluded that a contract was not formed as to arbitration because the breadth of the clause foreclosed the existence of mutual intent). Plaintiffs argue that when they accepted the Terms, TWDC and Fubo were not only unaffiliated companies but adversaries in antitrust litigation, underscoring that Plaintiffs could not have reasonably expected to arbitrate with TWDC. *Id.* at 12. But courts have repeatedly found that future affiliates provisions, or clauses granting rights to

successors, are valid, despite the existence of some inherent uncertainty. *See, e.g.*, *Cloney's Pharmacy, Inc. v. Wellpartner, Inc.*, 2024 WL 4349291, at *5 (S.D.N.Y. Sept. 30, 2024) ("Plaintiffs accepted amendments to the Arbitration Clause subsequent to Plaintiffs' signing of the CPAs, but prior to CVS Health's acquisition of Defendant, that did include 'future' 'affiliates'"); *Awad*, 2025 WL 753865, at *6 (finding that a signatory to an arbitration agreement may be required to arbitrate a dispute with a non-signatory when the arbitration clause explicitly vests rights to arbitrate in non-signatories).

For the above-mentioned reasons, the Court finds that Plaintiffs have not shown that the Arbitration Agreement or Future Affiliates Provision is invalid or unenforceable. Accordingly, TWDC may directly invoke the Arbitration Agreement to compel Plaintiffs to arbitrate their individual claims.

**C. Request for Discovery**

Plaintiffs request that the Court permit discovery as to whether, at the time "future affiliates" was added to the Terms, "that term was reasonably understood by the parties to encompass all potential future stakeholders of Fubo, even direct competitors like Disney." Opp'n 14–15. "The FAA permits the Court to order discovery to resolve whether a contract exists 'only if "the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue."'" *Voll v. HCL Techs. Ltd.*, 2019 WL 144863, at *5 (N.D. Cal. 2019) (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 726 (9th Cir. 1999)). Plaintiffs cite a handful of cases for the general proposition that courts may permit discovery following a motion to compel arbitration. *See* Opp'n at 14. But in each of these cases, there was an underlying question as to whether the parties had, in fact, made an arbitration agreement. For example, in *Knapfe v. PeopleConnect, Inc.*, the Ninth Circuit remanded the case to the district court to allow discovery of when an agency relationship was formed, a critical issue to determining whether the plaintiff had assented to an arbitration agreement via an agent. 38 F.4th 824, 833 (9th Cir. 2022). And in *Hicks v. Citigroup, Inc.*, the court permitted limited discovery where plaintiff "ha[d] no recollection of having received" credit card agreements that may have included arbitration clauses.

2012 WL 254254, at *2 (W.D. Wash. Jan. 26, 2012). A court in the Southern District of New York found that discovery was appropriate to resolve a factual dispute of whether plaintiff indicated to defendant that plaintiff was a principal such that plaintiff could enforce an arbitration clause. *Dun Shipping Ltd. v. Amerada Hess Shipping Corp.*, 234 F. Supp. 2d 291, 295, 297 (S.D.N.Y. 2002) ("Given the contested factual record, it is difficult to conclude, as a matter of law, that Plaintiff was or was not a party to the Charter Party and, as a result, can or cannot enforce the Charter Party arbitration provisions."). Here, Plaintiffs' primary argument is not that they did not agree to the Terms, thereby agreeing to arbitrate, and indeed the Court has found that they did, but rather that a non-signatory to the Terms cannot invoke the Agreement to compel arbitration. *See* Opp'n § I. Further, Plaintiffs' requested discovery is distinguishable from that requested in the cited cases, as it does not seek to discover factual information relating to whether, for example, Plaintiffs ever received the Terms or if they were actually the individuals managing their accounts. As Defendant points out, Plaintiffs' subjective understanding of "future affiliates" is superseded by their "objective manifestation of assent to the agreement's plain language." *Akhter v. Compass Grp. USA, Inc.*, 2022 WL 16838330, at *2 (S.D.N.Y. Nov. 9, 2022). For the foregoing reasons, the Court denies Plaintiffs' request for limited discovery into what the term "future affiliates" was reasonably understood to mean at the time that Plaintiffs assented to the Terms.

**D. Unconscionability**

Plaintiffs contend that even if there is an agreement to arbitrate between Plaintiffs and TWDC, the Arbitration Agreement and delegation subclause, which delegates to an arbitrator any threshold questions of arbitrability, are unconscionable and therefore unenforceable. Opp'n 19; *see also* Terms § 22.2(a). TWDC, on the other hand, asserts that under similar circumstances, courts have rejected unconscionability challenges.

Under New York law, an arbitration provision "will be deemed unenforceable on unconscionability grounds only where it is 'both procedurally and substantively unconscionable when made.'" *Spinelli v. Nat'l Football League*, 903 F.3d 185, 208 (2d Cir. 2018) (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988)). In other words, a plaintiff

arguing that such a provision is unconscionable must make "some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the party." *Hojnowski v. Buffalo Bills, Inc.*, 995 F. Supp. 2d 232, 238 (W.D.N.Y. 2014) (citing *Gillman*, 73 N.Y.2d at 10)). No set weight is to be given to any one factor, such that procedural and substantive unconscionability operate on a sliding scale. *David v. #£1 Mktg. Serv., Inc.*, 113 A.D.3d 810, 812 (2014).

**1. Substantive Unconscionability**

Plaintiffs argue that the one-sidedness of the Terms and provisions therein demonstrates substantive unconscionability. Opp'n 20. In support of their argument that the Terms unreasonably favor Fubo (and Disney), Plaintiffs argue that the delegation subclause is facially overbroad in a "manner that . . . redounds solely to Fubo's (and Disney's advantage)." *Id.* Plaintiffs take issue with the delegation of questions surrounding formation, existence, and validity of the arbitration agreement to the arbitrator and argue that it is otherwise overbroad. *Id.*; *see also* Terms § 22.2(a).[1] But courts have repeatedly found that similar provisions are not substantively unconscionable where there is clear and unmistakable evidence that the parties intended to arbitrate arbitrability issues. *See, e.g.*, *33 Calvert Props. LLC v. AMEC LLC*, 135 N.Y.S.3d 767, 776 (N.Y. Sup. 2020) ("[W]here there is a broad arbitration clause and the parties' agreement specifically incorporates by reference the AAA rules providing that the arbitration panel shall have the power to rule on its own jurisdiction, courts will 'leave the question of arbitrability to the arbitrators.'"(citation omitted)); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1200 (2d Cir. 1996) (finding that a delegation provision within an arbitration agreement providing that "any and all controversies . . . concerning any account, transaction, dispute or the construction, performance, or breach of this or any other agreement . . . shall be determined by arbitration"

[1] Plaintiffs also contend that delegation clauses such as the one in the Terms "would allow a federal class case to be relegated to non-class arbitration without any initial judicial determination that a valid agreement to arbitrate exists" and that the question of contract formation is reserved for the courts. Opp'n 20. Defendant points out, and the Court agrees, that even where delegation clauses exist, courts must still decide whether or not there is a valid agreement to arbitrate arbitrability. *See* Reply 11.

demonstrated "the parties' broad grant of power to the arbitrators" and that pursuant to an objective reading of the agreement, the parties intended to arbitrate issues of arbitrability); *see also Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). Plaintiffs continue that, in combination with the delegation clause, the "near *infinite* scope" of the arbitration clause suggests that it would apply to any conceivable lawsuit a subscriber might bring against Fubo or a future affiliate as long as the lawsuit involves a "product or service." Opp'n 20–21 (emphasis in original). For the reasons discussed above, including the application of *ejusdem generis* canon of interpretation, the Court is not persuaded by this argument. Plaintiffs' reliance on *McFarlane* does not convince the Court otherwise. There, the putative class action arose from a data breach at Altice, a television and communications provider. *McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 268 (S.D.N.Y. 2021). The named plaintiffs were current or former employees of Altice who had personal identifying information stolen during the breach. *Id.* Altice sought to compel many of the named plaintiffs to arbitrate claims based on an arbitration clause in the terms and conditions to which they agreed as subscribers of Altice's cable service. *Id.* at 273 ("Altice does so not based on an arbitration provision contained in any employment agreements with these Plaintiffs, but based on arbitration provisions contained in the General Terms and Conditions of Service . . . pertaining to the company's *cable* service." (emphasis in original)). The court characterized the referenced arbitration clause as "infinite" because it purported to cover any and all disputes arising between the customer and Altice as well as its parents, subsidiaries, affiliates, agents, and successors—the only limitation being that the dispute involve Altice or an associated entity. *Id.* at 275. The court explained that the "the Ninth Circuit and a handful of district courts around the country have declined to compel arbitration of claims based on 'infinite arbitration clauses' where the claims at issue lack any nexus whatsoever to the agreement containing the clause.'" *Id.* at 276. In reaching these decisions, the courts have held either that (1) the arbitration agreements did not "truly encompass 'any and all disputes' between" because such a clause would be unconscionable or (2) that no reasonable customer would have understood themselves to be signing over their right to pursue any claim against the defendant company in perpetuity and that

no reasonable company in the defendant's position could understand the customer's manifestation of assent to effect an absolute waiver of the customer's right to sue the defendant in state or federal court with respect to claims unrelated to an underlying service agreement. *Id.* at 276–77. The court in *McFarlane* concluded that the arbitration provision could not be applied to claims lacking a nexus to the Altice cable service agreement. *Id.* at 277. Here, however, Plaintiffs' claims relate to the streaming services offered by Fubo, not an unrelated event such as the data breach at issue in *McFarlane*.

Finally, Plaintiffs argue that TWDC has a "special, one-sided advantage" that is not afforded to Plaintiffs because "[f]uture affiliates . . . *can* invoke Fubo's rights under" the arbitration agreement but" are not required to observe any of the obligations under the agreement. Opp'n 22. This argument is very similar to Plaintiffs' argument that TWDC cannot enforce the arbitration clause because it did not "assume[] a corresponding obligation." *Id.* at 9. For the reasons discussed above, and because "TWDC and Plaintiffs agreed to play by the same arbitration rules [and] users' 'heirs, assigns, and successors,' may compel arbitration if Fubo brings a dispute," the Court finds that the Terms' language does not render the Term, including the delegation sub-clause and the Future Affiliates Provision substantively unconscionable. Reply 12; *see also* Mot. 4–5 (citing Terms § 22).

**2. Procedural Unconscionability**

Plaintiffs next argue that the delegation subclause is procedurally unconscionable, and that, because of the "pronounced substantive unconscionability," of the Terms, "only a modest showing of procedural unconscionability is required to render the arbitration provision unenforceable." Opp'n 22. Procedural unconscionability examines the contract-formation process and focuses on "the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." *Eisen v. Venulum Ltd.*, 244 F. Supp. 3d 324, 341 (W.D.N.Y. 2017) (citing *Gillman*, 73 N.Y.2d at 11).

Here, there is undoubtedly a disparity in bargaining power, though as Plaintiffs note, this is

not dispositive. Opp'n 22. At the time that Plaintiffs assented to the Terms, Fubo was "a national media corporation with large resources, ready access to legal counsel" and experience in litigation and arbitration, whereas Plaintiffs are natural people without comparable resources. *Id.* But Plaintiffs offer no evidence of other deceptive or high-pressured tactics which would support a finding that the Terms are procedurally unconscionable. Though Plaintiffs note that the Terms are a standardized contract imposed and drafted by the party of superior bargaining strength, providing the subscriber with only the opportunity to adhere to the contract or reject it, there is "no more than a minimal degree of procedural unconscionability." *Ronderos v. USF Reddaway, Inc.*, 114 F.4th 1080, 1090 (9th Cir. 2024) (applying California rather than New York law). Further, "in New York, being offered contract terms on a 'form . . . offered on a take-it-or-leave it basis' is generally 'insufficient to render the contract unconscionable.'" *Pilon v. Discovery Commc'ns, LLC*, 769 F. Supp. 3d 273, 296 (S.D.N.Y. 2025) (quoting *Anonymous v. JP Morgan Chase & Co.*, 2005 WL 2861589, at *6 (S.D.N.Y. 2005)); *see also Stoll v. JPMorgan Chase Bank, N.A.*, 2024 WL 4469174, at *6 (E.D.N.Y. July 16, 2024) ("Unconscionability for a contract of adhesion is found where the party seeking to enforce the contract used high pressure tactics or deceptive language in the contract and where there is inequality of bargaining power between the parties. In addition, it must be shown that the contract inflicts substantive unfairness on the weaker party." (citation omitted)); *Klos v. Lotnicze*, 133 F.3d 164, 169 (2d Cir. 1997) (noting that the concept of adhesion contracts "may not be invoked to trump the clear language of the agreement unless there is a disturbing showing of unfairness, undue oppression, or unconscionability").

As TWDC explains, and as set forth elsewhere in this Order, users who sign up for Fubo subscriptions must assent to the Terms, which are available to users and posted on Fubo's website, before using the service. Mot. 3; *see also* Gersen Decl. Ex. B-2, ECF No. 210-3. The reference to the "Terms of Service," appears in blue font and the Terms themselves are hyperlinked. Gersen Decl. Ex. B-2. Before payment is submitted, the Fubo website again includes a notice that, "[b]y clicking 'Submit', [the user] acknowledge[s] that [they] have read and agree to Fubo's Terms of Service." *Id.* at B-5. Again, the Terms are hyperlinked and are underlined. The Terms include an

United States District Court
Northern District of California

Arbitration Agreement and a Class Waiver Provision, along with an option for users to opt out of these portions of the Terms. Mot. at 4. Further, users may opt out and not be bound by the arbitration agreement and class waiver provisions by sending a signed, written opt-out notice to an identified email address; if a user opts out of a prior version of the Terms, Fubo honors any such valid opt outs. *Id.*

The Court finds that, although the Terms are appropriately characterized as a contract of adhesion, the degree of procedural unconscionability resulting from this characterization is de minimis, if it exists at all. This finding does not support an overarching conclusion that the Terms are unconscionable and therefore unenforceable, especially whereas here, there is a 30 day opt-out provision. *See Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 731 (E.D.N.Y. 2017) ("Courts applying New York law have considered an opt-out provision as an important, if not dispositive, factor in rejecting challenges of procedural unconscionability."); *see also Roitman v. T-Mobile USA Inc.*, 2025 WL 3156503, at *9 (E.D.N.Y. July 28, 2025). Further, despite Plaintiffs' arguments to the contrary, the Court finds that the Arbitration Agreement and Class Waiver Provision are not "concealed in dense legalese inaccessible to lay consumers." Opp'n 24. The very first page of the Terms refers to the mandatory arbitration provision and refers users to Section 22, where, in capital letters, the introduction states, "PLEASE READ THIS SECTION CAREFULLY. IT MAY SIGNIFICANTLY AFFECT YOUR LEGAL RIGHTS—INCLUDING YOUR RIGHT TO FILE A LAWSUIT IN COURT (BY REQUIRING YOUR DISPUTE TO BE SUBMITTED TO BINDING ARBITRATION ON AN INDIVIDUAL BASIS) AND LIMITING YOUR RIGHTS TO RESOLVE YOUR DISPUTE AS PART OF A CLASS." Terms § 22. In the first paragraph that follows, users are directed to "read the entirety of Section 22 carefully as it may significantly affect [their] legal rights." And in the immediately succeeding sentence, the Terms state, "Our past, present, and future affiliates and agents, as well as any of our successors and assigns, can invoke Fubo's rights under this agreement in the event they become involved in a dispute." *Id.*

The Court finds that the Terms, including the delegation subclause, are not

unconscionable. Accordingly, the Court finds that the Terms are enforceable.

**E. Putative Class Claims and Class Waiver**

TWDC argues that the Court should dismiss Plaintiffs' putative class claims because Plaintiffs Unger and Prescott agreed to give up their right to litigate claims as part of a class when they assented to the Terms during their sign-up journeys. Mot. 23; *see also* Terms § 22(c). Plaintiffs argue that the class waiver clause "falls with" the Arbitration Agreement. Opp'n 25.

"[T]he Supreme Court has recognized that arbitration agreements may contain waivers of the class action mechanism and require the parties to pursue their claims individually." *Capriole v. Uber Techs., Inc.*, 7 F.4th 854, 869 (9th Cir. 2021) (citing *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018)). Second Circuit precedent likewise affirms the enforceability of class and collective action waivers. *See Guerrero,* 2025 WL 3539105, at *15; *Camilo v. Lyft, Inc.*, 384 F. Supp. 3d 435, 439 (S.D.N.Y. 2019) (bringing New York law-based claims and finding the Supreme Court's decision in *Epic Systems* controlling for the notion that "the Arbitration Act seems to protect pretty absolutely a party's intention to use individualized rather than class or collective action procedures" (internal quotations omitted) (citing *Epic Sys. Corp.*, 138 S. Ct. at 1621)).

Because the Court finds that the Arbitration Agreement is valid, and waivers of the class action mechanism are enforceable, the Court **GRANTS** TWDC's motion to dismiss the class claims.

**F. Plaintiff Unger and Prescott's Individual Claims Stayed Pending Arbitration**

TWDC requests that this Court stay Unger's and Prescott's individual claims pending arbitration pursuant to Section 3 of the FAA. This Section provides that "when a dispute is subject to arbitration, the court 'shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.'" *Smith v. Spizzirri*, 601 U.S. 472, 472 (2024) (citing 9 U.S.C. § 3). The word "shall" requires a court to stay the proceeding. *Id.* at 476–77. Because TWDC may compel arbitration over Plaintiffs' individual claims for the reasons discussed above, the Court **GRANTS** TWDC's request and **STAYS** this

action pending arbitration.

**IV. CONCLUSION**

For the foregoing reasons, TWDC's Motion is **GRANTED** and this case shall be **STAYED** pending the outcome of the arbitration of Plaintiff's individual claims. Because the Terms are valid and by agreeing to them, Plaintiffs waived their right to litigate claims as part of a class, Plaintiffs' putative class claims are **DISMISSED**.

**IT IS SO ORDERED.**

Dated: September 8, 2026

EDWARD J. DAVILA
United States District Judge